FRANK D. HAWKINS, a citizen of the State )
of Georgia; DAVID LEE DOWNING, a )
citizen of the State of Georgia; TERRI S. )
MORTON, a citizen of the State of Georgia; )
LISA CHURCH-RODENHISHER, a citizen )
of the State of Georgia; TRACI E. MULLIS, )
a citizen of the State of Georgia; JANET P. )
JACKSON, a citizen of the State of Georgia; )
AVERY T. LANIUS, a citizen of the State of )
Georgia; DAVID E. WILKES, a citizen of the )
State of Georgia; WOODFORD W. MOSS, a )
citizen of the State of Georgia; MICHAEL E. )
WINTERS, a citizen of the State of Georgia; )
ROBIN W JONES, a citizen of the State of )
Georgia; and JOHN DOE NOS. 1-5, )
                                                                    )
                                          **Defendants.**  )
                                                                    )

## WYETH'S NOTICE OF REMOVAL

Come now the Wyeth Defendants[1] and file this Notice of Removal of this

action from the Superior Court of Muscogee County, Georgia, to the United States

District Court for the Middle District of Georgia, Columbus Division.  For the

reasons stated below, this Court should retain jurisdiction over Plaintiffs' claims.

---

[1] The Wyeth Defendants include: Wyeth, formerly known as American Home Products
Corporation and Wyeth Pharmaceuticals, Inc. (formerly known as Wyeth-Ayerst
Pharmaceuticals, Inc.).



## Preliminary Statement

Plaintiffs allege that they suffer heart valve injuries from the use of the diet drugs fenfluramine (Pondimin®), and/or dexfenfluramine (Redux™). Pondimin often was taken in combination with phentermine. Wyeth sold Pondimin and Redux, but not phentermine. Phentermine was sold by a number of other companies.

All federal diet drug cases have been consolidated before the United States District Court for the Eastern District of Pennsylvania (the "MDL Court") since 1997. The MDL Court has developed unparalleled expertise with respect to the legal and scientific issues presented in diet drug cases. In 2000, the MDL Court approved a nation-wide class action settlement (the "National Settlement"). The settlement class includes all diet drug users except for those who opted out of the class. Plaintiffs allege that, although they are members of the settlement class, they may sue under provisions of the National Settlement that permit class members to file lawsuits in certain circumstances.[2]

There has been an explosion of cases in the diet drug litigation in which plaintiffs attempt to evade the MDL Court by filing lawsuits in state court, fraudulently joining non-diverse defendants against whom there is no reasonable possibility of recovery or

---

[2] It is yet to be determined whether plaintiffs meet the medical and other criteria for being permitted to assert such claims under the terms of the National Settlement. If they do not meet those criteria, an existing injunction entered by the MDL Court bars and enjoins plaintiffs from asserting their claims. Brown v. Am. Home Prods. Corp., Nos. 1203 and 99-20593, 2000 WL 1222042, at *72 (E.D. Pa. Aug. 28, 2000). If this case is transferred to the MDL Court, the MDL Court will determine whether plaintiffs meet those criteria.

any good faith intent to pursue a claim.  The MDL Court addressed this problem in

Anderson v. American Home Products Corporation, 220 F. Supp. 2d 414 (E.D. Pa.

2002), explaining:

> What has been transpiring can only be characterized as a
> sham, at the unfair expense not only of AHP [now known
> as Wyeth] but of many individuals and small enterprises
> that are being unfairly dragged into court simply to
> prevent the adjudication of lawsuits against AHP, the real
> target, in a federal forum.

Id. at 425 (emphasis added).  The Court cautioned that "'so long as federal diversity

jurisdiction exists . . . the need for its assertion may well be greatest when plaintiff tries

hardest to defeat it.'"  Id. (quoting Boyer v. Snap-on Tools Corp., 913 F.2d 108, 111 (3d

Cir. 1990)).

In Anderson, the MDL Court specifically held that the plaintiffs had fraudulently

joined phentermine manufacturers, sales representatives, pharmacies and doctors to try

to defeat diversity jurisdiction.  220 F. Supp. 2d at 420-25.  The MDL Court concluded

that the sales representative defendants were fraudulently joined, noting that the

complaints failed to allege that the sales representatives supplied plaintiffs or their

doctors with any drugs, failed to comply with Federal Rule of Civil Procedure 9(b), and

failed to provide a reasonable basis for any claim under state law.  Id. at 424-25.

The MDL Court again addressed the issue of fraudulent joinder in Weaver v.

Am. Home Prods. Corp., No. 03-20153, slip op. (E.D. Pa. July 30, 2003) (Exhibit 1).

4

Weaver involved six cases removed from Georgia state court and transferred to the MDL Court. There, the MDL Court held that former Wyeth government relations employees, Wyeth sales representatives and a phentermine manufacturer were fraudulently joined. Id. at 10-18. The MDL Court found the Wyeth sales representatives fraudulently joined because plaintiffs did not allege that they or their doctors had any contact with the sales representatives, or that plaintiffs even used the particular diet drug – Redux – that the sales representatives promoted. Id. at 17-18.

Unfortunately, the sham litigation that the MDL Court tried to stop continues. In an effort to avoid the MDL Court, plaintiffs have filed scores of cases in Georgia state courts that fraudulently join defendants in an effort to defeat federal diversity jurisdiction. The Complaint in this case is one example. It incorporates the disparate claims of plaintiffs whose residencies are diverse from the real defendant in this case, Wyeth, but attempts to defeat federal jurisdiction by fraudulently joining as defendants former Wyeth sales representatives.

Plaintiffs' ploy must fail. As demonstrated below, the Wyeth sales representative defendants are fraudulently joined. Plaintiffs have no reasonable basis for a claim against them and no good faith intent to pursue one. Among other things, plaintiffs do not allege that these defendants had any contact with plaintiffs, and plaintiffs cannot show that these defendants harmed plaintiffs in any way.

## The Complaint

1.      Petitioners are defendants in a civil action brought against them on April 21, 2004, in the Superior Court of Muscogee County entitled *Angel, et al. v.Wyeth, Inc., et al.,* bearing Civil Action No. SU-04-CV-1392.

2.      A copy of the Complaint and any process, pleadings and orders served on or by Petitioners are attached to Wyeth's original Notice of Removal as Exhibit 2.

3.      The Complaint names twenty-seven individual plaintiffs.  Based upon the allegations in the Complaint, the plaintiffs are all citizens of the State of Georgia.  Complaint ¶ 1.

4.      The Complaint names as defendants Wyeth (formerly known as American Home Products Corporation) and Wyeth Pharmaceuticals, Inc. (formerly known as Wyeth-Ayerst Pharmaceuticals, Inc.).   Complaint ¶¶ 18, 22. The individuals named as defendants in the Complaint are alleged to be or have been Wyeth or Indevus sales representatives (the "sales representatives"): Rosemary Disimone (formerly Rosemary Stewart), Robert Haines, Marsha Fuller, Jennifer Wiggs, Shannon Buggs, Douglas W. Ray, Frank D. Hawkins, Terri Morton, Lisa Church-Rodenhiser, Traci Mullis, Janet Jackson, Avery Lanius, David Wilkes,

6

Woodford Moss, Michael Winters, David Downing and Robin Jones.   Complaint ¶¶ 26-42.  The only other defendants are alleged to be "John Does."

5.        Wyeth is a Delaware corporation with its principal place of business in New Jersey.  Complaint ¶ 18. Wyeth Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in Pennsylvania.  Complaint ¶ 22. The residencies of Wyeth and Wyeth Pharmaceuticals, Inc. are thus diverse from the residencies of all the plaintiffs.

6.   Based   on   the   allegations   of   the   Complaint   concerning   the   sales representatives, Rosemary Disimone (formerly Rosemary Stewart), Robert Haines, Marsha  Fuller,  Jennifer  Wiggs,  Shannon  Buggs,  Douglas  W.  Ray,  Frank  D. Hawkins,  Terri  Morton,  Lisa  Church-Rodenhiser,  Traci  Mullis,  Janet  Jackson, Avery  Lanius,  David  Wilkes,  Woodford  Moss,  Michael  Winters,  David  Downing and  Robin  Jones  are  citizens  and  residents  of  the  State  of  Georgia.   Complaint  ¶¶ 26-42.

### The Sales Representative Defendants Are Fruadulently Joined

7.        The presence of the sales representatives as defendants does not defeat removal because plaintiffs have no reasonable basis for a claim against them and no good faith intent to pursue a claim against them.

7

8.    The sales representatives visited physicians' offices to "detail" Wyeth's products. Their job was to ensure that physicians were aware of Wyeth's products and could therefore determine whether to prescribe them for particular patients. During the time relevant to this lawsuit, the sales representatives detailed only Redux, not Pondimin or phentermine. They were not involved in developing package inserts and had no control over the content of such materials or warnings given to physicians. They also were not involved in any regulatory approval process for diet drugs. See, e.g Fuller Aff. ¶¶ 2-8; Haines Aff. ¶¶ 2-8; Disimone (formerly Stewart) Aff. ¶¶ 2-8;; Buggs Aff. ¶¶ 2-8; Ray Aff. ¶¶ 2-8; Hawkins Aff. ¶¶ 2-8; Morton Aff. ¶¶ 2-8; Church-Rodenhiser Aff. ¶¶ 2-8; Mullis Aff. ¶¶ 2-8; Jackson Aff. ¶¶ 2-8; Lanius Aff. ¶¶ 2-8; Wilkes Aff. ¶¶ 2-8; Moss Aff. ¶¶ 2-8; Winters Aff. ¶¶ 2-8; Downing Aff. ¶¶ 2-9; and Jones Aff. ¶¶ 2-8 (all attached hereto as Exhibit 3).

9.    Plaintiffs have no reasonable basis for a claim against the sales representatives for several reasons, including the following.

First, none of the plaintiffs allege in the Complaint that they used the diet drug Redux, which is the only diet drug that the sales representatives promoted. Plaintiffs instead vaguely allege that they used fenfluramine (Pondimin®), dexfenfluramine (Redux™), "and/or" phentermine. During the time relevant to

8

this lawsuit, the sales representatives promoted <u>only</u> Redux, not Pondimin or phentermine.

Even if some of the plaintiffs used Redux, and even if they could state a cause of action against the sales representatives, this Court should not permit their claims to be joined with those plaintiffs who only used Pondimin. *See Tapscott v. M.S. Dealer Serv. Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996), *abrogated on other grounds*, *Cohen v. Office Depot*, 204 F.3d 1069 (11th Cir. 2000); *see also Weaver v. Am. Home Prods. Corp.*, No. 03-20153, slip op. at 17-18 (E.D. Pa. July 30, 2003) (Exhibit 1) (only Redux promoted).

<u>Second</u>, Plaintiffs have asserted claims of negligence, fraud and misrepresentation, negligent and reckless misrepresentation, and conspiracy to defraud and fraudulently conceal against the sales representatives.  All of these claims suffer from the same flaw: the sales representatives were unaware that Pondimin and Redux could cause valvular heart disease, the only injury Plaintiffs may sue for under the terms of the Nationwide Class Action Settlement Agreement (the "Settlement Agreement").  The sales representatives did not know of any alleged association between Pondimin and/or Redux and valvular heart disease until the time such allegations were first publicized in July 1997. *See e.g.* Fuller Aff. ¶ 9; Haines Aff. ¶ 9; Disimone (formerly Stewart) Aff. ¶ 9; Buggs Aff. ¶ 9;

9

Ray Aff. ¶ 9; Hawkins Aff. ¶ 9; Morton Aff. ¶ 9; Church-Rodenhiser Aff. ¶ 9; Mullis Aff. ¶ 9; Jackson Aff. ¶ 9 Lanius Aff. ¶ 9; Wilkes Aff. ¶ 9; Moss Aff. ¶ 9; Winters Aff. ¶ 9; Downing Aff. ¶ 10; and Jones Aff. ¶ 9 (Exhibit 3).  Shortly thereafter, Wyeth notified all prescribing physicians about the possible association between Pondimin and Redux and valvular heart disease.  *See* July 24, 1997 letter from Wyeth to physicians (Exhibit 4).

Plaintiffs' negligence claim against the sales representatives is saturated with allegations of the sales representatives' duty and/or failure to warn Plaintiffs regarding the dangers of Pondimin and Redux.  To make a failure to warn claim, however, Plaintiffs must establish that the sales representatives had information about the risks of valvular heart disease that was not publicly available and that they did not disclose.  *See Chrysler Corp. v. Batten*, 264 Ga. 723, 725 n.1, 450 S.E.2d 208 (1994) (holding that defendant "is required to…warn if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge of the danger").  Because the sales representatives did not know about the risks of valvular heart disease, Plaintiffs have no reasonable basis for a failure to warn claim.

The sales representatives furthermore did not have the information, authority, or educational background to independently investigate the accuracy of

~Doc# 557703 01~Doc# 557703 01~

the disclosures prepared by Wyeth.  Nor did the sales representatives have an independent duty to do so.  Employees of a corporation are not liable for the corporation's torts unless they were the "guiding spirit behind the wrongful conduct" or "the central figure in the challenged corporate activity."  *James v. Parke-Davis*, 1:00-CV-1203-JEC, slip op. at 18-19, 21 (N.D. Ga. Nov. 30, 2000) (Carnes, J.) (Exhibit 5).

Additionally, Plaintiffs' claims for fraud and misrepresentation against the sales representatives are not pled with the particularity that O.C.G.A. § 9-11-9(b) requires.  *See JarAllah v. Schoen*, 243 Ga. App. 402, 531 S.E.2d 778 (2000) (upholding dismissal for failing to plead fraud with particularity); *see also Anderson*, 220 F. Supp. 2d at 424-25.  Plaintiffs fail to allege what statements were made or at what time they were made, a failure that establishes that Plaintiffs have no reasonable basis for their claims and have fraudulently joined the sales representatives.  *See, e.g., Allen v. Tyson Foods, Inc.*, 153 F. Supp. 2d 886, 889-90 (S.D. Miss. 2001).

Third, Plaintiffs similarly fail to plead their conspiracy to defraud claims against the sales representatives with the requisite particularity.  Indeed, Plaintiffs do not even identify with whom the sales representatives are claimed to have conspired.  Moreover, the sales representatives in fact did not enter into any

11

agreement concerning the diet drugs with phentermine companies or Indevus. *See, e.g.,* Fuller Aff. ¶¶ 11-12; Haines Aff. ¶¶ 11-12; Disimone (formerly Stewart) Aff. 11-12; Buggs Aff. ¶¶ 11-12; Ray Aff. ¶¶ 11-12; Hawkins Aff. ¶¶ 11-12; Morton Aff. ¶¶ 11-12; Church-Rodenhiser Aff. ¶¶ 11-12; Mullis Aff. ¶¶ 11-12; Jackson Aff. ¶¶ 11-12; Lanius Aff. ¶¶ 11-12; Wilkes Aff. ¶¶ 11-12; Moss Aff. ¶¶ 11-12; Winters Aff. ¶¶ 11-12; Downing Aff. ¶¶ 11-12; and Jones Aff. ¶¶ 11-12 (Exhibit 3). And, as a matter of law, the Wyeth sales representatives could not have conspired with other Wyeth sales representatives or with Wyeth. *See, e.g., Johnson v. Wyeth,* No. 1:02-CV-1368, slip op. at 4 (N.D. Ga. Jan. 3, 2003) (Thrash, J.) at 4 ("[A] corporation cannot conspire with its own employees acting within the scope of their employment.") (Exhibit 6); *Alta Anesthesia Assoc. of Ga., P.C. v. Gibbons,* 245 Ga. App. 79, 85-86, 537 S.E.2d 388, 394-95 (2000) (corporation cannot conspire with itself); *Nailey Northside Chevrolet, Inc. v. Herring,* 215 Ga. App. 185, 188, 450 S.E.2d 452, 455 (1994) (same).

10.     Plaintiffs additionally have no reasonable basis for a claim against defendant sales representative Downing because their claims against him are time-barred.[3] The Georgia statute of limitations for plaintiffs claiming recovery for personal injury is two years, regardless of the legal theory on which the claim is

---

[3]     Under the Settlement Agreement, Wyeth waived certain rights to assert the statute of limitations as a defense on any claim asserted against it.

~Doc# 557703 01~Doc# 557703 01~

brought.  O.C.G.A. § 9-3-33; *Daniel v. Am. Optical Corp.*, 251 Ga. 166, 168, 304 S.E.2d 383, 385 (1983).  The statute of limitations began to run when Plaintiffs knew or should have known of their claims.  *Synalloy Corp. v. Newton*, 254 Ga. 174, 177, 326 S.E.2d 470, 472 (1985).

Wyeth withdrew Pondimin and Redux from the market on September 15, 1997.  Plaintiffs' alleged heart valve injuries from Pondimin and Redux, or phentermine used in combination with those drugs, occurred no later than that time because there is no evidence that the heart valve injuries associated with those drugs is latent.  *Brown v. Am. Home Prods. Corp.*, Nos. 1203 and 99-20593, 2000 WL 1222042, at *46 (E.D. Pa. Aug. 28, 2000) (MDL Court found "no evidence" of heart valve injuries developing later); *see also Ferrell v. Wyeth*, No. 03-20094, slip op. at 7 n.5 (E.D. Pa. Sept. 5, 2003) (Exhibit 7) (MDL Court "found that there is no latency period between the time of diet drug use and injury").  The MDL Court also has held that all class members, including Plaintiffs in this action, are collaterally estopped from asserting now that Pondimin and Redux caused latent injuries to their heart valves.  *See Alexander v. Wyeth*, No. 03-20206, slip op. at 14-15 (E.D. Pa. Jan. 29, 2004) (Exhibit 7).

Moreover, as a matter of law, all diet drug plaintiffs knew or should have known that diet drugs possibly could cause their alleged injuries by September or

October 1997 because of the enormous national and local publicity.  *See* Declaration of Sharon Taylor (Exhibit 8).  This massive publicity clearly put Plaintiffs on inquiry notice of their claims in 1997, and even more so by the Spring of 2000.[4]

The MDL Court recently reviewed some of the voluminous and extensive publicity concerning the diet drugs and held, as a matter of law, that "[i]n light of the massive publicity concerning the health risks...we find that the plaintiff was on inquiry notice...at the very latest by early Spring, 2000." *Ferrell*, slip op. at 17 (Exhibit 9).  The MDL Court accordingly held that the diet drug plaintiff in that action, who had failed to file her complaint until August 2002 despite Alabama's two-year statute of limitations, had no reasonable basis for a claim against her doctor and had fraudulently joined him. *Id.* at 17-18.

Plaintiffs' claims against defendant Downing are similarly time-barred. Despite the massive publicity providing Plaintiffs notice of their claims from 1997 through the Spring of 2000, Plaintiffs did not file their claims until approximately four years later in April 2004.

---

[4] *See United Klans of Am. v. McGovern*, 621 F.2d 152, 154-55 (5th Cir. 1980) (per curiam) (press conference, press release, and publication of Senate report put plaintiff on notice of potential claim); *see also Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548-49 (6th Cir. 2000) (plaintiff should have known of potential claim where publicity was extensive); *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 403-04 (5th Cir. 1998) (newspaper articles and television and radio reports put plaintiff on notice), *cert. denied*, 526 U.S. 1034 (1999).

14

11.    Plaintiffs have no good faith intent to pursue a claim against the sales representative defendants.  Plaintiffs have joined them as defendants solely to attempt to defeat diversity jurisdiction, and not to pursue any claim against them.

12.    If the Court has any doubt that the sales representative defendants are fraudulently joined, it should permit discovery on the issue.

## The "John Doe" Defendants Are Irrelevant

13.    Pursuant to 28 U.S.C. § 1441(a), the citizenship of the alleged "John Does" is to be disregarded for purposes of determining diversity jurisdiction.

## This Case Satisfies The Other Requirements
## For Diversity Jurisdiction And Removal

14.    Based on the allegations and claims in the Complaint, the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs and is a civil action brought in a state court over which the United States District Court has original jurisdiction because there is both a diversity of citizenship between the properly joined parties and the amount in controversy meets the monetary requirements under 28 U.S.C. § 1332.

~Doc# 557703 01~Doc# 557703.01~

15.     All properly joined and served defendants in this case join in this Notice of Removal.  (Exhibit 10).  Wyeth is not required to obtain the consent of the sales representative defendants because they were fraudulently joined.  See, e.g., Stanger v. Am. Home Prods. Corp., Nos. 03-20086 and 03-20088, slip op. at 4-9 (E.D. Pa. May 29, 2003) (Exhibit 11); Anderson v. Am. Home Prods. Corp., 220 F. Supp. 2d 414, 419-22, 424-25 (E.D. Pa. 2002).

16.     The pending action is one that may be removed to this Court, and this Notice of Removal is filed pursuant to 28 U.S.C. § 1441 et seq.

17.     After the filing of this Notice of Removal, Petitioners will promptly give notice thereof to plaintiffs and will file a true and correct copy of this Notice of Removal with the Superior Court of Muscogee County, Georgia.

WHEREFORE, Petitioners pray that this Notice of Removal be filed; that said action being Civil Action No. SU-04-CV-1392 in the Superior Court of Muscogee County, Georgia, be removed to this Court and that no further proceedings be had with respect to those claims in the Superior Court of Muscogee County, Georgia.

Respectfully submitted this __20th__ day of May, 2004.

16

Stephen M. Brooks
Georgia Bar No. 085151

NELSON MULLINS RILEY &
SCARBOROUGH, LLP
Suite 1400
999 Peachtree Street, NE
Atlanta, GA 30309
(404) 817-6000
(404) 817-6050 (facsimile)
*Counsel for Defendants Wyeth f/k/a
American Home Products
Corporation, Wyeth Pharmaceuticals,
Inc. f/k/a Wyeth-Ayerst
Pharmaceuticals, Inc., a Division of
American Home Products
Corporation, Rosemary Stewart,
Robert Haines, Marsha Fuller,
Shannon Buggs, Douglass W. Ray,
Frank D. Hawkins, Terri S. Morton,
Lisa Church-Rodenhisher, Traci E.
Mullis, Janet P. Jackson, Avery T.
Lanius, David E. Wilkes, Woodford
W. Moss, Michael E. Winters and
Robin W. Jones*

17

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

LISA ANGEL; BETTY BATES; THEOLA          )
BATTLE; AGNES BOYD; MICHAEL              )
BROWN; ANQUINETTE CARTER;               )
JANELL CHISM; BERNICE HAWK              )
COBB; MARY JO DIANA; BONNIE             )       **CIVIL ACTION FILE**
EIDSON; BETTY ELLINGER; JESSICA         )
HARROD; ALLYSON JOHNSON; JONI           )       **NO. _____**
LOVELACE; COLIN LUKE; ANGELA            )
LUKE; CATHERINE MATARO; JOYCE           )
PETTIT; LUANN PIERCE; BRENDA            )
ROSSE; SUSAN SPOOR; MONIQUE             )
ST. JULIEN; DEBORAH TERRELL;            )
RAMONA WALKER; NAOMI WALKER;            )
BRENDA WHITE; and MARTHA                )
WIGGINS,                                )
                                        )
                    Plaintiffs,         )
                                        )
v.                                      )
                                        )
WYETH, INC. f/k/a AMERICAN HOME         )
PRODUCTS CORPORATION; WYETH             )
PHARMACEUTICALS, INC. f/k/a WYETH-      )
AYERST PHARMACEUTICALS, INC., a         )
Division of American Home Products      )
Corporation; ROSEMARY STEWART, a        )
citizen of the State of Georgia; ROBERT )
HAINES, a citizen of the State of Georgia; )
MARSHA FULLER, a citizen of the State of )
Georgia; JENNIFER WIGGS, a citizen of the )
State of Georgia; SHANNON BUGGS, a      )
citizen of the State of Georgia; DOUGLASS )
W. RAY, a citizen of the State of Georgia; )
FRANK D. HAWKINS, a citizen of the State )
of Georgia; DAVID LEE DOWNING, a        )
citizen of the State of Georgia; TERRI S. )

18

MORTON, a citizen of the State of Georgia;      )
LISA CHURCH-RODENHISHER, a citizen      )
of the State of Georgia; TRACI E. MULLIS,      )
a citizen of the State of Georgia; JANET P.      )
JACKSON, a citizen of the State of Georgia;      )
AVERY T. LANIUS, a citizen of the State of      )
Georgia; DAVID E. WILKES, a citizen of the      )
State of Georgia; WOODFORD W. MOSS, a      )
citizen of the State of Georgia; MICHAEL E.      )
WINTERS, a citizen of the State of Georgia;      )
ROBIN W JONES, a citizen of the State of      )
Georgia; and JOHN DOE NOS. 1-5,      )
                                                                            )
                                        **Defendants.**   )
                                                                            )

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing **Wyeth's**

**Notice of Removal** upon the parties by depositing same in the United States mail,

in a properly addressed envelope with sufficient postage affixed thereto to ensure

delivery to counsel of record as follows:

W. Lewis Garrison, Jr., Esq.          M. Elizabeth O'Neill, Esq.
Garrison Scott Gamble &             Hawkins & Parnell, LLP
Rosenthal, PC                            303 Peachtree Street, NE
2224 First Avenue North            4000 SunTrust Plaza
Birmingham, AL 35203               Atlanta, GA 30308-3243

Counsel for Plaintiffs

This **20**ᵗ day of May, 2004.

Stephen M. Brooks
Georgia Bar No. 085151

NELSON MULLINS RILEY &
SCARBOROUGH, LLP
Suite 1400
999 Peachtree Street, NE
Atlanta, GA 30309
(404) 817-6000
Fax (404) 817-6050

*Counsel for Defendants Wyeth f/k/a
American Home Products
Corporation, Wyeth Pharmaceuticals,
Inc. f/k/a Wyeth-Ayerst
Pharmaceuticals, Inc., a Division of
American Home Products
Corporation, Rosemary Stewart,
Robert Haines, Marsha Fuller,
Shannon Buggs, Douglass W. Ray,
Frank D. Hawkins, Terri S. Morton,
Lisa Church-Rodenhisher, Traci E.
Mullis, Janet P. Jackson, Avery T.
Lanius, David E. Wilkes, Woodford
W. Moss, Michael E. Winters and
Robin W. Jones*

20

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS<br>(PHENTERMINE, FENFLURAMINE,<br>DEXFENFLURAMINE) PRODUCTS<br>LIABILITY LITIGATION | : | MDL DOCKET NO. 1203 |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| KATIE WEAVER, et al. | : | |
| v. | : | |
| AMERICAN HOME PRODUCTS<br>CORPORATION, NOW KNOWN AS<br>WYETH CORPORATION, et al. | : | CIVIL ACTION NO. 03-20153 |
| WILLIETTE NEASON, et al. | : | |
| v. | : | |
| AMERICAN HOME PRODUCTS<br>CORPORATION, NOW KNOWN AS<br>WYETH CORPORATION, et al. | : | CIVIL ACTION NO. 03-20154 |
| CHARLESE CARTER, et al. | : | |
| v. | : | |
| AMERICAN HOME PRODUCTS<br>CORPORATION, NOW KNOWN AS<br>WYETH CORPORATION, et al. | : | CIVIL ACTION NO. 03-20158 |
| LYNDA PARKER, et al. | : | |
| v. | : | |
| AMERICAN HOME PRODUCTS<br>CORPORATION, NOW KNOWN AS<br>WYETH CORPORATION, et al. | : | CIVIL ACTION NO. 03-20165 |
| SHERRELL COLE, et al. | : | |
| v. | : | |
| AMERICAN HOME PRODUCTS<br>CORPORATION, NOW KNOWN AS<br>WYETH CORPORATION, et al. | : | CIVIL ACTION NO. 03-20171 |

TAM

ZAKARA ROSS, et al.                    :
                                       :
              v.                       :
                                       :
AMERICAN HOME PRODUCTS                 :
CORPORATION, NOW KNOWN AS              :
WYETH CORPORATION, et al.              :   CIVIL ACTION NO. 03-20173
                                       :
————————————————————————————————

                MEMORANDUM AND PRETRIAL ORDER NO. 2946

Bartle, J.                                     July 30, 2003

          Before the court are the motions of plaintiffs in

Weaver, et al. v. American Home Products Corp., et al., Civ. A.

No. 03-20153, Neason, et al. v. American Home Products Corp., et

al., Civ. A. No. 03-20154, Carter, et al. v. American Home

Products Corp., et al., Civ. A. No. 03-20158, Parker, et al. v.

American Home Products Corp., et al., Civ. A. No. 03-20165, Cole,

et al. v. American Home Products Corp., et al., Civ. A. No. 03-

20171, and Ross, et al. v. American Home Products Corp., et al.,

Civ. A. No. 03-20173, to remand these actions to the Superior

Court of Fulton County, Georgia pursuant to 28 U.S.C. § 1446.

          Wyeth, previously known as American Home Products

Corporation, timely removed these six lawsuits to the United

States District Court for the Northern District of Georgia on the

ground of diversity of citizenship.[1]  It asks that we ignore the

————————————————————

1.  Although plaintiff's complaint alleges that Wyeth was
negligent in violating sections of the Federal Food, Drug and
Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq., these contentions
were apparently included to set forth a minimum standard of care
for the pharmaceutical industry towards its customers.  These
claims do not create federal question jurisdiction, because there
is no private right of action for FDCA violations.  21 U.S.C.
                                              (continued...)

                              -2-

citizenship of the non-diverse defendants as well as the non-
diverse plaintiffs because they are fraudulently joined.  The
pending motions are before the undersigned as the transferee
judge in MDL 1203, the mass tort litigation involving the diet
drugs Redux and Pondimin, commonly known as Fen-Phen, which were
manufactured by Wyeth.  Plaintiffs all allege they sustained
heart valve damage as a result of their use of the drugs.

     The complaints name identical defendants:  (1) Wyeth,
the manufacturer of Pondimin and Redux, and a citizen of New
Jersey; (2) two phentermine manufacturers, Eon Labs Manufacturing
("Eon") and Rugby Laboratories, Inc. ("Rugby"), the latter
purportedly being a citizen of Georgia; (3) three Georgia sales
representatives of Wyeth, Anthony D. Adams, Robin W. Jones, and
Avery T. Lanius, who plaintiffs allege marketed and promoted the
diet drugs; and (4) two Wyeth government relations employees,
Robert L. Scott and John A. Molnar, both citizens of Georgia who
plaintiffs maintain provided incorrect information relating to
the safety of the diet drugs to state regulatory entities.[2]  Each
of the six actions names multiple plaintiffs.

---

1.(...continued)
§ 337; Merrell Dow Pharms. Inc. v. Thompson, 478 U.S. 804, 811
(1986); In re: Orthopedic Bone Screw, 193 F.3d 781, 789 (3d Cir.
1999).

2.   The complaints also name "John Does No. 1-5" as defendants.
However, since 28 U.S.C. § 1441(a) states "[f]or purposes of
removal under this chapter, the citizenship of defendants sued
under fictitious names shall be disregarded," we need not address
these defendants in this memorandum.

09-08-2003  12:46pm  From-                                         T-336  P 005  F-699

There are twenty-two plaintiffs in <u>Weaver</u> who are citizens of four states.  One is from Georgia (Katie Weaver), and one is from New Jersey (Jesus Delgado), while the remaining twenty are citizens of either North Dakota or Utah.

In <u>Neason</u>, the seventeen plaintiffs are from six states.  Fifteen are from either Utah, Wisconsin, Wyoming, or North Dakota.  Of the remaining two, one plaintiff is from Georgia (Williette Neason), and the other from New Jersey (Iris Rodriguez).

The <u>Carter</u> action has twenty-three plaintiffs.  They hail from five states.  Again, one comes from Georgia (Charlese Carter), one from New Jersey (Mary Ann Panek), and twenty-one from North Dakota, Idaho or Utah.

Next, in <u>Parker</u>, there are twenty-two claimants from seven states, including one from Georgia (Linda Parker), one from New Jersey (Janet Crews), and the remaining twenty from Minnesota, Montana, Arizona, California, or Illinois.

In <u>Cole</u>, the twenty-five claimants are from five states.  Only one is a citizen of Georgia (Sherrell Cole).  There is one from New Jersey (Stefanie Bounassi) and the remaining twenty-three are listed as being North Dakota, Minnesota, or Utah citizens.

Finally, the <u>Ross</u> complaint names fifteen plaintiffs who are all citizens of either North Dakota, Minnesota or Utah, except for one plaintiff from Georgia (Zonora Ross) and one from New Jersey (Doris Towson).

-4-

Thus, in each of the six cases filed in the Georgia state court, there is only one Georgia plaintiff. Each also names one New Jersey plaintiff. Each case specifies as defendants three Georgia sales representatives, two Georgia government relations employees, one phentermine manufacturer which may be a Georgia citizen, and finally Wyeth, which is a New Jersey citizen. The plaintiffs maintain that remand is appropriate because complete diversity does not exist as required under 28 U.S.C. § 1332(a), given that Georgia plaintiffs Neason, Weaver, Carter, Parker, Ross, and Cole, respectively, have the same citizenship as Rugby and the five Wyeth employees and given that the New Jersey plaintiffs Delgado (Weaver), Rodriguez (Neason), Panek (Carter), Crews (Parker), Towson (Ross), and Bounassi (Cole) have the same citizenship as defendant Wyeth. As noted above, Wyeth counters that the Georgia defendants as well as the New Jersey plaintiffs are fraudulently joined and thus should be disregarded for purposes of determining diversity of citizenship of the parties. Wyeth also claims that the remaining plaintiffs, other than the ones from Georgia, are misjoined under Rule 20(a) of the Federal Rules of Civil Procedure.

I.

Under the federal removal statute, "any civil action brought in a state court of which the district courts of the United States have original jurisdiction may be removed by the defendant or defendants, to the district court." 28 U.S.C. § 1441(a). Federal district courts have original jurisdiction

-5-

over all civil actions between citizens of different states if
the amount in controversy exceeds $75,000, exclusive of interest
and costs.  28 U.S.C. § 1332(a)(1).  Complete diversity is
required.  Owen Equipment and Erection Co., 437 U.S. 365, 373-74
(1978).  If an action originally instituted in a state court
could have been brought in federal court pursuant to diversity
jurisdiction, the defendants may remove it to federal court
provided certain procedures are followed and certain conditions
met.  28 U.S.C. §§ 1441 and 1446.  Similarly, if the federal
court subsequently determines that it does not have subject
matter jurisdiction over a removed action, it must remand the
action to the state court where it originated.  28 U.S.C.
§ 1447(c).  A plaintiff or a defendant may seek to remand the
case, or the court may do so on its own motion.  American Fire &
Cas. Co. v. Finn, 341 U.S. 6, 16-19 (1951); 16 Moore's Federal
Practice, § 107.41[1][b][i] (Matthew Bender 3d ed.).  See also
Moses v. Ski Shawnee, Inc., 2000 WL 1053568 at *2 (E.D. Pa.
July 31, 2000).

     As an MDL court sitting within the Third Circuit,
defendant Wyeth is correct that we must apply the fraudulent
joinder standard of our Court of Appeals, not that of the
Eleventh Circuit.  See In re Korean Airlines Disaster, 829 F.2d
1171, 1174 (D.C. Cir. 1987); In re Ikon Office Solutions, Inc.
Secs. Litig., 86 F. Supp. 2d 481, 485 (E.D. Pa. 2000).

     Under our Court of Appeals decision in Boyer v. Snap-on
Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990), joinder of a

defendant is fraudulent 'where there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendant or seek a joint judgment.'  The presence of a party fraudulently joined cannot defeat removal. Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921). Whether the claims against the joined defendants are viable is, of course, a matter of state law.

We recognize that the burden on Wyeth to establish fraudulent joinder is a heavy one.  Wilson, 257 U.S. at 111.  We "must resolve all contested issues of substantive fact in favor of plaintiff."  Id.  We are also cognizant that the removal statute must be construed narrowly, and "all doubts should be resolved in favor of remand."  Steel Valley Auth. v. Union Switch and Signal Div., 809 F.2d 1006, 1010 (3d Cir. 1987) (citation omitted).  The Supreme Court made it clear in Wilson that if a plaintiff contests a defendant's assertion that joinder of another defendant was a sham to defeat removal, the District Court must determine the facts from the evidence.  Wilson, 257 U.S. at 98.  We are not to decide automatically in favor of remand simply because some facts may be said to be in dispute.

On matters of substantive law, "[i]f there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court."  Boyer, 913 F.2d at 111

-7-

(citation omitted).  We are mindful that our inquiry into Wyeth's
claims of fraudulent joinder is less searching than that
permissible when a party seeks to dismiss a claim under Rule
12(b)(6) of the Federal Rules of Civil Procedure.  Batoff v.
State Farm Ins. Co., 977 F.2d 848, 852 (3d Cir. 1992); see also
Gaul v. Neurocare Diagnostic, Inc., No. 02-CV-2135, 2003 WL
230800, at *2 (E.D. Pa. Jan. 3, 2003).  In other words, simply
because a claim against a party may ultimately be dismissed for
failure to state a claim does not necessarily mean that the party
was fraudulently joined.  In order for this court to remand,
plaintiffs in each case need only establish that there is a
"reasonable basis" for finding at least one claim to be colorable
against any of the Georgia defendants, that is, not "wholly
insubstantial and frivolous," Batoff, 977 F.2d at 852, or that
New Jersey plaintiffs, who are not diverse from Wyeth, are not
egregiously or fraudulently misjoined.  See In re Diet Drugs
(Chaney v. Gate Pharms.), No. Civ. A. 98-20487, 1999 WL 554584,
at *2 (E.D. Pa. July 16, 1999).

        We also conclude that the same principles of fraudulent
joinder apply where a plaintiff is improperly joined with another
plaintiff so as to defeat diversity jurisdiction.  Tapscott v.
M.S. Dealer Service Corp., 77 F.3d 1353, 1360 (11th Cir. 1996)
(overruled on other grounds); In re Benjamin Moore & Co., 309
F.3d 296, 298 (5th Cir. 2002); In re Diet Drugs, 1999 WL 554584.
Even if a non-diverse plaintiff may have a valid cause of action
against a defendant, that plaintiff may not prevent removal based

-8-

09-08-2003   12.47pm   From-                                    T-336   P 010/030   F-699

on diversity of citizenship if there is no reasonable basis for

the joinder of that non-diverse plaintiff with the other

plaintiffs. "Such 'procedural misjoinder' would be a plaintiff's

purposeful attempt to defeat removal by joining together claims

against two or more defendants where the presence of one would

defeat removal and where in reality there is no sufficient

factual nexus among the claims to satisfy the permissive joinder

standard." 14B Wright & Miller, Federal Practice & Procedure

§ 3723 at 656-57 (3d ed. 1998).

While plaintiffs and Wyeth agree that in this case the

federal and Georgia state rules of permissive joinder are

virtually identical, the parties dispute which standard should be

applied in ruling on the issue of fraudulent joinder of

plaintiffs. Here, plaintiffs urge the court to apply the

permissive joinder standard under Georgia law, while Wyeth

believes Rule 20(a) of the Federal Rules of Civil Procedure

governs.

In resolving whether a plaintiff is fraudulently joined

to defeat diversity, we will look to state joinder law. In doing

so, we are simply invoking the same principles as we would invoke

in the more common situation where a defendant is fraudulently

joined. In the single plaintiff case, for example, if there is a

reasonable basis for the state law claim against a non-diverse

defendant, the case may not be removed. Likewise, if the joinder

of multiple plaintiffs is not improper under state law, it cannot

be deemed a fraudulent or egregious effort to avoid federal

jurisdiction any more than the joinder of a defendant is
fraudulent where there is asserted a valid state law claim for
relief.  Federal law does not govern whether a plaintiff has
stated a viable claim against a non-diverse defendant for
purposes of fraudulent joinder.  Similarly, we do not see how
federal joinder rules should apply when the issue is fraudulent
misjoinder of non-diverse plaintiffs in a state court action so
as to defeat our diversity jurisdiction.  Bridgestone v.
Firestone, Inc. v. Ford Motor Co., 260 F. Supp. 2d 722, 728-29
(S.D. Ind. 2003); Conk v. Richards & O'Neil, LLP, 77 F. Supp. 2d
956, 971 (S.D. Inc. 1999).

II.

        We turn first to the issue of fraudulent joinder of the
phentermine defendant Rugby which, according to plaintiffs, is a
citizen of Georgia.[3]  Plaintiffs allege that Rugby failed in its
duty to promote the proper use of phentermine, and failed to warn
plaintiffs and their doctors about contra-indications if
phentermine was used in combination with fenfluramine and/or
dexfenfluramine.

------

3.  Rugby's citizenship is in dispute.  While plaintiffs and
Wyeth agree that the company is incorporated in New York,
plaintiffs contend the presence of Rugby destroys diversity
jurisdiction because its principal place of business is in
Georgia.  Wyeth counters that although Rugby once had its primary
business center in Georgia, in 1998 it moved to California.  In
support of this contention, Wyeth attached Johnson v. Wyeth, No.
1:02-CV-1368-TWT (N.D. Ga., Jan. 3, 2003), in which based on the
admission by Rugby that its principal place of business is
California, Judge Thrash denied plaintiff's motion to remand.
For present purposes, we will assume it is a Georgia citizen.

-10-

09-06-2003  12:48pm  From-                                    T-336  P.013/030  F-699

phentermine alleging that ingestion of their products caused valvular heart disease and primary pulmonary hypertension ("PPH").  As mentioned above, all federal cases were transferred to this court for consolidated discovery proceedings.  Voluminous discovery took place in both MDL 1203 and state court proceedings, including depositions, document review, and the development of expert testimony.  The evidence discovered pointed to fenfluramine and dexfenfluramine as the culprits.

Only two experts were ultimately proffered in MDL 1203 on phentermine causation.  After a Daubert[4] hearing, Judge Louis C. Bechtle of this court[5] granted the motions of the phentermine defendants to exclude this opinion testimony that using phentermine in combination with fenfluramine "induces greater cardiovascular toxicity than does fenfluramine alone." Memorandum and Pretrial Order No. 1351 at 29 (June 28, 2000). The court found that "at this time, no epidemiologic data support the position that phentermine, when combined with fenfluramine, increases the risk of PPH or VHD in humans."  Id. at 15.  It concluded that the proffered experts lacked reliability and a sufficient scientific basis for their opinions.  See Daubert, 526 U.S. at 589-90; Fed. R. Evid. 702.

---

4.  In Daubert v. Merrell Dow Pharms., Inc., 526 U.S. 579, 589-90 (1999), the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony.  The holding has now been incorporated into Rule 702 of the Federal Rules of Evidence.

5.  Judge Bechtle retired on June 30, 2001.

Similar results were reached by other courts.  For example, Wyeth identified in <u>Anderson</u> over thirty cases where courts have granted the motions of phentermine defendants to exclude scientific evidence of phentermine causation under <u>Daubert</u> or its state law equivalents.  These courts have granted motions for summary judgment or other motions based on plaintiffs' failure to produce admissible scientific evidence demonstrating that phentermine causes valvular heart disease or PPH.  In fact, no case has been brought to our attention in which a court has found scientifically reliable evidence of phentermine causing valvular heart disease or PPH.

In our role as the MDL court, we necessarily have a broader perspective than is available to a court faced with an individual fen-phen case.  We conclude that as in <u>Anderson</u>, <u>Stanger</u> and <u>Haslam</u>, plaintiffs here "have no real intention in good faith to seek a judgment against the phentermine defendants and that as a result the phentermine defendants are fraudulently joined in these actions."  <u>Anderson</u>, 220 F. Supp. 2d at 422; <u>Stanger</u>, slip op. at 9; <u>Haslam</u>, slip op. at 9.  Complicity between plaintiffs and the phentermine defendants will not be allowed to eviscerate federal diversity jurisdiction.

III.

We turn next to Wyeth's allegation that in each of the six cases before us, Wyeth's two government relations employees, Robert L. Scott and John A. Molnar, are fraudulently joined as defendants.  They are both Georgia citizens, and plaintiffs

-13-

assert claims for negligence and negligent/reckless
misrepresentation against them based on their allegedly false and
misleading statements about diet drugs.  Plaintiffs state Scott
and Molnar were part of a plan to keep the drugs on the market,
and knowing the dangers of the diet drugs, negligently made false
and misleading representations to state pharmaceutical boards and
regulators in the course of lobbying those bodies.  Weaver Compl.
at ¶ 50; Neason Compl. at ¶ 45; Carter Compl. at ¶ 51; Parker
Compl. at ¶ 50; Cole Compl. ¶ 53; Ross Compl. at ¶ 45.

Plaintiffs have "no reasonable basis in fact or
colorable ground supporting the claims" against Scott or Molnar.
Boyer, 935 F.2d at 111.  First, plaintiffs have not alleged they
or their physicians relied on defendants' alleged misstatements.
Reliance by the plaintiff, either direct or indirect, is an
essential element of a pharmaceutical negligent misrepresentation
action.  Johnson v. Wyeth, No. 1:02-CV-1368, slip op. at 4 (N.D.
Ga. Jan. 3, 2002).  Instead, plaintiffs allege they were
indirectly harmed by their reliance upon regulatory bodies who
mistakenly believed the drugs were safe based on the alleged
misrepresentations.  However, despite Scott and Molnar's efforts
to have certain regulators "deschedule" the diet drugs, that is,
remove them from the state schedule of tightly controlled
substances, the sale of diet drugs in those states continued to
be subject to the same regulatory restrictions as they had been
before those activities.  Given that their attempts were

-14-

unsuccessful, nothing Scott or Molnar did could therefore have
caused plaintiffs' alleged harm.

Even if plaintiffs could show misrepresentation
followed by indirect harm, which plaintiffs assert is supported
by Florida Rock & Tank Lines, Inc. v. Moore, 365 S.E. 2d 836 (Ga.
1998), plaintiffs fail to come forth with anything to support any
allegation that Scott and Molnar *intended* to defraud them.  In
Moore, the Georgia Supreme Court held the reliance requirement of
a fraud claim is satisfied where "[the defendant], having as his
objective to defraud [the plaintiff], and knowing that [the
plaintiff] will rely upon [a third party], fraudulently induces
[the third party] to act in some manner on which [the plaintiff]
relies, and whereby [the defendant's] purpose of defrauding [the
plaintiff] is accomplished."  Moore, 365 S.E.2d at 837.  Although
negligent misrepresentation is a lesser-included charge of fraud,
plaintiffs cannot meet the requirements of Moore.  Smiley v.
S & J Inves., Inc., 2003 WL 256970 at *7 (Ga. App. Feb. 7, 2003).
As in Lawson v. Smith and Nephew Richards, Inc., plaintiffs offer
no evidence from which the fact-finder could infer that the
plaintiffs relied on any act of the government regulatory entity
to which defendants allegedly supplied false information.
Similarly, plaintiffs proffer nothing to establish that
defendants knew the plaintiffs would rely on the acts of the
government entity, No. Civ. 4:96-CV029, 1999 WL 1129677, at *7
(W.D. Ga. Sept. 30, 1999).

Further, even if plaintiffs had shown reliance, they
have not complied with Georgia statutory law. See Hawks v.
Hinely, 556 S.E.2d 547, 551 (Ga. App. 2001). O.C.G.A. 9-11-11.1
states in relevant part:

> For any claim asserted against a person or
> entity arising from an act ... which could
> reasonably be construed as an act in
> furtherance of the right of free speech or
> the right to petition government ... the
> party asserting the claim ... shall be
> required to file ... a written verification
> .... If the claim is not verified as
> required by this subsection, it shall be
> stricken unless it is verified within ten
> days after the omission is called to the
> attention of the party asserting the claim.

O.C.G.A. 9-11-11.1(b) (emphasis added). The speech referred to
by this provision is broadly defined as:

> [a]ny written or oral statement, writing or
> petition ... made ... to a legislative,
> executive proceeding ... or in connection
> with an issue under consideration or review
> by a legislative, executive or judicial body.

O.C.G.A. 9-11-11.1(c). Defendants Scott and Molnar's lobbying
efforts to have the diet drugs "descheduled," and to discuss the
drugs with various government entities is clearly the type of
speech intended to be protected under the statute. Wyeth
notified plaintiffs that their claims did not comply with the
statute in their removal petition filed on February 3, 2003, and
plaintiffs never responded with proper verification. Where
plaintiffs are notified that they have failed to verify such a
claim in accordance with this statute and do not cure this
failure within ten days after the defect is called to their
attention, such claims "must be stricken." Hawks, 556 S.E.2d at

-16-

551.  We therefore conclude that plaintiffs in all six cases have
no colorable claim against Scott and Molnar and that they are
fraudulently joined.

IV.

Wyeth also contends that the three sales
representatives - Anthony D. Adams, Robin W. Jones, and Avery T.
Lanius - are fraudulently joined.  All three are citizens of
Georgia, and thus non-diverse from plaintiffs Weaver, Neason,
Carter, Parker, Cole and Ross, respectively.  Plaintiffs have
brought claims against the sales representatives, along with
Wyeth, for their alleged negligence and negligent/reckless
misrepresentation by marketing the "unreasonably dangerous
subject drugs" as safe to the consuming public, "including, but
not limited to, plaintiffs and *plaintiff's physicians*." Weaver
Compl. at ¶ 146, 56, 59, 62; Neason Compl. at ¶ 141, 51, 54, 57;
Carter Compl. at ¶ 147, 57, 60, 63; Parker Compl. at ¶ 146, 56,
59, 62; Cole Compl. at ¶ 149, 59, 62, 65; Ross Compl. at ¶ 141,
51, 54, 57 (emphasis added).

The plaintiffs' complaints do not allege that any of
these Wyeth representatives had contact with them or their
doctors, that they made any specific misrepresentations to the
doctors, or that the doctors relied on any of their
misrepresentations.  Further, it is undisputed that the duties of
the sales representatives' consisted solely of making visits to
physicians in Georgia to discuss Redux, not Pondimin.  A
spreadsheet produced by plaintiffs' counsel listing plaintiffs'

-17-

doctors and diet drugs ingested shows that five of the six
Georgia plaintiffs - all but Neason - ingested Pondimin, not
Redux.

Under Georgia law pleadings are generally liberally
construed in the light most favorable to plaintiffs with all
doubts resolved in their favor, Snooty Fox, Inc. v. First
American Inv. Corp., 241 S.E. 2d 47 (Ga. App. 1977).
Nonetheless, plaintiffs must still demonstrate by a "short and
plain statement of the claim [that they are] entitled to relief."
O.C.G.A. 9-11-8.  The pleadings simply do not allege colorable
claims against Adams, Jones, or Lanius, the Wyeth sales
representatives.  We therefore find that they too were
fraudulently joined.

V.

Plaintiffs additionally ask the court to remand this
action to state court because at least one of the plaintiffs in
each case is a citizen of New Jersey, the same state of which
defendant Wyeth is a citizen.[6]  Wyeth asserts that in each case,
the single New Jersey plaintiff was egregiously and fraudulently
misjoined to evade federal jurisdiction.  As discussed above, we
look to Georgia's joinder law to determine if there is any
reasonable basis for joining them as plaintiffs in these six
actions.

─────────────

6.  Wyeth is incorporated in New Jersey and maintains its
principal place of business in Pennsylvania.

-18-

The Georgia permissive joinder statute, which incidentally is virtually identical to Rule 20(a) of the Federal Rules of Civil Procedure, provides in relevant part:

> All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action.

O.C.G.A. 911-20(a).  Thus, if any New Jersey plaintiff makes at least one claim that arises out of the "same transaction [or] occurrence" as those of the Georgia co-plaintiffs in their individual cases, then joinder is proper, and diversity jurisdiction does not exist.

Plaintiffs argue that the New Jersey plaintiffs' allegations against Wyeth and its representatives are grounded on this same series of occurrences because all plaintiffs' claims arise out of the ingestion of either Pondimin or Redux and are against the same defendants under the same legal thesis.  We are not persuaded.  The Georgia Court of Appeals in Howard Motor Co., Inc. v. Swint, 448 S.E. 2d 713 (Ga. App., 1994) explained that

> O.C.G.A. § 9-11-20(a) authorizes joinder of separate plaintiffs' claims if they arise out of the *same* transaction, occurrence, or series of transactions or occurrences. It does not authorize joinder of claims arising out of "similar" transactions .... Even under a liberal construction, the statutory requirement that an occurrence or series of occurrences be the *same* is obviously not satisfied by the fact that there is a "logical relationship" between them.

Id. at 714.

-19-

The "claims of plaintiffs who have not purchased or received diet drugs from an identical source, such as a physician, hospital or diet center, do not satisfy the [same] transaction or occurrence requirement." In re Diet Drugs at *4; See also Simmons v. Wyeth Labs, 1996 WL 617492, at *4 (E.D. Pa. Oct. 24, 1996). Here, there are no allegations that a Georgia physician, much less the same physician, prescribed the diet drugs to New Jersey plaintiffs Delgado, Rodriguez, Panek, Crews, Bounassi or Towson. Instead, these six plaintiffs reside far from Georgia, and from what is before us were prescribed diet drugs by different doctors at different times. Further, plaintiffs allege only that they took Redux, Pondimin and/or phentermine – not necessarily the same combination of drugs or for the same amount of time. Different evidence surely will be required to litigate the claims of each of the New Jersey plaintiffs, such that judicial economy would not be served by trying them together. In sum, the claims of plaintiffs clearly do not arise out of the same transaction, occurrence, or series of occurrences. Accordingly, we conclude that the New Jersey plaintiffs are egregiously and fraudulently misjoined under Georgia law. See Howard, 448 S.E. 2d at 714. Thus, we will disregard their citizenship for purposes of determining this court's subject matter jurisdiction.

V.

Defendants Scott, Molnar, Adams, Jones, and Lanius, all Georgia citizens, as well as defendant Rugby, purportedly a

-20-

citizen of Georgia, are fraudulently joined.  Plaintiffs from New

Jersey are also fraudulently misjoined.  As a result, we have

diversity jurisdiction over these six actions.  We now turn to

the issue of possible misjoinder under Rule 20(a) of the Federal

Rules of Civil Procedure of remaining plaintiffs – that is, those

who are not citizens of Georgia or New Jersey.  "Once the court

properly exercises jurisdiction, the Federal Rules of Civil

Procedure may be applied to shape this civil action to one that

comports with those Rules."  In re Diet Drugs at *4.  The federal

rule of permissive joinder provides in relevant part:

> All persons may join in one action as
> plaintiffs if they assert any right to relief
> jointly, severally, or in the alternative in
> respect of or arising out of the same
> transaction, occurrence, or series of
> transactions or occurrences and if any
> question of law or fact common to all these
> persons will arise in the action.

Fed. R. Civ. P. 20(a).  Since the language of Rule 20(a) of the

Federal Rules of Civil Procedure is virtually identical to

O.C.G.A. 9-11-20(a), our analysis mirrors our analysis above.

Therefore, if the additional plaintiffs make at least one claim

that arises out of the "same transaction [or] occurrence" as

those of the Georgia plaintiffs, then joinder is proper.

However, as we discussed above in the context of O.C.G.A. 9-11-

20(a), we find that under Rule 20(a) of the Federal Rules of

Civil Procedure, the claims of the pharmaceutical plaintiffs who

had drugs prescribed by different doctors for different time

periods do not arise out of the same "transaction, occurrence, or

series of transactions or occurrences."

-21-

Again, plaintiffs point to no evidence that the non-Georgia plaintiffs purchased or received the drugs from an identical source, such as a physician, hospital or diet center. In re Diet Drugs, 1999 WL 554584 at *4.  Instead, these plaintiffs reside in various states throughout the country, and were prescribed different diet drugs by different doctors at different times.  Our decision comports with those of other courts, who have similarly found misjoinder where the only connection among plaintiffs is their use of certain pharmaceuticals or a pharmaceutical medical device.  For example, in In re Rezulin Prods. Liabl. Litig., 2002 WL 548750, at *2 (S.D.N.Y. Apr. 12, 2002), the court held that "the joinder of plaintiffs who have no connection to each other aside from the fact that they ingested Rezulin is misjoinder."

Due to these variances, we find that the claims of the non-Georgia plaintiffs in each of the six cases did not arise out of the same transaction, occurrence, or series of occurrences as the Georgia plaintiffs.  Accordingly, we conclude they are misjoined under Rule 20(a), and will exercise our discretion under Rule 21 to dismiss their claims without prejudice to their right to file individual actions against Wyeth.

VI.

In sum, we will deny the motions of plaintiffs to remand the six actions to the Superior Court of Fulton County, Georgia.  We will dismiss the claims against defendants Scott, Molnar, Adams, Jones, Lanius and Rugby as fraudulently joined.

-22-

We will also dismiss the actions of the New Jersey plaintiffs against Wyeth without prejudice because said plaintiffs are fraudulently misjoined with the Georgia plaintiffs under O.C.G.A. 9-11-20(a).  Finally, pursuant to Rule 21 of the Federal Rules of Civil Procedure, we will dismiss the claims of the remaining non-Georgia plaintiffs because of misjoinder under Rule 20(a) of the Federal Rules of Civil Procedure without prejudice to their right to reinstitute suit against Wyeth.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS<br>(PHENTERMINE, FENFLURAMINE,<br>DEXFENFLURAMINE) PRODUCTS<br>LIABILITY LITIGATION | : <br> : <br> : <br> : <br> : | MDL DOCKET NO. 1203 |
| THIS DOCUMENT RELATES TO: | : | |
| KATIE WEAVER, et al. | : <br> : | |
| v. | : <br> : | |
| AMERICAN HOME PRODUCTS<br>CORPORATION, NOW KNOWN AS<br>WYETH CORPORATION, et al. | : <br> : <br> : | CIVIL ACTION NO. 03-20153 |
| WILLIETTE NEASON, et al. | : | |
| v. | : <br> : | |
| AMERICAN HOME PRODUCTS<br>CORPORATION, NOW KNOWN AS<br>WYETH CORPORATION, et al. | : <br> : <br> : | CIVIL ACTION NO. 03-20154 |
| CHARLESE CARTER, et al. | : | |
| v. | : <br> : | |
| AMERICAN HOME PRODUCTS<br>CORPORATION, NOW KNOWN AS<br>WYETH CORPORATION, et al. | : <br> : <br> : | CIVIL ACTION NO. 03-20158 |
| LYNDA PARKER, et al. | : | |
| v. | : <br> : | |
| AMERICAN HOME PRODUCTS<br>CORPORATION, NOW KNOWN AS<br>WYETH CORPORATION, et al. | : <br> : <br> : | CIVIL ACTION NO. 03-20165 |
| SHERRELL COLE, et al. | : | |
| v. | : <br> : | |
| AMERICAN HOME PRODUCTS<br>CORPORATION, NOW KNOWN AS<br>WYETH CORPORATION, et al. | : <br> : <br> : | CIVIL ACTION NO. 03-20171 |

ZAKARA ROSS, et al.                    :

             v.                        :
                                       :
AMERICAN HOME PRODUCTS                 :
CORPORATION, NOW KNOWN AS              :
WYETH CORPORATION, et al.              :   CIVIL ACTION NO. 03-20173
_____:

PRETRIAL ORDER NO. 2946

AND NOW, this 30th day of July, 2003, for the reasons
set forth in the accompanying Memorandum, it is hereby ORDERED
that:

(1)  the motion of plaintiffs in Weaver, et al. v.
American Home Products Corp., et al., Civ. A. No. 03-20153
("Weaver") to remand to the Superior Court of Fulton County,
Georgia is DENIED;

(2)  all claims in Weaver against defendants Rugby
Laboratories, Inc., Anthony D. Adams, Robin W. Jones, Avery T.
Lanius, Robert L. Scott and John A. Molnar are DISMISSED;

(3)  the claims of the New Jersey plaintiff, Jesus
Delgado, against Wyeth in Weaver are DISMISSED without prejudice;

(4)  the claims of the remaining non-Georgia
plaintiffs, Marc Haug, Don Herrly, Paulette Neva, Deborah McCann,
Helen Lang, P. Susan Kollman, Cyndi Zueger, Debra Wold, Carol
McConnell, Edith Sailer, Jill Rarick, Arlene Huff, Merriann
Isaac, Sharlene McDearman, Suzanne Wilson, Ruth Samuels, Kathryn
Perkins, Patricia O'Neil, Jerry Chavez and Carol Galliett,
against Wyeth in Weaver are DISMISSED without prejudice;

-2-

(5)  the motion of plaintiffs in <u>Neason, et al. v.</u> <u>American Home Products Corp., et al.</u>, Civ. A. No. 03-20154 ("<u>Neason</u>") to remand to the Superior Court of Fulton County, Georgia is DENIED;

(6)  all claims in <u>Neason</u> against defendants Rugby Laboratories, Inc., Anthony D. Adams, Robin W. Jones, Avery T. Lanius, Robert L. Scott and John A. Molnar are DISMISSED;

(7)  the claims of the New Jersey plaintiff, Iris Rodriguez, against Wyeth in <u>Neason</u> are DISMISSED without prejudice;

(8)  the claims of the remaining non-Georgia plaintiffs, Candyce Jaramillo, Margaret Duncan, Robert Rohrer, Kathryn Rasmussen, Leanna Mittleider, Rebecca Hoselton, Sheila Braunberger, Evelyn Helmer, Teresa Potter, Julie Sailor, Elizabeth Anderson, Sandra Sommers, Traci Bertsch, Trude Hendrickson and Brenda Nygard against Wyeth in <u>Neason</u> are DISMISSED without prejudice;

(9)  the motion of plaintiffs in <u>Carter, et al. v.</u> <u>American Home Products Corp., et al.</u>, Civ. A. No. 03-20158 ("<u>Carter</u>") to remand to the Superior Court of Fulton County, Georgia is DENIED;

(10)  all claims in <u>Carter</u> against defendants Rugby Laboratories, Inc., Anthony D. Adams, Robin W. Jones, Avery T. Lanius, Robert L. Scott and John A. Molnar are DISMISSED;

(11)  the claims of the New Jersey plaintiff, Mary Ann Panek, against Wyeth in <u>Carter</u> are DISMISSED without prejudice;

-3-

(12)  the claims of the remaining non-Georgia
plaintiffs, Lisa Baumler, Deborah Lee, Annamarie Herrly, Pamela
Fladeland, Norma Rudel, Ardis Bahr, Jody Nelson, Janet Meyer,
Patricia Huff, Gayle Weatherston, Jeffery Huff, Ilene Allen,
Daniel Jetty, Alicia Myer, Cheryl Smith, Mary Velasquez, Susan
Duncan, Marita Rollins, Merlene Robertson, Brenda Jorgensen and
Nanette Orton against Wyeth in Carter are DISMISSED without
prejudice;

(13)  the motion of plaintiffs in Parker, et al. v.
American Home Products Corp., et al., Civ. A. No. 03-20165
("Parker") to remand to the Superior Court of Fulton County,
Georgia is DENIED;

(14)  all claims in Parker against defendants Rugby
Laboratories, Inc., Anthony D. Adams, Robin W. Jones, Avery T.
Lanius, Robert L. Scott and John A. Molnar are DISMISSED;

(15)  the claims of the New Jersey plaintiff, Janet
Crews, against Wyeth in Parker are DISMISSED without prejudice;

(16)  the claims of the remaining non-Georgia
plaintiffs, Tracy Lee, Lynda Scholin, Jeri Giefer, Mary Rutten,
Penny Taylor, Deborah Figarelle, Leah Miller, John Jensen,
Geraldine Cottrell, Wayne Stokka, June Hoffman, Paula Martin,
Lisa Miller, Dana Stockert, Wendy Fultz, Susan Lindemoen, Luann
Larson, Karen Jackson, Pamela Skogen and Mary Hall against Wyeth
in Parker are DISMISSED without prejudice;

(17)  the motion of plaintiffs in Cole, et al. v.
American Home Products Corp., et al., Civ. A. No. 03-20171

-4-

("Cole") to remand to the Superior Court of Fulton County, Georgia is DENIED;

(18)  all claims in Cole against defendants Rugby Laboratories, Inc., Anthony D. Adams, Robin W. Jones, Avery T. Lanius, Robert L. Scott and John A. Molnar are DISMISSED;

(19)  the claims of the New Jersey plaintiff, Stefanie Bounassi, against Wyeth in Cole are DISMISSED without prejudice;

(20)  the claims of the remaining non-Georgia plaintiffs, Cheryl Hoban, Geraldine Lies, Olinda McCabe, Carrie Nelson-Hartman, Vicky Ortiz, Lisa Anderson, Mary Bergquist, Wendy Brovold, Gail Davidson, Cheryl Gumke, Chandace Woehlhaff, Kristy Kongslie, Karen Olson, Karen Ramsey, Bonnie Sandeen, Bonnie Simmons, Janice Strande, Dedriene Taylor, Terri Hams, Marilyn Aiken, Bettery J. Montgomery, Patricia Bailey-Stuhr and Diane Talbot against Wyeth in Cole are DISMISSED without prejudice;

(21)  the motion of plaintiffs in Ross, et al. v. American Home Products Corp., et al., Civ. A. No. 03-20173 ("Ross") to remand to the Superior Court of Fulton County, Georgia is DENIED;

(22)  all claims in Ross against defendants Rugby Laboratories, Inc., Anthony D. Adams, Robin W. Jones, Avery T. Lanius, Robert L. Scott and John A. Molnar are DISMISSED;

(23)  the claims of the New Jersey plaintiff, Doris Towson, against Wyeth in Ross are DISMISSED without prejudice; and

-5-

(24)  the claims of the remaining non-Georgia plaintiffs, Mary Ehni, Delemma Greywater, Clinton Sauter, Margaret Schwab, Sue Nieland, Becky Meek, Richard Nicklos, Mary Tintes, Susan Olson-Edwardson, Doug Waters, Colleen Bergeron, Sheri Coleman, Holly Anderson, Enid Haslam and Kelly Hoss against Wyeth in <u>Ross</u> are DISMISSED without prejudice.

BY THE COURT:

Harvey Bartle  
                                                      J.

IN THE SUPERIOR COURT OF MUSCOGEE COUNTY
STATE OF GEORGIA

LISA ANGEL, et al                    )
                                     )
        Plaintiffs,                  )
                                     )
vs.                                  )    CIVIL ACTION FILE NO. _Suo4Cv 1392_
                                     )
WYETH, INC., et al                   )
                                     )
        Defendants.                  )

---

# S U M M O N S

---

This service by Sheriff or Certified Server of this Summons is initiated upon the written request of Plaintiffs' attorney pursuant to the Georgia Rules of Civil Procedure.

Robert Haines
30 Spring Court
Midland, GA 31820

## NOTICE TO DEFENDANT(S)

The complaint which is attached to this summons is important, and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the complaint, to W. Lewis Garrison, Jr., GARRISON, SCOTT, GAMBLE & ROSENTHAL, P.C., 2224 First Avenue North, Birmingham, AL, 35203. THE ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS AFTER THE SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR YOUR HOME, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR FOR OTHER THINGS DEMANDED IN THE COMPLAINT. You must file the original of your Answer with the Clerk of this Court within reasonable time afterward.

DATED: _April 21, 2004_      _____
                             CLERK OF THE COURT

GEORGIA, MUSCOGEE COUNTY
CLERK'S OFFICE, SUPERIOR COURT
FILED IN OFFICE

APR 2 1 2004

A1 _____
              DEPUTY
      CLERK, SUPERIOR COURT

IN THE SUPERIOR COURT OF MUSCOGEE COUNTY
STATE OF GEORGIA

LISA ANGEL, et al          )
                           )
    Plaintiffs,            )
                           )
vs.                        )      CIVIL ACTION FILE NO. _____
                           )
WYETH, INC., et al         )
                           )
    Defendants.            )

---

## S U M M O N S

---

This service by Certified Mail of this Summons is initiated upon the written request of Plaintiffs' attorney pursuant to the Georgia Rules of Civil Procedure.

Janet P. Jackson
3410 Grove Park Drive
Duluth, GA 30096

### NOTICE TO DEFENDANT(S)

The complaint which is attached to this summons is important, and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the complaint, to W. Lewis Garrison, Jr., GARRISON, SCOTT, GAMBLE & ROSENTHAL, P.C., 2224 First Avenue North, Birmingham, AL, 35203. THE ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS AFTER THE SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR YOUR HOME, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR FOR OTHER THINGS DEMANDED IN THE COMPLAINT. You must file the original of your Answer with the Clerk of this Court within reasonable time afterward.

DATED: __4-21-04__          _____
                           CLERK OF THE COURT

IN THE SUPERIOR COURT OF MUSCOGEE COUNTY
STATE OF GEORGIA

LISA ANGEL, BETTY BATES,              )
THEOLA BATTLE, AGNES BOYD,            )
MICHAEL BROWN, ANQUINETTE             )
CARTER, JANELL CHISM, BERNICE         )
HAWK COBB, MARY JO DIANA,             )
BONNIE EIDSON, BETTY ELLINGER,        )
JESSICA HARROD, ALLYSON JOHNSON,)
JONI LOVELACE, COLIN LUKE,            )
ANGELA LUKE, CATHERINE MATARO,        )
JOYCE PETTIT, LUANN PIERCE,           )
BRENDA ROSSE, SUSAN SPOOR,            )
MONIQUE ST. JULIEN, DEBORAH           )
TERRELL, RAMONA WALKER,               )
NAOMI WALKER, BRENDA WHITE,           )
and MARTHA WIGGINS,                   )
                                      )
        Plaintiffs,                   )
                                      )
vs.                                   )     CIVIL ACTION FILE NO. _S404CV 1392_
                                      )
WYETH, INC., f/k/a AMERICAN HOME      )
PRODUCTS CORPORATION; WYETH           )
PHARMACEUTICALS, INC. f/k/a WYETH-    )
AYERST PHARMACEUTICALS, INC., a       )
Division of American Home Products    )
Corporation;, ROSEMARY STEWART, a     )
citizen of the State of Georgia; ROBERT )
HAINES, a citizen of the State of Georgia; )
MARSHA FULLER; a citizen of the State )
of Georgia; JENNIFER WIGGS, a citizen )
of the State of Georgia; SHANNON      )
BUGGS, a citizen of the State of Georgia; )
DOUGLASS W. RAY, a citizen of the State )
of Georgia; FRANK D. HAWKINS, a citizen )
of the State of Georgia; DAVID LEE    )
DOWNING, a citizen of the State of    )
Georgia; TERRI S. MORTON, a citizen of )
the State of Georgia; LISA CHURCH-    )
RODENHISHER, a citizen of the State of )
Georgia;  TRACI E. MULLIS, a citizen of )
the State of Georgia; JANET P. JACKSON,)



GEORGIA, MUSCOGEE COUNTY
CLERK'S OFFICE, SUPERIOR COURT
FILED IN OFFICE

APR 2 1 2004

At _____

DEPUTY
CLERK, SUPERIOR COURT

IN THE SUPERIOR COURT OF MUSCOGEE COUNTY
STATE OF GEORGIA

LISA ANGEL, et al )
)
    Plaintiffs, )
)
vs. )    CIVIL ACTION FILE NO. _____
)
WYETH, INC., et al )
)
    Defendants. )

---

## S U M M O N S

---

This service by Certified Mail of this Summons is initiated upon the written request of Plaintiffs' attorney pursuant to the Georgia Rules of Civil Procedure.

Shannon Buggs
9250 Sourwood Drive
Gainesville, Georgia 30506

### NOTICE TO DEFENDANT(S)

    The complaint which is attached to this summons is important, and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the complaint, to W. Lewis Garrison, Jr., GARRISON, SCOTT, GAMBLE & ROSENTHAL, P.C., 2224 First Avenue North, Birmingham, AL, 35203. THE ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS AFTER THE SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR YOUR HOME, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR FOR OTHER THINGS DEMANDED IN THE COMPLAINT. You must file the original of your Answer with the Clerk of this Court within reasonable time afterward.

DATED: _4-21-04_

_Received 5/12/04_

CLERK OF THE COURT

GEORGIA, MUSCOGEE COUNTY
CLERK'S OFFICE, SUPERIOR COURT
FILED IN OFFICE

APR 21 2004

a citizen of the State of Georgia; AVERY )
T. LANIUS, a citizen of the State of )
Georgia; DAVID E. WILKES, a citizen of )
the State of Georgia; WOODFORD W. )
MOSS, a citizen of the State of Georgia; )
MICHAEL E. WINTERS, a citizen of the )
State of Georgia; ROBIN W. JONES, a )
citizen of the State of Georgia, and )
JOHN DOE NOS. 1-5, )
 )
       Defendants. )

## COMPLAINT FOR DAMAGES

COME NOW the Plaintiffs and set forth their complaint for Damages against

Defendants as follows:

### Introduction

1.

Plaintiffs LISA ANGEL, BETTY BATES, THEOLA BATTLE, AGNES BOYD,

MICHAEL BROWN, ANQUINETTE CARTER, JANELL CHISM, BERNICE HAWK

COBB, MARY JO DIANA, BONNIE EIDSON, BETTY ELLINGER, JESSICA HARROD,

ALLYSON JOHNSON, JONI LOVELACE, COLIN LUKE, ANGELA LUKE, CATHERINE

MATARO, JOYCE PETTIT, LUANN PIERCE, BRENDA ROSSE, SUSAN SPOOR,

MONIQUE ST. JULIEN, DEBORAH TERRELL, RAMONA WALKER, NAOMI WALKER,

BRENDA WHITE, and MARTHA WIGGINS are citizens and residents of the State of

Georgia who are suffering from heart valve damage and/or valvular regurgitation as a

result of their ingestion, consumption and use of fenfluramine (Pondimin®) and/or

dexfenfluramine (Redux™).

2

2.

Each named Plaintiff, by virtue of certain defined damage to their heart incurred as a result of their ingestion, consumption and use of fenfluramine (Pondimin®), and/or dexfenfluramine (Redux™), is properly classified as a *Brown* class member (*Brown v. American Home Products, et al*, U.S.D.C. E.D.Pa. Civil Action File NO. 99-20593) holding claims which may be properly opted out of the Nationwide Class Action Settlement Agreement With American Home Products Corporation (hereinafter "National Settlement") under the terms and conditions of PTO 1415 entered in MDL Proceeding 1203, pending in the United States District Court for the Eastern District of Pennsylvania.

3.

The injuries that are the subject of this Complaint were first diagnosed by echocardiograms performed subsequent to September 30, 1999.

4.

Each Plaintiff suffers from injury to her mitral and/or aortic valve that has been established as being FDA Positive or greater by a board certified cardiologist.

5.

Each named Plaintiff timely and properly filed an Intermediate and/or Back-End opt-out form with the Claims Administrator in compliance with the terms and conditions of the National Settlement.

6.

By virtue of the filing of an Intermediate and/or Back-End opt-out, each named Plaintiff is entitled to pursue the present action against the "AHP/WYETH Defendants" as defined herein below.

7.

This action has been brought by each named Plaintiff for the purpose of recovering damages for the personal injuries and damages he or she has sustained as the result of his or her ingestion, consumption and use of fenfluramine (Pondimin®), and/or dexfenfluramine (Redux™). Defendants are liable to Plaintiffs for their individual and collective acts, omissions, and involvement in developing, testing, evaluating, securing government approval for, manufacturing, distributing, advertising, conspiring to promote, monitoring and/or selling said drug compounds despite Defendants' knowledge of the unreasonable risk of death and bodily injury associated with the use of said drugs which was knowingly and purposely concealed by the Defendants from the Plaintiffs, the Plaintiffs' doctors, and others.

8.

Each named Plaintiff seeks to recover only those damages permitted under the terms and conditions of the National Settlement in relation to the "AHP/WYETH

4

Defendants."

9.

Each named Plaintiff seeks to recover all damages permitted under law against all other Defendants in this action (i.e. all Defendants other than the "AHP/WYETH Defendants").

10.

The injuries sustained by Plaintiffs were the result of the acts and omissions of Defendants committed both inside and outside the State of Georgia.

11.

As a direct and proximate result of Defendants' purposeful concealment of the dangers associated with the use of fenfluramine and dexfenfluramine, Plaintiffs have only recently discovered and learned that they were injured and damaged by Defendants' misconduct. Plaintiffs were prevented from discovering, and could not have discovered, their injuries and damages earlier because of Defendants' fraudulent misrepresentations, conspiracy and concealment of facts and information relating to the subject drugs as more specifically alleged below.

12.

The Honorable Louis Bechtle, formerly of the District Court for the Eastern District of Pennsylvania made the following findings in his Order approving the Nationwide Class Action Settlement with American Home Products in MDL Proceeding 1203 (In Re: Diet Drugs):

> "The instant class has a great deal of cohesion in that the class was basically exposed to one substance, manufactured by one defendant over

5

a relatively short period of time and suffers or is at risk of suffering one particular type of injury." (PTO 1415 at p. 46)

Each class member's claims allege a common defect in the diet drugs and a common course of conduct by AHP with regard to developing and marketing those diet drugs."  (PTO 1415 at p. 43)

"[T]he Court finds that common issues that pre-existed this settlement – involving a common product, defendant, and course of conduct – when considered in light of the proposed settlement, predominate over any individual issues between class members." (PTO 1415 at p. 43)

"Although there are some individual differences among class members, the common class-wide focus of AHP's knowledge and conduct predominate such that judicial efficiency will be improved through the class mechanism as opposed to relitigating the same issues in a series of individual cases....the class here involves a single defendant with essentially a single diet drug product." (PTO 1415 at p. 42)

See *Pretrial Order 1415* (MDL Proceeding 1203), 2000 WL 1222042 (E.D. Pa. August 8, 2000)

13.

The Honorable Harvey Bartle of the District Court for the Eastern District of Pennsylvania made the following findings in his Order approving the joinder of multiple intermediate and back-end opt-out plaintiffs in single complaints in MDL Proceeding 1203 (In Re: Diet Drugs):

"We do not think that the joinder of multiple intermediate and back-end

6

opt-out plaintiffs adversely affects the intentions or goals of the parties to the Settlement Agreement. Each such plaintiff in a point trial is limited to compensatory damages, and each must prove his or her own individual claim. We are confident that in these circumstances, the appropriate limiting instructions to the jury will protect Wyeth from the dangers related to *res judicata*, collateral estoppel, issue preclusion and claim preclusion. In addition, we cannot ignore the interests of judicial economy which are at the heart of procedural rules allowing multiple joinder. They generally have the effect of saving the court's time and reducing the parties' costs. They also allow cases, particularly in overburdened jurisdictions, to move to trial more quickly than if a blanket rule existed requiring each person's case to be instituted and tried separately."

See *Pretrial Order 2627* (MDL Proceeding 1203) at p. 3. (A copy of PTO 2627 Memorandum and Pretrial Order is attached hereto as Exhibit "A").

14.

The Honorable Penny Brown Reynolds of the State Court of Fulton County, Georgia recently held not only that the claims of two (2) individuals alleging injuries as a result of their ingestion of diet drugs were properly joined under O.C.G.A. §9-11-20, but that said claims were properly joined for trial as well. (See November 27, 2002 Order attached hereto as Exhibit "B").

7

15.

On December 6, 2002, the Honorable Penny Brown Reynolds of the State Court of Fulton County, Georgia denied Defendants' Motion for Reconsideration of her November 27, 2002 Order (Exhibit "B" attached hereto), and denied Defendant's request for a Certificate of Immediate Review. (See December 6, 2002 Order attached hereto as Exhibit "C").

16.

In *Alexander v. Fulton County*, 207 f.3d 1303 (11th Cir. 2000), the Eleventh Circuit Court of Appeals discussed Federal Rule of Civil Procedure 20, the permissive joinder rule on which O.C.G.A. Section 9-11-20 is based. In *Alexander*, eighteen plaintiffs sued a defendant for discriminatory practices. Following discovery, the defendants moved to sever the plaintiffs' claims on the grounds that the multiple claims would confuse the jury and unfairly prejudice the defendant. The district court denied the motion. The Eleventh Circuit affirmed on appeal, noting that "the central purpose of Rule 20 is to promote trial convenience and expedite the resolution of disputes, thereby eliminating unnecessary lawsuits." *Id.* At 1323. The Court held that, even though each plaintiff had a different claim and sought different relief, all of the plaintiffs' claims were "based on the same series of discriminatory transactions by the same decision-maker in the same department during the same short time frame." *Id.* At 1324.

17.

Plaintiffs claims are properly joined in this action under O.C.G.A. §9-11-20, as they have asserted rights to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences, and have alleged that multiple

8

questions of law and fact common to all of them will arise in this action. Further, judgment may be given for one or more of the plaintiffs according to their respective rights to relief and against one or more of the defendant according to their respective liabilities.

## Defendants

18.

Defendant, WYETH, INC. (formerly known as American Home Products Corporation) (hereinafter "AHP/WYETH" or "AHP/WYETH Defendant," or "Manufacturer Defendant"), has its principal place of business at 5 Giralda Farms, Madison, New Jersey. AHP/WYETH is incorporated under the laws of the State of Delaware. At all times relevant hereto, AHP/WYETH (itself and as a successor to A. H. Robins Company) was and has been in the business of promoting, marketing, distributing, manufacturing and/or selling the pharmaceutical drugs fenfluramine and/or dexfenfluramine. At all times relevant to this action, AHP/WYETH developed, manufactured, promoted, marketed, distributed and/or sold the aforementioned drugs through interstate commerce and in the State of Georgia, and otherwise did business in Georgia related to this cause.

19.

On March 11, 2002 American Home Products Corporation changed its name to "WYETH" or "WYETH, INC."

9

20.

Defendant AHP/WYETH may be served with a copy of summons and complaint through its registered agent for service of process, Prentice-Hall Corp System, Inc. at 4845 Jimmy Carter Blvd., Norcross, Gwinnett County, State of Georgia, 30093.

21.

Defendant AHP/WYETH is subject to the jurisdiction and venue of this court.

22.

Defendant, WYETH PHARMACEUTICALS, INC., a division of Wyeth, Inc. (formerly known as Wyeth-Ayerst Pharmaceuticals, Inc.) (hereinafter WYETH PHARMACEUTICALS" or "AHP/WYETH Defendant" or "Manufacturer Defendant"), has its principal place of business at 555 Lancaster Avenue, St. Davids, Pennsylvania, 19087. To the extent that WYETH PHARMACEUTICALS does not maintain its principal place of business at said address, it maintains its principal place of business at 500 Arcola Road, Collegeville, Pennsylvania, 19426. WYETH PHARMACEUTICALS is incorporated under the laws of the State of Delaware. At all times relevant hereto, WYETH PHARMACEUTICALS was in the business of promoting, marketing, distributing, manufacturing and/or selling the pharmaceutical drugs fenfluramine and /or dexfenfluramine. At all times relevant to this action WYETH PHARMACEUTICALS developed, manufactured, promoted, marketed, distributed and/or sold the aforementioned drugs through interstate commerce and in the State of Georgia, and otherwise did business in Georgia related to this cause.

23.

On March 11, 2002 WYETH-AYERST PHARMACEUTICALS, INC. changed its name to "WYETH PHARMACEUTICALS."

24.

Defendant WYETH PHARMACEUTICALS may be served with a copy of summons and complaint through the Georgia Secretary of State and/or at its principal place of business, 555 Lancaster Avenue, St. Davids, Pennsylvania, 19087.

25.

Defendant WYETH PHARMACEUTICALS is subject to the jurisdiction and venue of this court.

26.

Defendant ROSEMARY STEWART (hereinafter "Sales Rep Defendant" or "AHP/WYETH Defendant") is a citizen of Muscogee County, Georgia.

27.

Defendant ROBERT HAINES (hereinafter "Sales Rep Defendant" or "AHP/WYETH Defendant") is a citizen of Muscogee County, Georgia.

28.

Defendant MARSHA FULLER (hereinafter "Sales Rep Defendant" or "AHP/WYETH Defendant") is a citizen of the State of Georgia.

29.

Defendant JENNIFER WIGGS (hereinafter "Sales Rep Defendant" or "AHP/WYETH Defendant") is a citizen of the State of Georgia.

30.

Defendant SHANNON BUGGS (hereinafter "Sales Rep Defendant" or "AHP/WYETH Defendant") is a citizen of the State of Georgia.

31.

Defendant DOUGLASS W. RAY (hereinafter "Sales Rep Defendant" or "AHP/WYETH Defendant") is a citizen of the State of Georgia.

32.

Defendant FRANK D. HAWKINS (hereinafter "Sales Rep Defendant" or "AHP/WYETH Defendant") is a citizen of the State of Georgia.

33.

Defendant DAVID LEE DOWNING (hereinafter "Sales Rep Defendant" or "AHP/WYETH Defendant") is a citizen of the State of Georgia.

34.

Defendant TERRI S. MORTON (hereinafter "Sales Rep Defendant" or "AHP/WYETH Defendant") is a citizen of the State of Georgia.

35.

Defendant LISA CHURCH-RODENHISHER (hereinafter "Sales Rep Defendant" or "AHP/WYETH Defendant") is a citizen of the State of Georgia.

36.

Defendant TRACI E. MULLINS (hereinafter "Sales Rep Defendant" or "AHP/WYETH Defendant") is a citizen of the State of Georgia.

37.

Defendant JANET P. JACKSON (hereinafter "Sales Rep Defendant" or

committed positive tortuous acts against noted Plaintiffs. Specifically, within the years of 1996 and 1997, and prior to that time, the following named Sales Rep Defendants were directly involved in detailing, marketing, promoting, selling and/or distributing of drugs fenfluramine (Pondimin®) and/or dexfenfluramine (Redux™), alone or in combination with phentermine to the following named Plaintiff's prescribing physicians:

      a.    Sales Rep Defendant ROSEMARY STEWART detailed, marketed, promoted, sold and/or distributed fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine to Plaintiff Agnes Boyd and Brenda Rosse's prescribing physician, Robert Stout, M.D. and to Plaintiff Deborah Terrell's prescribing physicians Robert Stout, M.D. and Dr. Guin, M.D.;

      b.    Sales Rep Defendant ROBERT HAINES detailed, marketed, promoted, sold and/or distributed fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine to Plaintiff Agnes Boyd and Brenda Rosse's prescribing physician, Robert Stout, M.D.; and to Plaintiff Deborah Terrell's prescribing physician's Robert Stout, M.D. and Dr. Guin, M.D.;

      c.    Sales Rep Defendant MARSHA FULLER detailed, marketed, promoted, sold and/or distributed fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine to Plaintiff Allyson Johnson's  prescribing physician,

Stephen Balch, M.D.; and to Plaintiff Ramona Walker's prescribing physician, Laurence Rivkin, M.D.;

d.  Sales Rep Defendant JENNIFER WIGGS detailed, marketed, promoted, sold and/or distributed fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine to Plaintiff Betty Ellinger's  prescribing physician, Dr. Morris, M.D.;

e.  Sales Rep Defendant SHANNON BUGGS detailed, marketed, promoted, sold and/or distributed fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine to Plaintiff Betty Ellinger's  prescribing physician, Dr. Morris, M.D.; to Plaintiff Colin Luke's prescribing physician, David Pierce, M.D.; and to Plaintiff Catherine Mataro's prescribing physician, Gerald Price, M.D.;

f.  Sales Rep Defendant DOUGLASS W. RAY detailed, marketed, promoted, sold and/or distributed fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine to Plaintiff Lisa Angel's  prescribing physician, David E. Field, M.D.; and to Plaintiff Joyce Dalton's prescribing physician, W.J. Jagiella, M.D.;

g.  Sales Rep Defendant FRANK D. HAWKINS detailed, marketed, promoted, sold and/or distributed fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with

phentermine to Plaintiff Lisa Angel's prescribing physician, David E. Field, M.D.;

h. Sales Rep Defendant DAVID LEE DOWNING detailed, marketed, promoted, sold and/or distributed fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine to Plaintiff Betty Bates' prescribing physician, Robert A. Harris, M.D.; to Plaintiff Mary Jo Diana's prescribing physician, Robert A. Harris, M.D.; to Plaintiff Theola Battle's prescribing physician, Donald Gross, M.D.; to Plaintiff Luann Pierce's prescribing physician, Leon Lane, M.D.; to Plaintiff Monique St. Julien's prescribing physician, R. Udom McCoy, M.D.; and to Plaintiff Martha Wiggins' prescribing physician, R. Udom, M.D.;

i. Sales Rep Defendant TERRI S. MORTON detailed, marketed, promoted, sold and/or distributed fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine to Plaintiff Michael Brown's prescribing physician, Shulman Scott, M.D.; to Plaintiff Janell Chism's prescribing physician, Diong Ong Low, M.D.; to Plaintiff Allyson Johnson's prescribing physician, Stephen Balch, M.D;

j. Sales Rep Defendant LISA CHURCH-RODENHISHER detailed, marketed, promoted, sold and/or distributed fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine to Plaintiff Michael Brown's

16

prescribing physician, Shulman Scott, M.D.; and to Plaintiff Allyson

Johnson's prescribing physician, Stephen Balch, M.D;

k.    Sales Rep Defendant TRACI E. MULLIS detailed, marketed,

promoted, sold and/or distributed fenfluramine (Pondimin®),

dexfenfluramine (Redux™), alone and/or in combination with

phentermine to Plaintiff Anquinette Carter and Angela Luke's

prescribing physician, Hank Moseley, M.D.;

l.    Sales Rep Defendant JANET P. JACKSON detailed, marketed,

promoted, sold and/or distributed fenfluramine (Pondimin®),

dexfenfluramine (Redux™), alone and/or in combination with

phentermine to Plaintiff Bernice Hawk Cobb's  prescribing

physician, Roopal Desai, M.D.;

m.    Sales Rep Defendant AVERY T. LANIUS detailed, marketed,

promoted, sold and/or distributed fenfluramine (Pondimin®),

dexfenfluramine (Redux™), alone and/or in combination with

phentermine to Plaintiff Bonnie Eidson's  prescribing physician,

Michael Gains, M.D.; and to Plaintiff Jessica Harrod's prescribing

physician, John Earle, M.D.;

n.    Sales Rep Defendant DAVID E. WILKES detailed, marketed,

promoted, sold and/or distributed fenfluramine (Pondimin®),

dexfenfluramine (Redux™), alone and/or in combination with

phentermine to Plaintiff Susan Spoor and Naomi Walker's

prescribing physician, Steve Anderson, M.D.; and to Plaintiff

17

Brenda White's prescribing physician, Francis Coleman, M.D.;

o. Sales Rep Defendant WOODFORD W. MOSS detailed, marketed, promoted, sold and/or distributed fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine to Plaintiff Monique St. Julien's prescribing physician, R. Udom McCoy, M.D.; to Plaintiff Martha Wiggins' prescribing physician, Dr. Udom, M.D.;

p. Sales Rep Defendant MICHAEL E. WINTERS detailed, marketed, promoted, sold and/or distributed fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine to Plaintiff Monique St. Julien's prescribing physician, R. Udom McCoy, M.D.; and to Plaintiff Martha Wiggins' prescribing physician, Dr. Udom, M.D.; and,

q. Sales Rep Defendant ROBIN W. JONES detailed, marketed, promoted, sold and/or distributed fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine to Plaintiff Ramona Walker's prescribing physician, Laurence Rivkin, M.D.

44.

Upon information and belief the positive tortuous acts which were committed by the Sales Rep Defendants in their individual and/or corporate capacity, include, but are not limited to, the following:

a. Sales Rep Defendants failed to convey adequate warnings to the

18

Plaintiffs through the prescribing physician set forth above regarding the risks of prescribing fenfluramine (Pondimin®) and dexfenfluramine (Redux™);

b.  Sales Rep Defendants were in the business of marketing, promoting, selling and/or distributing the unreasonably dangerous pharmaceutical drug fenfluramine (Pondimin®) and dexfenfluramine (Redux™) which has caused harm to the Plaintiffs;

c.  Sales Rep Defendants negligently distributed, marketed, advertised and/or promoted the drugs fenfluramine (Pondimin®) and dexfenfluramine (Redux™);

d.  Sales Rep Defendants made fraudulent and reckless misrepresentations regarding the character, safety and efficacy of the drug fenfluramine (Pondimin®) and dexfenfluramine (Redux™), and;

e.  Sales Rep Defendants, with knowledge of unreasonable risks associated with the ingestion of fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine continued to make misrepresentations regarding the character, safety and efficacy of drug fenfluramine (Pondimin®) and dexfenfluramine (Redux™), while providing and/or offering incentives, rebates, reimbursements, perks, and/or other consideration to each Plaintiff's prescribing physician in furtherance of attempting to influence the prescribing of said diet drugs.

19

45.

Defendant Rosemary Stewart may be served with a copy of summons and complaint at 2918 Beacon Avenue, Columbus, Georgia, 31904.

46.

Defendant Rosemary Stewart is subject to the jurisdiction and venue of this court.

47.

Defendant Robert Haines may be served with a copy of summons and complaint at 30 Spring Court, Midland, Georgia 31820.

48.

Defendant Robert Haines is subject to the jurisdiction and venue of this court.

49.

Defendant Marsha Fuller may be served with a copy of summons and complaint at 3055 Antler Tail, Marietta, Georgia 30066.

50.

Defendant Marsha Fuller is subject to the jurisdiction and venue of this court.

51.

Defendant Jennifer Wiggs may be served with a copy of summons and complaint at 3777 Peachtree Road 534, Atlanta, Georgia 30319.

52.

Defendant Jennifer Wiggs is subject to the jurisdiction and venue of this court.

53.

Defendant Shannon Buggs may be served with a copy of summons and

complaint at 9250 Sourwood Drive, Gainesville, Georgia 30506.

54.

Defendant Shannon Buggs is subject to the jurisdiction and venue of this court.

55.

Defendant Douglass W. Ray may be served with a copy of summons and complaint at 3608 Cherbourg Way, Marietta, GA, 30062.

56.

Defendant Douglass W. Ray is subject to the jurisdiction and venue of this court.

57.

Defendant Frank D. Hawkins may be served with a copy of summons and complaint at 334 Knotts Circle, Woodstock, GA 30188.

58.

Defendant Frank D. Hawkins is subject to the jurisdiction and venue of this court.

59.

Defendant David Lee Downing may be served with a copy of summons and complaint at 4252 Chestnut Walk, Marietta, GA 30066.

60.

Defendant David Lee Downing is subject to the jurisdiction and venue of this court.

61.

Defendant Terri S. Morton may be served with a copy of summons and complaint at 3219 Highway Road SW, Atlanta, GA  30311.

21

62.

Defendant Terri S. Morton is subject to the jurisdiction and venue of this court.

63.

Defendant Lisa Church-Rodenhisher may be served with a copy of summons and complaint at 11635 Vista Forrest Drive, Alpharetta, GA 30005.

64.

Defendant Lisa Church-Rodenhisher is subject to the jurisdiction and venue of this court.

65.

Defendant Traci E. Mullis may be served with a copy of summons and complaint at 235 Blue Pool Drive, Valdosta, GA 31602.

66.

Defendant Traci E. Mullis is subject to the jurisdiction and venue of this court.

67.

Defendant Janet P. Jackson may be served with a copy of summons and complaint at 3410 Grove Park Drive, Duluth, GA 30096.

68.

Defendant Janet P. Jackson is subject to the jurisdiction and venue of this court.

69.

Defendant Avery T. Lanius may be served with a copy of summons and complaint at 930 Bishopwood Place, Alpharetta, GA 30005.

70.

Defendant Avery T. Lanius is subject to the jurisdiction and venue of this court.

22

71.

Defendant David E. Wilkes may be served with a copy of summons and complaint at 603 44th Street East, Tifton, GA 31794.

72.

Defendant David E. Wilkes is subject to the jurisdiction and venue of this court.

73.

Defendant Woodford W. Moss may be served with a copy of summons and complaint at 2223 Overton Road, Augusta, GA 30904.

74.

Defendant Woodford W. Moss is subject to the jurisdiction and venue of this court.

75.

Defendant Michael E. Winters may be served with a copy of summons and complaint at 4552 Reigate Court, Evans, GA 30809.

76.

Defendant Michael E. Winters is subject to the jurisdiction and venue of this court.

77.

Defendant Robin W. Jones may be served with a copy of summons and complaint at 1639 Musket Ridge NW, Atlanta, GA 30327.

78.

Defendant Robin W. Jones is subject to the jurisdiction and venue of this court.

23

79.

Defendants JOHN DOE NOS. 1-5 are five separate persons, firms and/or corporations, who are believed to be citizens of the State of Georgia whose identities are otherwise unknown at this time.  At all times material hereto, said Defendants were in the business of promoting, marketing, developing, selling and/or distributing the pharmaceutical drugs phentermine, fenfluramine and/or dexfenfluramine.  The John Doe Defendants were also involved in a conspiracy to conceal certain information relating to the dangers associated with the subject drug products from the consuming public, including but not limited to, Plaintiffs.

80.

Once the identities and whereabouts of each John Doe Defendant is established, said Defendants will be served with a copy of summons and complaint as provided by law.

81.

The John Doe Defendants are subject to the jurisdiction and venue of this court.

### General Allegations

82.

The drugs, fenfluramine (Pondimin®) and dexfenfluramine (Redux™) were widely sold, distributed, promoted and advertised by the named Defendants, and various fictitious party Defendants, as effective weight control products.  Defendants sold and distributed the subject drugs in Georgia as well as other states and placed said drugs into the stream of commerce knowing that they would enter the state(s) in which Plaintiffs resided and be consumed therein.

24

83.

Fenfluramine was one of the drugs prescribed in combination and promoted and referred to as "fen/phen." The AHP/WYETH Defendants marketed fenfluramine under the trade name, Pondimin. In doing so, the AHP/WYETH Defendants actively encouraged, and/or failed to effectively discourage, the combined use of fenfluramine because they knew that the combined use would increase sales of fenfluramine.

84.

The named Defendants, as well as the fictitious party Defendants, directly or indirectly, made, created, manufactured, assembled, designed, sterilized, tested, evaluated, labeled, supplied, packaged, marketed, advertised, warranted, distributed and/or sold the drugs fenfluramine (Pondimin®) and dexfenfluramine (Redux™). These same Defendants assisted in, and had control over, the design, assembly, packaging, labeling, marketing, advertising, manufacturing distribution and sale of the drugs fenfluramine (Pondimin®) and dexfenfluramine (Redux™).

85.

At all times material hereto, all Defendants, including the fictitious party Defendants, either knew or should have known that the drugs fenfluramine (Pondimin®) and dexfenfluramine (Redux™) had been related to and associated with severe and life threatening complications.

86.

In 1965, the diet drug Aminorex was introduced in Europe. Aminorex was touted as a wonder weight loss drug that worked by increasing brain serotonin and inhibiting reuptake of serotonin. However, by 1967 evidence began to surface that the ingestion

25

of Aminorex was associated with pulmonary hypertension. Over the next six years, an Aminorex epidemic raged in Europe. There was a ten-fold increase in primary pulmonary hypertension cases. Half of the patients died within ten years and the rest of the patients suffered significant oxygen deprivation and are debilitated for the remainder of their lives. Aminorex was removed from the European market in 1972. The AHP/WYETH Defendants knew, or should have known, of the European experience with Aminorex and how it would relate to AHP/WYETH's drugs Pondimin® and Redux™ three (3) decades later.

87.

In 1973, Pondimin was introduced into the United States market. Pondimin® is a fenfluramine drug and is in the same family of drugs as Aminorex, and is very similar to Aminorex. Pondimin® was touted as a wonder weight loss drug that worked by increasing brain serotonin and inhibiting reuptake of serotonin. However, because the drug when used alone made users lethargic and tired, sales of Pondimin languished.

88.

In the year 1990, the Food and Drug Administration (FDA) approved fenfluramine for use as a weight reduction drug for the short-term medical management of obesity. Since that time, fenfluramine has been increasingly prescribed and used in combination with the drug phentermine to maximize weight loss. This combination is commonly known as "fen-phen."

89.

The AHP/WYETH Defendants actively encouraged, and/or failed to effectively discourage, the combined use of fenfluramine and phentermine because they knew that the combined use would increase sales of fenfluramine.

90.

The "phen" portion of "fen-phen" consists of phentermine, an amphetamine which helps the body burn calories faster and which serves to counteract the drowsiness caused by the "fen" portion of the dosage consisting of fenfluramine, a drug which affected the serotonin levels in the brain. Despite the fact that the concomitant use of fenfluramine and phentermine was never approved by the FDA, the subject drugs were widely prescribed for use in combination with each other and/or with dexfenfluramine in place of fenfluramine, as promoters of weight loss.

91.

Dexfenfluramine is the d-isomer of fenfluramine, containing essentially the same active ingredient as fenfluramine.  The AHP/WYETH Defendants marketed dexfenfluramine under the trade name Redux™.

92.

The AHP/WYETH Defendants have known the serious side effects of fenfluramine and/or dexfenfluramine for a substantial period of time.  These side effects were known or should have been known to all Defendants at the time that they marketed the drugs to the public based on, among other things, medical evidence of dangerous and potentially fatal side effects from the use of the drugs in Europe and elsewhere, as detailed below. Defendants did not, however, conduct adequate testing

27

to establish the safety of the drugs before marketing them. Rather, the Defendants aggressively marketed the drugs and promoted their use, both individually and in combination with other drugs, while downplaying evidence of the serious and potentially fatal side effects that consumers of these drugs could face.

93.

Defendants undertook a willful, wanton and reckless course of action and marketing strategy which included advertising and promotional campaigns to aggressively promote and sell the subject drugs by falsely misleading potential users about the products, by suppressing material facts, and by failing to warn users about the serious health effects which Defendants knew or should have known could result from the use of the subject drugs.

94.

This advertising campaign on the whole, through its affirmative misrepresentations and omissions, falsely and fraudulently sought to create the impression and to convey to Plaintiffs and others on whom Plaintiffs would rely, that the use of either fenfluramine or dexfenfluramine alone or in combination with phentermine as "fen-phen" was safe and had fewer adverse health and side effects than was actually known to Defendants at the time they made these representations.

95.

Fenfluramine and dexfenfluramine were aggressively marketed by Defendants, often by encouraging unapproved off-label combination use of the products.

96.

Defendants, as manufacturers and distributors, or agents thereof, knew of and

28

recklessly encouraged the prevalence of off-label combination use of their drugs and failed to warn physicians and consumers that the combination drug regimen was not FDA approved, was not recommended and had not been systematically tested by appropriate clinical trials or follow-up reporting of adverse effects.

97.

Defendants undertook a promotional campaign that included the placement of numerous articles in scientific, medical and general interest magazines extolling the virtues of fenfluramine combined with phentermine in order to induce widespread use of the product. Many of these articles either cited or reported the results of studies that were funded by the AHP/WYETH Defendants. Thus, the AHP/WYETH Defendants actively encouraged, or failed to effectively discourage, combinations of these drugs.

98.

Defendants actively encouraged, or failed to effectively discourage, combinations of these drugs by employing and/or contracting with commission based salespersons to promote the widespread prescribing of fenfluramine and/or the combination of fenfluramine and phentermine to patients that were not clinically obese.

99.

The marketing program as a whole, by affirmative misrepresentations and omissions, falsely and fraudulently sought to create the image and impression that the use of fenfluramine, both individually and/or in combination with phentermine, was safe for human use, had fewer side effects and adverse reactions than other methods of weight loss, constituted a convenient, safe form of weight loss and would not interfere with daily life.

29

100.

Defendants purposefully downplayed and understated the health hazards and risks associated with fenfluramine and/or dexfenfluramine.

101.

Defendants falsely and fraudulently concealed relevant information from doctors and potential fenfluramine and/or dexfenfluramine users regarding the safety of fenfluramine and/or dexfenfluramine.

102.

In particular, the AHP/WYETH Defendants' marketing efforts as well as their product inserts, falsely, fraudulently and negligently misrepresented a number of facts regarding fenfluramine and/or dexfenfluramine, including the following:

a) The presence of adequate testing of fenfluramine and the presence of adequate testing of any combination use of the product with phentermine;

b) Fenfluramine and/or dexfenfluramine's efficacy including but not limited to the severity, frequency and discomfort of side effects and adverse health effects caused by the drugs; and

c) The relative risks associated with the drugs including the prevalence of pulmonary hypertension and primary pulmonary hypertension.

103.

On October 3, 1981, Dr. J.G. Douglas published *Pulmonary Hypertension and Fenfluramine* in the British Medical Journal. On January 25, 1986 an article entitled *Irreversible Pulmonary Hypertension after Treatment with Fenfluramine*, was published in the British Medical Journal. The AHP/WYETH Defendants knew, or should have known, of the British Medical Journal articles and how those articles related to their

drug Pondimin® a decade later.

104.

In 1984, Dr. Michael Weintraub published *A Double-Blind Clinical Trial in Weight Control: Use of Fenfluramine and Phentermine Alone and in Combination* in the Archives of Internal Medicine. Dr. Weintraub's study was supported by A.H. Robins (which was later acquired by AHP/WYETH). Despite noting some adverse effects associated with fenfluramine, Dr. Weintraub entirely failed to examine the long-term safety of fenfluramine. Instead, the study focused on the short-term effectiveness of the drugs used individually, and in combination.

105.

In 1992, Dr. Weintraub published a series of articles in Clinical Pharmacological Therapies, in which he reported his research regarding the long term use of fenfluramine and phentermine for weight control. Dr. Weintraub's research was supported by the AHP/WYETH Defendants.

106.

Dr. Weintraub's research assumed the safety of fenfluramine, and did not examine the short-term or long-term safety of the drug. Further, the AHP/WYETH Defendants failed to conduct or fund any studies or research regarding the long-term safety of the fenfluramine drug, Pondimin. Nevertheless, the AHP/WYETH Defendants did promote to physicians and the public Dr. Weintraub's conclusion that long term combination use of fenfluramine and phentermine was effective for the management of obesity.

31

107.

By 1993, the AHP/WYETH Defendants labeling for Pondimin® indicated that there were only 4 reported cases of pulmonary hypertension reported in association with the drug. Yet, that same year, Dr. Francois Brenot published *Primary Pulmonary Hypertension and Fenfluramine Use*, in the British Heart Journal. Dr. Brenot identified 25 cases of primary pulmonary hypertension associated with the use of fenfluramine and/or dexfenfluramine. The AHP/WYETH Defendants knew or should have known of the Brenot article. AHP/WYETH should have known by at least 1993 that Pondimin® was defective and unreasonably dangerous. AHP/WYETH should have known by at least 1993 that AHP/WYETH's labeling of Pondimin® was false.

108.

On June 24, 1994, AHP/WYETH Safety Surveillance Monitor, Amy Myers, wrote a memo to AHP Medical Monitor, Fred Wilson, and indicated that AHP/WYETH's database contained 37 cases of primary pulmonary hypertension associated with Pondimin®. Further, in February 1994, the preliminary results of the International Primary Pulmonary Hypertension study ("IPPH Study") entitled "Appetite Suppressants and the Risk of Primary Pulmonary Hypertension" was released and available to the AHP/WYETH Defendants. The preliminary results of the IPPH Study confirmed the association between fenfluramine and dexfenfluramine, and pulmonary hypertension and primary pulmonary hypertension. The AHP/WYETH Defendants concealed the number of cases of primary pulmonary hypertension associated with Pondimin® that the AHP/WYETH Defendants knew existed in order to continue to market Pondimin® for profit.

109.

On June 15, 1995 AHP/WYETH Defendants' James Ottinger, reported to Joseph Bathish the status of the European Committee on Proprietary Medicinal Product's ("CPMP") pharmacovigilance discussion wherein the CPMP working party concluded that a causal relationship between anorectic agents, like fenfluramine and/or dexfenfluramine, and the occurrence of primary pulmonary hypertension had been established.

110.

The August 26, 1996 issue of the New England Journal of Medicine reported the final results of IPPH Study, which had been preliminarily released in February 1994. The IPPH Study concluded that fenfluramine-based anorexigens, such as fenfluramine and dexfenfluramine, increased the risk of PPH by a multiple of more than 23 times.

111.

The AHP/WYETH Defendants were aware of the result of the IPPH study by at least February 1994. Nevertheless, the AHP/WYETH Defendants failed to apprise the public or physicians that the risk of contracting PH or PPH was many, many multiples of that previously reported by the AHP in their literature. Even after the Brenot article and the preliminary release of the IPPH Study the AHP/WYETH Defendants failed to remove Pondimin® from the market when the AHP/WYETH Defendants knew of the extreme danger, causal relationship and substantial risk of harm associated with the use AHP's drug Pondimin.

33

116.

The AHP/WYETH Defendants did not adequately or appropriately disclose fenfluramine and/or dexfenfluramine information or related drug information to physicians in the United States. Instead the AHP/WYETH Defendants fraudulently concealed the pulmonary hypertension (PH) or primary pulmonary hypertension (PPH) danger they knew of from physicians. As a result, physicians have over-prescribed fenfluramine and/or dexfenfluramine drugs, Pondimin® and Redux™, to patients who were grossly under-informed regarding the risk of PH or PPH associated with the drugs.

117.

Although the FDA approved phentermine and fenfluramine separately, the FDA never approved the drugs for combined use. The AHP/WYETH Defendants knew of and encouraged the prevalence of off-label combined use of their drugs, and failed to adequately and appropriately warn physicians and consumers that the combination drug regimen was not FDA approved, was hazardous due to the presence of fenfluramine, was not recommended and had not been systematically tested by appropriate clinical trials. Further, the AHP/WYETH Defendants fraudulently concealed, destroyed and removed written evidence and/or intentionally misrepresented evidence supporting the association between PH and/or PPH with fenfluramine and/or dexfenfluramine.

118.

The AHP/WYETH Defendants failed to fully and adequately warn doctors, the public and/or the Plaintiffs about the risk of pulmonary hypertension and primary pulmonary hypertension from Pondimin® and Redux™.

119.

At all times relevant to this cause, Defendants also knew or should have known of many other studies, regulatory actions and concerns, incidences of injury and/or death, concerns about the subject drugs, safety among scientists, researchers, regulators and other knowledgeable professionals, the dangers of drug combinations, meetings among pharmaceutical industry officers, executives or employees (including Defendants), internal memos and reports of health concerns regarding the subject drugs, the desire of Defendants to stop or delay regulatory action regarding the subject drugs, the lack of sufficient safety studies before and during marketing of the subject drugs, the contents of Defendants' own files, plans and reports, the danger of the off-label use of medications, the desire of Defendants to maximize profits despite safety concerns, safety concerns about the drugs which could block or change FDA approval, regulatory actions, reports of injury and concerns about the subject drugs in Europe, case reports of pulmonary hypertension, regulatory efforts to make changes in the warning and labels required on these products and the plans and actions of Defendants to fight such changes (including supplying regulators with false or misleading information), warning labels on the products designed so that they would be overlooked by physicians and users such as Plaintiffs, statements by medical professionals regarding safety concerns for the subject drugs, the fact that phentermine is an MOAI

drug which would be contra-indicated for usage with fenfluramine and dexfenfluramine, prevalent usage of unsafe combinations of the subject drugs (as promoted by Defendants) and adverse effects reported therefrom, the failure of Defendants to report incidences of PPH resulting from the use of the subject drugs to regulators and health care professionals, false information provided by sales representatives and others concerned with advertising and promoting the subject drugs, efforts to derail regulatory review and oversight of the subject drugs, the identification of groups most at risk of injury, the misrepresentation and concealment of reports regarding adverse health effect of the subject drugs by Defendants from regulators and health care professionals, and many other material facts regarding the subject drugs and which would have shown the danger and adverse health effect of using the subject drugs. Nevertheless, Defendants did suppress, misrepresent and failed to inform Plaintiffs, the public at large, or physicians of these material facts and risks, and did encourage and promote unsafe usage by Plaintiffs and others.

120.

Defendants, having undertaken the manufacture, sale, marketing, distribution and promotion of the diet drugs described herein owed a duty to provide Plaintiffs, physicians, state regulators and others upon whom it was known, or should have known, by Defendants that Plaintiffs would rely, accurate and complete information regarding the subject drug products. Nevertheless, Defendants misrepresented these facts, and failed to inform and did conceal from Plaintiffs, the public at large, and physicians of the material facts and risks of using the subject drugs.

37

121.

Defendants fraudulently represented to Plaintiffs, Plaintiffs' physicians, state regulators and others upon whom it was known, or should have been known that each Plaintiff would rely, that the subject drugs were safe and effective, that the benefits of taking the subject drugs outweighed any risks and misrepresented and concealed safety and effectiveness information regarding its products including but not limited to the propensity to cause serious physical harm when used alone and in combination. The continuous and ongoing course of action constituting fraud and misrepresentation upon Plaintiffs started as early as 1993, if not earlier, and continued through repeated acts and non-disclosure every year since then, in the State(s) in which the Plaintiffs reside, throughout the United States, and elsewhere.

122.

Defendants' fraudulent misrepresentations took the form of, among other forms, express and implied statements, publicly disseminated misinformation, misinformation provided to state regulatory agencies, inadequate, incomplete and misleading warnings about the subject products, failure to disclose important safety and injury information regarding the products while having a duty to disclose to Plaintiffs and others such information, and elaborate marketing, promotional, and advertising activities designed to conceal and mislead regarding the safety of the subject products.

38

123.

The subject drug products were in fact unsafe, and the use of the subject drug products posed a risk of injury and death that outweighed the purported benefits of their use, such that injury was in fact caused to Plaintiffs and others.

124.

Defendants failed to adequately warn Plaintiffs and those whom they knew Plaintiffs would rely of the hazards associated with the use of the subject diet drug products and conspired to conceal and did conceal this knowledge from Plaintiffs and others. As a result of this failure to warn, Plaintiffs were caused to suffer the injuries and damages hereinafter set forth.

125.

Plaintiffs were prescribed and/or ingested the drugs fenfluramine (Pondimin®), dexfenfluramine (Redux™), and/or phentermine for weight loss and suffered injury thereby.

126.

Although Defendants knew or should have known that dangerous risks were associated with the use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), and phentermine, Defendants proceeded to or permitted the same to be advertised, promoted, distributed and sold without adequate warnings of the serious side effects and dangerous risks. Defendants knew of and encouraged the prevalence of off-label combination use of their drugs and failed to warn physicians and consumers that the combination drug regimen was not FDA approved, was not recommended and had not been tested by appropriate clinical trials. All Defendants, including individual

39

Defendants who promoted and/or distributed the drugs, had actual and/or constructive knowledge that the drugs posed a danger to consumers, including the Plaintiffs herein.

127.

The drugs fenfluramine and dexfenfluramine were defective and unreasonably dangerous when they left the possession of Defendants in that, among other ways:

a.  the subject drugs caused injury to the user far beyond any warned, noticed, or expected reasonable side effect, or adverse reaction, and when placed in the stream of commerce they contained unreasonably dangerous defects subjecting Plaintiffs to risks from expected or known usage, including bodily injury and death, which exceeded the benefits of the subject drugs;

b.  when placed in the stream of commerce the subject drugs were defective in design and formulation, making use of the drugs more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with obesity and weight loss;

c.  the subject drugs contained insufficient and/or ineffective warnings to alert consumers and users to the risks of injury and death by PPH;

i.  the subject drugs were insufficiently tested (singularly or in combination);

ii.  there were insufficient instructions on the proper use of the subject drugs;

iii.  there was misleading advertising and promotion concerning the safety and benefits of using the subject drugs;

40

iv.    there were inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the significant risks previously described, Defendants failed to provide adequate warnings to users and consumers, and/or their physicians, and continued to promote the sale and use of the subject drugs; and

v.    the subject drugs had not been materially altered or modified prior to the use of said drugs by Plaintiffs.

d.    Defendants were in the business of distributing and selling the products made the basis of this lawsuit.  Defendants sold and/or distributed these products in a defective condition that was unreasonably dangerous to the user or ultimate consumer of this product.  Each product was expected to and did reach the user and consumer Plaintiffs without substantial change in the condition at which it was sold.

128.

As a direct and legal result of the defective condition of the drugs fenfluramine (Pondimin®) and dexfenfluramine (Redux™), Plaintiffs have sustained and will continue to sustain serious and permanent injuries, physical pain and suffering, impairment, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors, and undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; and fear and

41

133.

The fenfluramine (Pondimin®) and dexfenfluramine (Redux™) drugs which were designed, developed, researched, manufactured, and/or supplied by the AHP/WYETH Defendants were not merchantable nor reasonably suited to their intended use due to design defects in the subject drugs.

134.

The risk of severe and life threatening complications and other side effects associated with use of the subject diet drugs constituted dangers and risks which were inherent in the design of the drugs that served to outweigh any utility the drugs may have had.

135.

AHP/WYETH and John Doe Defendants, individually and collectively, knew, or should have known, that fenfluramine (Pondimin®) and dexfenfluramine (Redux™) were, and are, dangerously defective products that posed an unacceptable risk unknown to, and unknowable by, the consuming public.

136.

Plaintiffs have suffered injury and have incurred damages as a direct and proximate result of the design defects existing in regard to fenfluramine (Pondimin®) and dexfenfluramine (Redux™) causing Defendants to be liable to Plaintiffs under the doctrine of strict liability due to the defective nature of the subject drug products.

43

## COUNT II (STRICT LIABILITY - FAILURE TO WARN)

137.

Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

138.

The allegations set forth under Count II apply only to the AHP/WYETH Defendants as identified hereinabove.

139.

At the time the AHP/WYETH Defendants placed fenfluramine (Pondimin®) and dexfenfluramine (Redux™) into the stream of commerce for sale or consumption by Plaintiffs, said AHP/WYETH Defendants failed to accompany the inherently dangerous products with sufficient warnings to advise doctors or consumers of the health risks associated with the subject drugs.

140.

To the extent that any warning was provided by the Defendants with the subject drug products, the warning was defective as it did not accurately reflect the true dangers associated with the defective drug products and did not accurately serve to warn physicians or consumers of:

a) the true risks of injury associated with the products;

b) the symptoms of such injuries;

c) the scope of such injuries; or

d) the severity of the known risks associated with these products.

44

**COUNT IV (NEGLIGENCE)**

146.

Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

147.

At all times material hereto, <u>each</u> Defendant owed a duty to Plaintiffs to exercise reasonable care in the design, manufacture, testing, processing, advertising, marketing, promotion, labeling, assembling, packaging, distributing and selling of the subject diet drug products.

148.

Defendants, individually and collectively, were negligent in their actions, misrepresentations, and omissions toward Plaintiffs.

149.

Defendants were negligent in their design, manufacture, processing, testing, advertising, marketing, promotion, labeling, assembling, packaging, distributing and/or selling the subject drugs which they knew were unreasonably dangerous and carried with them significant side effects. Such negligent acts include, but are not limited to the following:

    a)    Defendants acted negligently in designing, manufacturing, processing, advertising, marketing, promotion, testing, labeling, assembling, packaging, distributing and/or selling the drugs which they knew, or through the exercise of reasonable diligence should have known, were dangerous or unreasonably dangerous and carried with them significant side effects;

b)   Defendants acted negligently in failing to include adequate warnings with the drugs that would alert consumers and physicians to the potential risks and serious side effects of the drugs;

c)   Defendants acted negligently in failing to adequately and properly test the drugs before placing the drugs on the market;

d)   Defendants acted negligently in failing to conduct sufficient testing on the drugs that, if properly performed, would have shown that the drugs had serious side effects;

e)   Defendants acted negligently in failing to warn Plaintiffs that use of the drugs should be accompanied by a professional examination and regularly scheduled follow-up examinations so that primary pulmonary hypertension (PPH) could be avoided and/or detected early;

f)   Defendants acted negligently in failing to warn Plaintiffs that use of the drugs carried a risk of temporary or permanent disability due to primary pulmonary hypertension (PPH) while at the same time promoting dangerous use of the drugs alone and in combination;

g)   Defendants acted negligently in failing to warn Plaintiffs that use of the drugs carried a risk that heart transplant and lung transplant might become necessary to repair damages caused by the drugs;

h)   Defendants acted negligently by failing to inform physicians and hospitals of the dangers associated with the drugs, despite the actual and/or constructive knowledge of such dangers by Defendants, and knowing that the suppression of such dangers would increase the consumption of the

47

## COUNT V (BREACH OF WARRANTIES)

152.

Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

153.

When the AHP/WYETH Defendants and the John Doe Defendants placed the subject drugs into the stream of commerce, they knew of the use for which the drugs were intended (as diet aids and weight loss medications), and expressly and impliedly warranted the products to be of merchantable quality and to be safe and fit for such use.

154.

Plaintiffs reasonably relied upon the expertise, skill, judgment and knowledge of these Defendants and the John Doe Defendants and upon the express and/or implied warranty that the drugs were of merchantable quality and fit for use for weight loss and/or weight control.

155.

The drugs were not of merchantable quality and were not safe or fit for their intended use because the products were, and are, unreasonably dangerous and unfit for the ordinary purposes for which they were used, in that they caused injury to Plaintiffs and others far beyond any acceptable or warned side effect. Said drug products were unduly dangerous in expected use and did cause undue injury to Plaintiffs.

156.

As a direct and proximate result of the AHP/WYETH Defendants' and the John Doe Defendants breach of both implied and expressed warranties, Plaintiffs have suffered injuries and sustained damages.

157.

As a direct and proximate result of the breach of warranty by the Defendants and the John Doe Defendants, Plaintiffs have sustained and will continue to sustain serious and permanent injuries; physical pain and suffering; mental pain and suffering; impairment; disability; disfigurement; mental anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems including but not limited to those associated with her injuries; and as otherwise set forth under this Complaint.

## COUNT VI (FRAUD AND MISREPRESENTATION)

158.

Plaintiffs adopt and re-allege each paragraph above as if fully set forth herein.

159.

All Defendants, including the Sales Rep Defendants, and the John Doe Defendants, knew or should have known that the material representations they were making regarding the safety and efficacy of the subject diet drug products were false, and made such misrepresentations with the intent or purpose that Plaintiffs, Plaintiffs'

50

physicians, state medical boards, state pharmacy boards, state regulators, and others would rely upon them, leading to the ingestion and use of the subject drugs by Plaintiffs.

160.

At the time of Defendants' fraudulent misrepresentations and omissions, Plaintiffs were unaware of the falsity of the statements being made, reasonably believed such statements to be true, and acted in reasonable reliance upon such statements.

161.

Defendants breached their duty to disclose to Plaintiffs (including those duties established under 21 C.F.R §§ 1.21; 99.101; 201.56; 201.57; 310.303; 314.70; 314.80; & 314.81 as well as under other laws of this State and others) by willfully and recklessly providing false, incomplete, and misleading information regarding the subject drug products, and Defendants acted with deliberate intent to deceive and mislead Plaintiffs, and those who Defendants knew or should have known each Plaintiffs would rely upon in ingesting and using of the subject diet drugs.

162.

Plaintiffs reasonably relied upon these inaccurate and fraudulent misrepresentations, and relied upon the absence of adverse safety information about the drugs which Defendants did suppress, conceal, or fail to disclose, and suffered damage and injury as a result thereof.

51

163.

As a direct and proximate result of Defendants' willful, fraudulent and intentional misrepresentations, made with the intent to deceive Plaintiffs and others, Plaintiffs have suffered injury and damages; physical pain and suffering; mental pain and suffering; impairment; disability; disfigurement; mental anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems including but not limited to those associated with their injuries; and as otherwise set forth under this Complaint.

**COUNT VII (NEGLIGENT AND RECKLESS MISREPRESENTATION)**

164.

Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

165.

Defendants negligently and recklessly represented to Plaintiffs, Plaintiffs' physicians, state medical boards, state pharmacy boards, state regulators and other persons and professionals on whom it was known by Defendants that Plaintiffs would rely, as well as the public at large, that the subject diet drug products were safe to ingest and that the utility of these products outweighed any risk in use for the intended purpose of weight loss and/or weight control. Also, by negligently failing to disclose to Plaintiffs, and others for the benefit of Plaintiffs, important safety and injury information, thereby suppressing material facts about the drugs, while having a duty to disclose

such information, which duty arose from their actions of making, marketing, lobbying in support of, promoting, distributing and selling pharmaceutical products to Plaintiffs and others, Defendants further led Plaintiffs to rely upon the safety of the product in its use.

166.

The false representations of Defendants were negligently and recklessly made, in that the subject drug products in fact caused injury, were unsafe, and the benefits of their use were far outweighed by the risk associated with use thereof. Defendants, individually and collectively, committed acts of negligent misrepresentation and negligent concealment by suppressing material facts relating to the dangers and injuries associated with, and caused by, the use of the subject drugs.

167.

Defendants knew or should have known that their representations were false. Defendants made such false, negligent and/or reckless representations with the intent or purpose that Plaintiffs and Plaintiffs' physicians would rely upon such representations, leading to the use of the subject drugs by Plaintiffs.

168.

As a direct and proximate result of Defendants' negligent and reckless misrepresentations or concealment of facts, upon which Plaintiffs reasonably relied, Plaintiffs have suffered injury and sustained damages for which Defendants are liable.

169.

In undertaking to disseminate the negligent and reckless misrepresentations set forth above, Defendants intended to cause the deregulation, removal of restrictions on sale, and otherwise make the subject diet drug products readily available to Plaintiffs and the general public for purchase and/or use of the subject drug products solely to facilitate economic gain by Defendants. As a direct result of the negligent and reckless misrepresentation of Defendants, Plaintiffs have sustained and will continue to sustain serious and permanent injuries; physical pain and suffering; mental pain and suffering; impairment; disability; disfigurement; mental anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; physically suffering, and undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems including but not limited to those associated with their injuries; and as otherwise set forth under this Complaint.

## COUNT VIII (CONSPIRACY TO DEFRAUD AND FRAUDULENTLY CONCEAL)

170.

Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

171.

All Defendants, as well as the John Doe Defendants, entered into a conspiracy to suppress and fraudulently misrepresent material information that they were under a duty to disclose to Plaintiffs. In undertaking such conspiracy, Defendants purposely

failed to properly inform consumers, including Plaintiffs, of the health risks associated with these products as known by Defendants. Defendants entered this conspiracy that included those acts previously described concerning various studies and reports which were not disclosed to the consuming public, and the other specific allegations regarding fraud and misrepresentation made hereinabove.

172.

Defendants conspired together to commit the tort of fraud and misrepresentation upon Plaintiffs, in the same manner as contained in the allegations of fraud, concealment and misrepresentation stated above, knowing that same would lead to increased sales of said products and personal gain to each Defendant with a proportionate increased incidence and risk of injury and death to Plaintiffs.

173.

Each Defendant herein participated in combination in the conspiracy to defraud, conceal and misrepresent, which conspiracy had an unlawful, oppressive, and immoral purpose (to increase profits by increasing incidences and risks of death and injury) and/or achieved its purpose by unlawful, oppressive and immoral means (the suppression and fraudulent misrepresentation of material facts regarding important safety and health information which Defendants had a duty to disclose and disseminate under applicable state and federal law) and did commit overt acts in furtherance of the conspiracy, which was a legal cause of actual injury and damage to Plaintiffs.

174.

As a result of the conspiracy, Defendants made fraudulent misrepresentations to Plaintiffs and others as set forth above, and important safety and injury information was concealed from and misrepresented to Plaintiffs, and others upon whom Plaintiffs relied, with the intent that Plaintiffs would rely upon the misrepresentations and absence of concealed information, as more specifically set forth above.

175.

As a result of the conspiracy, Plaintiffs relied upon the misrepresentations of fact as specifically stated above, and did rely upon the absence of important safety and injury information, and as a result was injured and suffered serious and permanent injuries; physical pain and suffering; mental pain and suffering; impairment; disability; disfigurement; mental anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; physically suffering, and undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems including but not limited to those associated with her injuries; and as otherwise set forth under this Complaint.

## COUNT IX (JOHN DOE DEFENDANT LIABILITY)

176.

Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

177.

The John Doe Defendants listed in this Complaint, whose identities at this time are unknown, are also liable to Plaintiff in strict liability, negligence, breach of expressed and implied warranty, fraud and misrepresentation, negligent and reckless misrepresentation, and conspiracy to defraud and fraudulently conceal, as well as those other actions pled in this Complaint.

178.

As a direct and proximate of the aforementioned illegal and tortuous acts, Plaintiffs were injured and suffered damages including, but not limited to: (permanent and ongoing into the future) injury to Plaintiffs' hearts and other physical injuries; physical pain and suffering; mental pain and suffering; impairment; disability; disfigurement; mental anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; physically suffering, and undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems including but not limited to those associated with her injuries; and as otherwise set forth under this Complaint.

## COUNT X (JOINT AND SEVERAL LIABILITY)

179.

Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

180.

By virtue of their individual and collective acts and omissions, Defendants are

57

jointly and severally liable to Plaintiffs as such acts and omissions have proximately caused Plaintiffs to suffer a single indivisible injury for which each Defendant is responsible.

## COUNT XI  (PLAINTIFF'S DAMAGES)

181.

Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

182.

As a result of the individual, combined and concurring acts and omissions of Defendants as set forth herein above, each above-named Defendant, caused or contributed to cause the following injuries to Plaintiffs:

a)   Plaintiffs have been caused to suffer physical injury, past, present and future pain and suffering, disability, impairment, lost capacity to enjoy life, mental anguish, and lost earnings in an amount to be proven at trial;

b)   Plaintiffs have been caused to incur medical expenses and will in the future incur medical expenses an amount to be proven at trial;

c)   Plaintiffs have been caused to undergo medical monitoring and will be required to undergo medical monitoring for the rest of Plaintiffs lives an amount to be proven at trial; and

d)   Plaintiffs have been caused to suffer past, present and future fear and mental anguish concerning their present and future medical problems including but not limited to those associated with her injuries in an amount to be proven at trial.

WHEREFORE, Plaintiffs pray:

58

a)   That process issue according to law;

b)   That each Defendant be served with a copy of Plaintiffs Complaint and
     show cause why the prayers for relief requested by each Plaintiff herein
     should not be granted;

c)   That Plaintiffs be granted a trial by jury in this matter;

d)   That the Court enter a judgment against each Defendant, jointly and
     severally, for all general and compensatory damages allowable to
     Plaintiffs under the terms of the National Settlement, to the extent it
     applies;

e)   That the Court enter a judgment against each Defendant, jointly and
     severally, for all other relief sought by Plaintiffs under this Complaint in a
     manner consistent with the National Settlement, to the extent that it
     applies;

f)   That the costs of this action be cast upon Defendants; and

g)   That the Court grant Plaintiffs such further relief which the Court deems
     just and appropriate.

Respectfully submitted this 20 day of April, 2004.

_____
W. LEWIS GARRISON, JR. (GA BAR #286815)

OF COUNSEL:

GARRISON SCOTT GAMBLE & ROSENTHAL, P.C.
2224 First Avenue North
Birmingham, AL 35203
205-326-3336
205-326-3332 - facsimile

**GEORGIA, MUSCOGEE COUNTY:**

I have this day served the defendant

_robert Harnes_

personally with copy of the within complaint order of the court and summons.

This _26_ day of _APRIL_ ,20 _04_

_S. Haden  527810Y_

Deputy Sheriff, Muscogee County, GA

**GEORGIA, MUSCOGEE COUNTY:**

I have served the defendant

_____

**by** leaving a copy of the action and summons at his most notorius place of abode in this County.
Delivered same into hands of ——————

_____

described as follows: age, about ——————
years; weight, about—— pounds; height,
about—— feet and—— inches, domiciled
at the residence of the defendant.
This—— day of——— , 20 ———

_____

Deputy Sheriff, Muscogee County, GA

## AFFIDAVIT OF MARSHA M. FULLER

Personally appeared before me, the undersigned officer duly authorized to administer oaths, **MARSHA M. FULLER**, who, being duly sworn, states as follows:

1.      My name is MARSHA M. FULLER.  I am currently a resident of the state of Georgia.  I am over 21 years of age, and I am suffering from no legal disability. I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.      I began working for the Lederle division of American Home Products Corporation, now Wyeth, in 1988 and left Wyeth in 2002.  I was employed as a field sales representative, also known as a "detailer."  As a field sales representative, my job involved visits to physicians' offices to discuss (i.e., "detail") Wyeth products.  My job was to make sure that physicians were aware of Wyeth's products so as to determine whether to prescribe them for particular patients.

3.      I am not a medical doctor or pharmacist.  Wyeth provided me with the FDA-approved package inserts and other materials regarding the drugs I detailed for me to give to the physicians I visited.

3

4.      As part of my job responsibilities in 1996 and 1997, I detailed Redux with physicians in Georgia.  I have never had any job responsibilities or performed any work in relation to Redux in any state other than Georgia.

5.      With respect to Pondimin and phentermine, during the time relevant to this litigation, I did not detail Pondimin or phentermine, and had no job responsibilities for those products in any state.  I was not involved in the development of package inserts or promotional materials for the sale of Pondimin or phentermine, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Pondimin or phentermine.

6.      I was not involved in the development of package inserts or promotional materials for the sale of Redux, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Redux.

7.      I never sold or distributed Redux to any physicians or pharmacies, or anyone else.

8.      I was not involved in the regulatory approval process with the FDA for Redux or Pondimin.  Nor did I have any responsibilities for communicating or interacting with any state or federal regulatory agencies concerning Redux or Pondimin.

12.    I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with Indevus Pharmaceuticals, Inc., Interneuron Pharmaceuticals, Inc., or Eckerd Corporation or their representatives.

13.    I understand that I have been sued by the individuals listed on Schedule A, attached hereto.  To the best of my knowledge and recollection, I have never had any kind of communications or dealings of any kind with any of the individuals listed on Schedule A, attached hereto.

This _17th_ day of _____May_____, 2004.

_Marsha M. Fuller_
**MARSHA M. FULLER**


STATE OF _Georgia_    )
                      )          **ACKNOWLEDGMENT**
COUNTY OF _Cobb_      )

    I, _Robert J Faux_, Notary Public for the State of _Georgia_,   do hereby certify that the above-named MARSHA M. FULLER, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

    Witness my hand and official seal this the _17th_ day of _May_, 2004.

_Robert J Faux_
Notary Public for
My Commission Expires: _9-12-06_

4

## AFFIDAVIT OF ROBERT HAINES

Personally appeared before me, the undersigned officer duly authorized to administer oaths, ROBERT HAINES, who, being duly sworn, states as follows:

1.    My name is ROBERT HAINES.  I am currently a resident of the state of Georgia. I am over 21 years of age, and I am suffering from no legal disability.  I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.    I began working for the A.H. Robins division of American Home Products Corporation, now Wyeth, in 1988 and am still employed by Wyeth.  I am employed as a field sales representative, also known as a "detailer."  As a field sales representative, my job involves visits to physicians' offices to discuss (i.e., "detail") Wyeth products.  My job is to make sure that physicians are aware of Wyeth's products so as to determine whether to prescribe them for particular patients.

3.    I am not a medical doctor or pharmacist.  Wyeth provides me with the FDA-approved package inserts and other materials regarding the drugs I detail for me to give to the physicians I visit.

4.    As part of my job responsibilities in 1996 and 1997, I detailed Redux with physicians in Georgia and Alabama.  I have never had any job responsibilities or performed any work in relation to Redux in any state other than Georgia and Alabama.

5.     During the time relevant to this litigation, I did not detail Pondimin or phentermine, and had no job responsibilities for those products in any state. I was not involved in the development of package inserts or promotional materials for the sale of Pondimin or phentermine, and had no control over the content of those or other written warnings to be provided to physicians. I was not involved in the design, manufacture, testing, or labeling of Pondimin or phentermine.

6.     I was not involved in the development of package inserts or promotional materials for the sale of Redux, and had no control over the content of those or other written warnings to be provided to physicians. I was not involved in the design, manufacture, testing, or labeling of Redux.

7.     I never sold or distributed Redux to any physicians or pharmacies, or anyone else.

8.     I was not involved in the regulatory approval process with the FDA for Redux or Pondimin. Nor did I have any responsibilities for communicating or interacting with any state or federal regulatory agencies concerning Redux or Pondimin.

9.     I was not aware of any alleged association between Redux and/or Pondimin and valvular heart disease until the time such allegation was first publicized. I was not aware before that time of any published study, report, or literature that claimed that an association existed between Redux and/or Pondimin and valvular heart disease.

10.    I have made no representations regarding Redux, Pondimin, or the "fen-phen" combination, whether by way of promotion or advertising or otherwise, to the general public.  I have never intentionally misrepresented the safety or efficacy of, or knowingly made any false statements or mispresentations about, Redux, Pondimin, or the "fen-phen" combination to any health care professional or anyone else.

11.    I have never had any contact or communications of any kind regarding Redux, Pondimin or phentermine with representatives of Medeva Pharmaceuticals, Inc., Fisons Corporation, Celltech Pharmaceuticals, Inc., Goldline Pharmaceuticals, Inc., Zenith-Goldline Pharmaceuticals, Inc., Rugby Laboratories, Inc., Ion Laboratories, Inc., or with any other representatives of phentermine manufacturers or distributors.  I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with any of those entities or their representatives.

12.    I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with Indevus Pharmaceuticals, Inc., Interneuron Pharmaceuticals, Inc., or Eckerd Corporation or their representatives.

13.    I understand that I have been sued by the individuals listed on Schedule A, attached hereto.  To the best of my knowledge and recollection, I have never had any kind of communications or dealings of any kind with any of the individuals listed on Schedule A, attached hereto.

~ Doc# 522005.02 ~

This _12_ day of _Sept_____, 2003.

_Robert R. Haines_
ROBERT HAINES

STATE OF                    )
                           )          ACKNOWLEDGMENT
COUNTY OF                   )

I, _Bonnie Reed Melton_ Notary Public for the State of ___Georgia___,    do hereby certify that the above-named ROBERT HAINES, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal this the _12th_ day of _September_, 2003.

_Bonnie Reed Melton_
Notary Public for
My Commission Expires: _____

4

**Schedule A**

BENITA DAVIS; DANA HAMBY; CHERYL MACY; REBECCA WATKINS; ANITA METTS; A. LEE SNOW, as Surviving Spouse and as Executor of the Estate of JANICE SUE SNOW, Deceased; CHARLENE MINNIS; MARY RAY; VALERIE SEWELL; and MELODY WILSON.

~ Doc# 522005.02 ~

## AFFIDAVIT OF ROSEMARY STEWART DISIMONE

Personally appeared before me, the undersigned officer duly authorized to administer oaths, ROSEMARY STEWART DISIMONE, who, being duly sworn, states as follows:

1.   My name is ROSEMARY STEWART DISIMONE.  I am currently a resident of the state of Georgia.  I am over 21 years of age, and I am suffering from no legal disability.  I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.   I began working for the Lederle division of American Home Products Corporation, now Wyeth, in June 1997 and am still employed by Wyeth.  I was employed as a field sales representative, also known as a "detailer."  As a field sales representative, my job involved visits to physicians' offices to discuss (i.e., "detail") Wyeth products.  My job was to make sure that physicians were aware of Wyeth's products so as to determine whether to prescribe them for particular patients.

3.   I am not a medical doctor or pharmacist.  Wyeth provided me with the FDA-approved package inserts and other materials regarding the drugs I detailed for me to give to the physicians I visited.

4.   As part of my job responsibilities from June 1997 until September 1997, I detailed Redux with physicians in Georgia and Alabama.  I have never had any

job responsibilities or performed any work in relation to Redux in any state other than Georgia and Alabama.

5.     With respect to Pondimin and phentermine, during the time relevant to this litigation, I did not detail Pondimin or phentermine, and had no job responsibilities for those products in any state.   I was not involved in the development of package inserts or promotional materials for the sale of Pondimin or phentermine, and had no control over the content of those or other written warnings to be provided to physicians.   I was not involved in the design, manufacture, testing, or labeling of Pondimin or phentermine.

6.     I was not involved in the development of package inserts for the sale of Redux, and had no control over the content of those or other written warnings to be provided to physicians.   I was not involved in the design, manufacture, testing, or labeling of Redux.

7.     I never sold or distributed Redux to any physicians or pharmacies, or anyone else.

8.     I was not involved in the regulatory approval process with the FDA for Redux or Pondimin.   Nor did I have any responsibilities for communicating or interacting with any state or federal regulatory agencies concerning Redux or Pondimin.

2

9.   I was not aware of any alleged association between Redux and/or Pondimin and valvular heart disease until the time such allegation was first publicized. I was not aware before that time of any published study, report, or literature that claimed that an association existed between Redux and/or Pondimin and valvular heart disease.

10.   I have made no representations regarding Redux, Pondimin, or the "fen-phen" combination, whether by way of promotion or advertising or otherwise, to the general public. I have never intentionally misrepresented the safety or efficacy of, or knowingly made any false statements or mispresentations about, Redux, Pondimin, or the "fen-phen" combination to any health care professional or anyone else.

11.   I have never had any contact or communications of any kind regarding Redux, Pondimin or phentermine with representatives of Fisons Corporation, Celltech Pharmaceuticals, Inc., Goldline Pharmaceuticals, Inc., Zenith-Goldline Pharmaceuticals, Inc., Rugby Laboratories, Inc., Ion Laboratories, Inc., or with any other representatives of phentermine manufacturers or distributors. I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with any of those entities or their representatives.

~Doc# 557746 01~

# SCHEDULE A

LISA ANGEL; BETTY BATES; THEOLA BATTLE; AGNES BOYD; MICHAEL BROWN; ANQUINETTE CARTER; JANELL CHISM; BERNICE HAWK COBB; MARY JO DIANA; BONNIE EIDSON; BETTY ELLINGER; JESSICA HARROD; ALLYSON JOHNSON; JONI LOVELACE; COLIN LUKE; ANGELA LUKE; CATHERINE MATARO; JOYCE PETTIT; LUANN PIERCE; BRENDA ROSSE; SUSAN SPOOR; MONIQUE ST. JULIEN; DEBORAH TERRELL; RAMONA WALKER; NAOMI WALKER; BRENDA WHITE; and MARTHA WIGGINS.


EULA BOWEN; CYNTHIA BECKHAM; MARGIE BROWN; NANCY BROWN; SONIA BROWN; GREGORY BRUNNER; CATRINA CARR-McCOLLOUGH; NANCY COLLETT; SHELLY DAMBECK; BARBETTE DRIVER; LINDA FARRIS; O'KEEMA GARVIN; KATHY GORE; JAN GUM; SYBIL HOFFMAN; JANNIE JENNINGS; CAROL LAYFIELD; MARY LOVELESS; TERESA MACKIE; THERESA MASON; CHARLENE MILLER; WANDA MORRIS; JANE MOYE; HELEN MULLIGAN; JERRY PAYNE; LANA RABY; WENDY RAPER; MARTHA SHASTEEN; LYNDA STAMPS; LAURA TALTON; STACEY WALL; GLENDA WILLIAMS; ROBERT WILLIS; BERTHA WILSON.


FRANCES HUMPHREY; CYNTHIA KELLEY; GINA GOLDEN; SHEILA ANDERSON; KATHERINE HYATT; LORI SIMMONS; JANICE SIMS; JEWELL STEWART; and CAROLE ROGERS.

~Doc# 557746 01~

12.     I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with Indevus Pharmaceuticals, Inc., Interneuron Pharmaceuticals, Inc., Medeva Pharmaceuticals, Inc., or Eckerd Corporation or their representatives.

13.     I understand that I have been sued by the individuals listed on Schedule A, attached hereto.  To the best of my knowledge and recollection, I have never had any kind of communications or dealings of any kind with any of the individuals listed on Schedule A, attached hereto.

This _19_ day of _May_____, 2004.

_____
**ROSEMARY STEWART DISIMONE**


STATE OF   Georgia   )
                    )          ACKNOWLEDGMENT
COUNTY OF  Muscogee )

I, _Carolyn Young_, Notary Public for the State of _Georgia____,   do hereby certify that the above-named ROSEMARY STEWART DISIMONE, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal this the _19_ day of _May____, 2004.

_____
Notary Public for
My Commission Expires: _____

Notary Public, Muscogee County, Georgia
My Commission Expires april 19, 2007

# AFFIDAVIT OF SHANNON BUGGS

Personally appeared before me, the undersigned officer duly authorized to administer oaths, **SHANNON BUGGS**, who, being duly sworn, states as follows:

1.      My name is Shannon Buggs.  I am currently a resident of the state of Georgia. I am over 21 years of age, and I am suffering from no legal disability.  I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.      I began working for the Lederle division of American Home Products Corporation, now Wyeth, in 1992 and left Wyeth in 1998.  I was employed as a field sales representative, also known as a "detailer."  As a field sales representative, my job involved visits to physicians' offices to discuss (i.e., "detail") Wyeth products.  My job was to make sure that physicians were aware of Wyeth's products so as to determine whether to prescribe them for particular patients.

3.      I am not a medical doctor or pharmacist.  Wyeth provided me with the FDA-approved package inserts and other materials regarding the drugs I detailed for me to give to the physicians I visited.

4.    As part of my job responsibilities in 1996 and 1997, I detailed Redux with physicians in Georgia.  I have never had any job responsibilities or performed any work in relation to Redux in any state other than Georgia.

5.    With respect to Pondimin and phentermine, during the time relevant to this litigation, I did not detail Pondimin or phentermine, and had no job responsibilities for those products in any state.  I was not involved in the development of package inserts or promotional materials for the sale of Pondimin or phentermine, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Pondimin or phentermine.

6.    I was not involved in the development of package inserts or promotional materials for the sale of Redux, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Redux.

7.    I never sold or distributed Redux to any physicians or pharmacies, or anyone else.

8.    I was not involved in the regulatory approval process with the FDA for Redux or Pondimin.  Nor did I have any responsibilities for communicating or interacting with any state or federal regulatory agencies concerning Redux or Pondimin.

~Doc# 557765 01~

9.    I was not aware of any alleged association between Redux and/or Pondimin and valvular heart disease until the time such allegation was first publicized.  I was not aware before that time of any published study, report, or literature that claimed that an association existed between Redux and/or Pondimin and valvular heart disease.

10.   I have made no representations regarding Redux, Pondimin, or the "fen-phen" combination, whether by way of promotion or advertising or otherwise, to the general public.  I have never intentionally misrepresented the safety or efficacy of, or knowingly made any false statements or mispresentations about, Redux, Pondimn, or the "fen-phen" combination to any health care professional or anyone else.

11.   I have never had any contact or communications of any kind regarding Redux, Pondimin or phentermine with representatives of Medeva Pharmaceuticals, Inc., Fisons Corporation, Celltech Pharmaceuticals, Inc., Goldline Pharmaceuticals, Inc., Zenith-Goldline Pharmaceuticals, Inc., Rugby Laboratories, Inc., Ion Laboratories, Inc., or with any other representatives of phentermine manufacturers or distributors.  I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with any of those entities or their representatives.

~Doc# 557765 01~

12.   I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with Indevus Pharmaceuticals, Inc., Interneuron Pharmaceuticals, Inc., or Eckerd Corporation or their representatives.

13.   I understand that I have been sued by the individuals listed on Schedule A, attached hereto.  To the best of my knowledge and recollection, I have never had any kind of communications or dealings of any kind with any of the individuals listed on Schedule A, attached hereto.

This _14_ day of __MAY_____, 2004.

                                          _____
                                          **SHANNON BUGGS**

STATE OF                    )
                            )          ACKNOWLEDGMENT
COUNTY OF                   )

    I, _Harry N Transue_____, Notary Public for the State of _Georgia_____,   do hereby certify that the above-named SHANNON BUGGS, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

    Witness my hand and official seal this the _14th_ day of __May_____, 2004.

                                          _____
                                          Notary Public for _Forsyth Co Georgia_
                                          My Commission Expires: _3/26/05_

~Doc# 557765 01~

# SCHEDULE A

LISA ANGEL; BETTY BATES; THEOLA BATTLE; AGNES BOYD; MICHAEL BROWN; ANQUINETTE CARTER; JANELL CHISM; BERNICE HAWK COBB; MARY JO DIANA; BONNIE EIDSON; BETTY ELLINGER; JESSICA HARROD; ALLYSON JOHNSON; JONI LOVELACE; COLIN LUKE; ANGELA LUKE; CATHERINE MATARO; JOYCE PETTIT; LUANN PIERCE; BRENDA ROSSE; SUSAN SPOOR; MONIQUE ST. JULIEN; DEBORAH TERRELL; RAMONA WALKER; NAOMI WALKER; BRENDA WHITE; and MARTHA WIGGINS.

EULA BOWEN; CYNTHIA BECKHAM; MARGIE BROWN; NANCY BROWN; SONIA BROWN; GREGORY BRUNNER; CATRINA CARR-McCOLLOUGH; NANCY COLLETT; SHELLY DAMBECK; BARBETTE DRIVER; LINDA FARRIS; O'KEEMA GARVIN; KATHY GORE; JAN GUM; SYBIL HOFFMAN; JANNIE JENNINGS; CAROL LAYFIELD; MARY LOVELESS; TERESA MACKIE; THERESA MASON; CHARLENE MILLER; WANDA MORRIS; JANE MOYE; HELEN MULLIGAN; JERRY PAYNE; LANA RABY; WENDY RAPER; MARTHA SHASTEEN; LYNDA STAMPS; LAURA TALTON; STACEY WALL; GLENDA WILLIAMS; ROBERT WILLIS; BERTHA WILSON.

## AFFIDAVIT OF DOUGLAS W. RAY

Personally appeared before me, the undersigned officer duly authorized to administer oaths, **DOUGLAS W. RAY**, who, being duly sworn, states as follows:

1.  My name is Douglas W. Ray.  I am currently a resident of the state of Georgia. I am over 21 years of age, and I am suffering from no legal disability.  I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.  I began working for the Wyeth-Ayerst Laboratories division of American Home Products Corporation, now Wyeth, in 1990 and am still employed by Wyeth.  I am employed as a field sales representative, also known as a "detailer."  As a field sales representative, my job involves visits to physicians' offices to discuss (i.e., "detail") Wyeth products.  My job is to make sure that physicians are aware of Wyeth's products so as to determine whether to prescribe them for particular patients.

3.  I am not a medical doctor or pharmacist.  Wyeth provides me with the FDA-approved package inserts and other materials regarding the drugs I detail for me to give to the physicians I visit.

4.      As part of my job responsibilities in 1996 and 1997, I detailed Redux with physicians in Georgia.  I have never had any job responsibilities or performed any work in relation to Redux in any state other than Georgia.

5.      With respect to Pondimin and phentermine, during the time relevant to this litigation, I did not detail Pondimin or phentermine, and had no job responsibilities for those products in any state.  I was not involved in the development of package inserts or promotional materials for the sale of Pondimin or phentermine, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Pondimin or phentermine.

6.      I was not involved in the development of package inserts or promotional materials for the sale of Redux, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Redux.

7.      I never sold or distributed Redux to any physicians or pharmacies, or anyone else.

8.      I was not involved in the regulatory approval process with the FDA for Redux or Pondimin.   Nor did I have any responsibilities for communicating or interacting with any state or federal regulatory agencies concerning Redux or Pondimin.

9.   I was not aware of any alleged association between Redux and/or Pondimin and valvular heart disease until the time such allegation was first publicized.  I was not aware before that time of any published study, report, or literature that claimed that an association existed between Redux and/or Pondimin and valvular heart disease.

10.   I have made no representations regarding Redux, Pondimin, or the "fen-phen" combination, whether by way of promotion or advertising or otherwise, to the general public.  I have never intentionally misrepresented the safety or efficacy of, or knowingly made any false statements or mispresentations about, Redux, Pondimn, or the "fen-phen" combination to any health care professional or anyone else.

11.   I have never had any contact or communications of any kind regarding Redux, Pondimin or phentermine with representatives of Medeva Pharmaceuticals, Inc., Fisons Corporation, Celltech Pharmaceuticals, Inc., Goldline Pharmaceuticals, Inc., Zenith-Goldline Pharmaceuticals, Inc., Rugby Laboratories, Inc., Ion Laboratories, Inc., or with any other representatives of phentermine manufacturers or distributors.  I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with any of those entities or their representatives.

~Doc# 557767 01~

12.     I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with Indevus Pharmaceuticals, Inc., Interneuron Pharmaceuticals, Inc., or Eckerd Corporation or their representatives.

13.     I understand that I have been sued by the individuals listed on Schedule A, attached hereto. To the best of my knowledge and recollection, I have never had any kind of communications or dealings of any kind with any of the individuals listed on Schedule A, attached hereto.

This /7ᵀᴴ day of _____May_____, 2004.

_____
**DOUGLAS W. RAY**

STATE OF Georgia          )
                          )          ACKNOWLEDGMENT
COUNTY OF Cherokee        )

     I, Rhonda Coker, Notary Public for the State of Georgia, do hereby certify that the above-named DOUGLAS W. RAY, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal this the 17 day of May, 2004.

_____
Notary Public for
My Commission Expires: _____

Rhonda Coker
Notary Public-Cherokee County, Georgia
My Commission Expires January 16, 2006

~Doc# 557767 01~

# SCHEDULE A

LISA ANGEL; BETTY BATES; THEOLA BATTLE; AGNES BOYD; MICHAEL BROWN; ANQUINETTE CARTER; JANELL CHISM; BERNICE HAWK COBB; MARY JO DIANA; BONNIE EIDSON; BETTY ELLINGER; JESSICA HARROD; ALLYSON JOHNSON; JONI LOVELACE; COLIN LUKE; ANGELA LUKE; CATHERINE MATARO; JOYCE PETTIT; LUANN PIERCE; BRENDA ROSSE; SUSAN SPOOR; MONIQUE ST. JULIEN; DEBORAH TERRELL; RAMONA WALKER; NAOMI WALKER; BRENDA WHITE; and MARTHA WIGGINS.

EMMIE BASS; TERESA BELFLOWER; CLAUDIA R. BUCHER; CAROLANN CHERRY; JILL CLAYBORN; MARY DUVALL; PATRICIA R. FOSTER; CATHY B. GRANT; DINA S. KILGORE; MARIAN LANGFORD; MILDRED LING; SOPHIA LOUIS; CHERYL P. PAINTER; MARLENE PEAVY; PAULETTE PIERSON; DOLORES D. TURNER; LAURA WALZ; DEBRA J. WEAVER; and BETTY WHIDBY.

## AFFIDAVIT OF FRANK HAWKINS

Personally appeared before me, the undersigned officer duly authorized to administer oaths, **FRANK HAWKINS**, who, being duly sworn, states as follows:

1.      My name is Frank Hawkins.  I am currently a resident of the state of Georgia.  I am over 21 years of age, and I am suffering from no legal disability.  I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.      I began working for the A.H. Robins division of American Home Products Corporation, now Wyeth, in 1965 and left Wyeth in 1999.  I was employed as a field sales representative, also known as a "detailer."   As a field sales representative, my job involved visits to physicians' offices to discuss (i.e., "detail") Wyeth products.  My job was to make sure that physicians were aware of Wyeth's products so as to determine whether to prescribe them for particular patients.

3.      I am not a medical doctor or pharmacist.  Wyeth provided me with the FDA-approved package inserts and other materials regarding the drugs I detailed for me to give to the physicians I visited.

4.      As part of my job responsibilities in 1996 and 1997, I detailed Redux with physicians in Georgia.  I have never had any job responsibilities or performed any work in relation to Redux in any state other than Georgia.

5.     With respect to Pondimin and phentermine, during the time relevant to this litigation, I did not detail Pondimin or phentermine, and had no job responsibilities for those products in any state.   I was not involved in the development of package inserts or promotional materials for the sale of Pondimin or phentermine, and had no control over the content of those or other written warnings to be provided to physicians.   I was not involved in the design, manufacture, testing, or labeling of Pondimin or phentermine.

6.     I was not involved in the development of package inserts or promotional materials for the sale of Redux, and had no control over the content of those or other written warnings to be provided to physicians.   I was not involved in the design, manufacture, testing, or labeling of Redux.

7.     I never sold or distributed Redux to any physicians or pharmacies, or anyone else.

8.     I was not involved in the regulatory approval process with the FDA for Redux or Pondimin.   Nor did I have any responsibilities for communicating or interacting with any state or federal regulatory agencies concerning Redux or Pondimin.

9.     I was not aware of any alleged association between Redux and/or Pondimin and valvular heart disease until the time such allegation was first publicized.   I was not aware before that time of any published study, report, or literature that claimed that an association existed between Redux and/or Pondimin and valvular heart disease.

~ Doc# 517853.01 ~

10.     I have made no representations regarding Redux, Pondimin, or the "fen-phen" combination, whether by way of promotion or advertising or otherwise, to the general public.  I have never intentionally misrepresented the safety or efficacy of, or knowingly made any false statements or mispresentations about, Redux, Pondimn, or the "fen-phen" combination to any health care professional or anyone else.

11.     I have never had any contact or communications of any kind regarding Redux, Pondimin or phentermine with representatives of Medeva Pharmaceuticals, Inc., Fisons Corporation, Celltech Pharmaceuticals, Inc., Goldline Pharmaceuticals, Inc., Zenith-Goldline Pharmaceuticals, Inc., Rugby Laboratories, Inc., Ion Laboratories, Inc., or with any other representatives of phentermine manufacturers or distributors.  I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with any of those entities or their representatives.

12.     I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with Indevus Pharmaceuticals, Inc., Interneuron Pharmaceuticals, Inc., or Eckerd Corporation or their representatives.

13.     I understand that I have been sued by the individuals listed on Schedule A, attached hereto.  To the best of my knowledge and recollection, I have never had any kind of communications or dealings of any kind with any of the individuals listed on Schedule A, attached hereto.

This 3rd day of _____Sept_____, 2003.

_____
**FRANK HAWKINS**

4

**SCHEDULE A**

**Pietrocarlo, Lucille,** As Personal Representative Of The Estate Of Dorothy Venturi; Bernice West; Linda Cowart; Marissa Pevahouse; Gina Brown; Julia Bazo; Pamela Whidden; Catherine Mcalpin; Kathryn Mouton; Jerraldine Evans; Jocelyn Cato-Broussard; Patricia A. Thomas; Catherine Heintze; Angela Waguespack; Daniel Shulz; Betty Pellissier; Barbara Whittington; Wendy Warner; Jackie Moore; Rhoda Galvani; Sharon Snyder; Georgeanna McConnell; and Karen Lewis.

## AFFIDAVIT OF TERRI S. MORTON

Personally appeared before me, the undersigned officer duly authorized to administer oaths, TERRI S. MORTON, who, being duly sworn, states as follows:

1. My name is Terri S. Morton.  I am currently a resident of the state of Georgia.  I am over 21 years of age, and I am suffering from no legal disability.  I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2. I began working for the Wyeth-Ayerst division, and subsequently for the A.H. Robins division, of American Home Products Corporation, now Wyeth, in 1993, and left Wyeth in 1998.  I was employed as a field sales representative, also known as a "detailer."  As a field sales representative, my job involved visits to physicians' offices to discuss (i.e., "detail") Wyeth products.  My job was to make sure that physicians were aware of Wyeth's products so as to determine whether to prescribe them for particular patients.

3. I am not a medical doctor or pharmacist.  Wyeth provided me with the FDA-approved package inserts and other materials regarding the drugs I detailed for me to give to the physicians I visited.

4. As part of my job responsibilities in 1996 and 1997, I detailed Redux with physicians in Georgia.  I have never had any job responsibilities or performed any work in relation to Redux in any state other than Georgia.

5.      With respect to Pondimin and phentermine, during the time relevant to this litigation, I did not detail Pondimin or phentermine, and had no job responsibilities for those products in any state.   I was not involved in the development of package inserts or promotional materials for the sale of Pondimin or phentermine, and had no control over the content of those or other written warnings to be provided to physicians.   I was not involved in the design, manufacture, testing, or labeling of Pondimin or phentermine.

6.      I was not involved in the development of package inserts or promotional materials for the sale of Redux, and had no control over the content of those or other written warnings to be provided to physicians.   I was not involved in the design, manufacture, testing, or labeling of Redux.

7.      I never sold or distributed Redux to any physicians or pharmacies, or anyone else.

8.      I was not involved in the regulatory approval process with the FDA for Redux or Pondimin.   Nor did I have any responsibilities for communicating or interacting with any state or federal regulatory agencies concerning Redux or Pondimin.

9.      I was not aware of any alleged association between Redux and/or Pondimin and valvular heart disease until the time such allegation was first publicized.   I was not aware before that time of any published study, report, or literature that claimed that an association existed between Redux and/or Pondimin and valvular heart disease.

~ Doc# 519785 01 ~

10.     I have made no representations regarding Redux, Pondimin, or the "fen-phen" combination, whether by way of promotion or advertising or otherwise, to the general public. I have never intentionally misrepresented the safety or efficacy of, or knowingly made any false statements or mispresentations about, Redux, Pondimin, or the "fen-phen" combination to any health care professional or anyone else.

11.     I have never had any contact or communications of any kind regarding Redux, Pondimin or phentermine with representatives of Medeva Pharmaceuticals, Inc., Fisons Corporation, Celltech Pharmaceuticals, Inc., Goldline Pharmaceuticals, Inc., Zenith-Goldline Pharmaceuticals, Inc., Rugby Laboratories, Inc., Ion Laboratories, Inc., or with any other representatives of phentermine manufacturers or distributors. I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with any of those entities or their representatives.

12.     I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with Indevus Pharmaceuticals, Inc., Interneuron Pharmaceuticals, Inc., or Eckerd Corporation or their representatives.

13.     I understand that I have been sued by the individuals listed on Schedule A, attached hereto. To the best of my knowledge and recollection, I have never had any kind of communications or dealings of any kind with any of the individuals listed on Schedule A, attached hereto.

This 10th day of September, 2003.

TERRI S. MORTON

STATE OF                          )
                                     )            ACKNOWLEDGMENT

COUNTY OF                      )

I, _Jacquelene Clemmons_, Notary Public for the State of _Georgia_, do hereby certify that the above-named TERRI S. MORTON, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal this the _10th_ day of _Sept._, 2003.

_Jacquelene Clemmons_

Notary Public for _DeKalb_

My Commission Expires: _12-30-05_

## SCHEDULE A

Atkinson, Linda; Laila Kaer; Karen Matthews; Diane Mcphearson; Natalie Laustsen; Susan Gundersen;Carolyn Winchester; Karen Foster;Candice Day; Dawn Gray; Corri Hildenbrand; Mary Seabolt; Hazel Allen; Jacqueline Robinson; Pamela Burman; Robert Martinez; Elaine Cahill; Burnadell Nelson; Bonnie Tillman; Deana Fox; Kathy Loudin; Sandra Clough; Lynda Montgomery; Deona Gonzales; Melanie Miller McNair; ChristenaRollin; Deborah Cantrell; Gay McLain; Carol Aiken; Dannette Addison; Joan Butler; Leslie Ellison; Mary Foster; Debra Gordon-Wade; Debra Grismer; Lisa Grueninger; Anna Halstead; KathyHamm; Carol Henline; Paula Hubbard; Patricia Kersey; Vickie King; Rosemary Krebs; Paula McKim; Susan Mellick; Nina Miller; Theresa; Ruddell; Karen Cole; Donna Consuegra; and Donald Craft;

Wood, Terri Lynn; Timothy E. Miller;Valerie L. Hornik; Shirley A. Mcintosh; Cindy Bridges; Karen Gainey; Betty Groves; Mary A. Kempke; Barbara Grannum; Mary Ann Koromi; Terri Smetana; Denise A. Braun; Deborah R. Stewart-Kent; Maureen K. Hayden; Charles W. Williams; Sandra Sullivan; Candice K. Seger; Becky Govea; Jean Kopel; Vera Lewis; Barbara Armour; Rita Moncrief; Richard Labrosse; Rosemary Rodgers; Lisa Lowry; Laura Holmes; Betty J. Burkett; Marie Tucker; Darlene Reffitt; Nancy S. Patterson; Donald Henderson; Idamarie Gagliardi; Louanna M. Cox; Jacqueline Ropella; Natha P. Lloyd; Sherry Langset; Donna Howell-Gilbert; Ruth Windsor; Sharon Bullard-Taylor; Elizabeth Riner; Elizabeth A. Avila; Naomi M. Linder; Debbie Lau; Jacqueline L. Turner; Rebecca A. Whitaker; Gina Bergens; Stephanie Bergmann; Myrlene Marinello; and Audrey Hall;

Wurdinger, Mary; Brenda Petersen; Mollie Gillespie; Donna Bohrer; Nancy Sundstrom; Greg Bovee; Judy Skoglund; Linda Bogus; Penny Teeters; Ronna Dueling; Jennifer Kaae; Marilyn Johnson; Karen Lloyd; Nena Graham-Burke; Mary Lothman; Cynthia Rahrer; Barbara Mahlum; Georgia Gundersen; Angela Mcnicol; Kaye Poe; Jan Deford; Shelia Hartl; Louise Benson; Shirlynn Campbell; Diane Dellis; Bonnie Holbrook; Richard Michaels; Ethel Mizell; Dorothy Reese; Diana Spurlock; Jennifer Stone; Michael Suber; Gail Tackett; Virgil Tackett; Felicia Tanner; Cindy Thornquest; Robbie Tidwell; Joyce Trimble; Stephanie Tucker; Dwana Turner; Nina Vannatter; Beth Vickstrom; Alvis Michael Walker; Claudia Ward; Melissa Webb; Robert Weinstein; Deborah Ann Wester; Nancy Westfale; Connie S. Bailey; and Nancy J. Phillips;

Agee, Deborah J.; Ball, Judy E.; Barton, Doreen L.; Baylor, Rosina E.; Benjamin, Stacy; Benoit, Barbara; Berard, Cynthia; Beyer, Wanda M.; Bieling, Gualthera A.; Croft, Kim L.; Daniel, Deanie G.; Davis, Anita B.; Dogan, Carol; Eustache, Ernst; Harper, Sheneda; Hernandez, Elizabeth; Horton, Barbara; Hull, Dorothy Ann; Keel, Suzanne; Kirby, Glenda; Knight, Ruby J.; Kocsis, Angela; Lindsay, Brett E.; Littles, Beverly Willis; Littleton, Erma; Lott, Edith L.; Mcneill, Janifer; Murtagh, Margaret; Nembhard, Sherry; Nix, Marilyn; Norris, Doris B.; O'cain, Lisa; Olmeda, Licette; Olson, Nancy Jeanne; Page, Mary Ellen; Pattin, Jacqueline Marie; Pye,

Shelley; Range, Melissa S.; Smith, Gail M.; Spears, Ozella; Stepps, Linda Louise; Stewart, Saundra Ellington; Suttles, Deanna G.; Sweeny, Janet F.; Wilson, Rosemary S.; Younger, Robert H.; Young-Jones, Beverly; Zinn, Dianne.

## AFFIDAVIT OF LISA CHURCH RODENHISER

Personally appeared before me, the undersigned officer duly authorized to administer oaths, **LISA CHURCH RODENHISER**, who, being duly sworn, states as follows:

1.      My name is LISA CHURCH RODENHISER.  I am currently a resident of the state of Georgia.  I am over 21 years of age, and I am suffering from no legal disability.  I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.      I began working for the Lederle division of American Home Products Corporation, now Wyeth, in 1993 and am still employed by Wyeth.  I was employed as a field sales representative, also known as a "detailer."  As a field sales representative, my job involved visits to physicians' offices to discuss (i.e., "detail") Wyeth products.  My job was to make sure that physicians were aware of Wyeth's products so as to determine whether to prescribe them for particular patients.

3.      I am not a medical doctor or pharmacist.  Wyeth provided me with the FDA-approved package inserts and other materials regarding the drugs I detailed for me to give to the physicians I visited.

4.  As part of my job responsibilities in 1996 and 1997, I detailed Redux with physicians in Georgia. I have never had any job responsibilities or performed any work in relation to Redux in any state other than Georgia.

5.  During the time relevant to this litigation, I did not detail Pondimin or phentermine, and had no job responsibilities for those products in any state. I was not involved in the development of package inserts or promotional materials for the sale of Pondimin or phentermine, and had no control over the content of those or other written warnings to be provided to physicians. I was not involved in the design, manufacture, testing, or labeling of Pondimin or phentermine.

6.  I was not involved in the development of package inserts or promotional materials for the sale of Redux, and had no control over the content of those or other written warnings to be provided to physicians. I was not involved in the design, manufacture, testing, or labeling of Redux.

7.  I never sold or distributed Redux to any physicians or pharmacies, or anyone else.

8.  I was not involved in the regulatory approval process with the FDA for Redux or Pondimin. Nor did I have any responsibilities for communicating or interacting with any state or federal regulatory agencies concerning Redux or Pondimin.

~Doc# 557814.01~

9.      I was not aware of any alleged association between Redux and/or Pondimin and valvular heart disease until the time such allegation was first publicized.  I was not aware before that time of any published study, report, or literature that claimed that an association existed between Redux and/or Pondimin and valvular heart disease.

10.     I have made no representations regarding Redux, Pondimin, or the "fen-phen" combination, whether by way of promotion or advertising or otherwise, to the general public.  I have never intentionally misrepresented the safety or efficacy of, or knowingly made any false statements or mispresentations about, Redux, Pondimin, or the "fen-phen" combination to any health care professional or anyone else.

11.     I have never had any contact or communications of any kind regarding Redux, Pondimin or phentermine with representatives of Medeva Pharmaceuticals, Inc., Fisons Corporation, Celltech Pharmaceuticals, Inc., Goldline Pharmaceuticals, Inc., Zenith-Goldline Pharmaceuticals, Inc., Rugby Laboratories, Inc., Ion Laboratories, Inc., or with any other representatives of phentermine manufacturers or distributors.  I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with any of those entities or their representatives.

12.     I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with Indevus Pharmaceuticals, Inc., Interneuron Pharmaceuticals, Inc., or Eckerd Corporation or their representatives.

13.     I understand that I have been sued by the individuals listed on Schedule A, attached hereto.  To the best of my knowledge and recollection, I have never had any kind of communications or dealings of any kind with any of the individuals listed on Schedule A, attached hereto.

This _14th_ day of _May_____, 2004.

_Lisa Church Rodenhiser_
LISA CHURCH RODENHISER

STATE OF  Georgia        )
                         )           ACKNOWLEDGMENT
COUNTY OF  Gwinnett      )

    I, _Arshiya Momin_, Notary Public for the State of _Georgia_____,  do hereby certify that the above-named LISA CHURCH RODENHISER, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

    Witness my hand and official seal this the _14_ day of _May_____, 2004.

_____
Notary Public for
My Commission Expires: _March 19, 2007_

4

## SCHEDULE A

LISA ANGEL; BETTY BATES; THEOLA BATTLE; AGNES BOYD; MICHAEL BROWN; ANQUINETTE CARTER; JANELL CHISM; BERNICE HAWK COBB; MARY JO DIANA; BONNIE EIDSON; BETTY ELLINGER; JESSICA HARROD; ALLYSON JOHNSON; JONI LOVELACE; COLIN LUKE; ANGELA LUKE; CATHERINE MATARO; JOYCE PETTIT; LUANN PIERCE; BRENDA ROSSE; SUSAN SPOOR; MONIQUE ST. JULIEN; DEBORAH TERRELL; RAMONA WALKER; NAOMI WALKER; BRENDA WHITE; and MARTHA WIGGINS.

## AFFIDAVIT OF TRACI MULLIS JOHNSON

Personally appeared before me, the undersigned officer duly authorized to administer oaths, **TRACI MULLIS JOHNSON**, who, being duly sworn, states as follows:

1.  My name is Traci Mullis Johnson.  I am currently a resident of the state of Georgia.  I am over 21 years of age, and I am suffering from no legal disability. I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.  I began working for the Lederle division of American Home Products Corporation, now Wyeth, in 1995 and left Wyeth in 2000.  I was employed as a field sales representative, also known as a "detailer."   As a field sales representative, my job involved visits to physicians' offices to discuss (i.e., "detail") Wyeth products.  My job was to make sure that physicians were aware of Wyeth's products so as to determine whether to prescribe them for particular patients.

3.  I am not a medical doctor or pharmacist.  Wyeth provided me with the FDA-approved package inserts and other materials regarding the drugs I detailed for me to give to the physicians I visited.

4.     As part of my job responsibilities in 1996 and 1997, I detailed Redux with physicians in Georgia. I have never had any job responsibilities or performed any work in relation to Redux in any state other than Georgia.

5.     With respect to Pondimin and phentermine, during the time relevant to this litigation, I did not detail Pondimin or phentermine, and had no job responsibilities for those products in any state. I was not involved in the development of package inserts or promotional materials for the sale of Pondimin or phentermine, and had no control over the content of those or other written warnings to be provided to physicians. I was not involved in the design, manufacture, testing, or labeling of Pondimin or phentermine.

6.     I was not involved in the development of package inserts or promotional materials for the sale of Redux, and had no control over the content of those or other written warnings to be provided to physicians. I was not involved in the design, manufacture, testing, or labeling of Redux.

7.     I never sold or distributed Redux to any physicians or pharmacies, or anyone else.

8.     I was not involved in the regulatory approval process with the FDA for Redux or Pondimin. Nor did I have any responsibilities for communicating or interacting with any state or federal regulatory agencies concerning Redux or Pondimin.

~Doc# 557811.01~

9.     I was not aware of any alleged association between Redux and/or Pondimin and valvular heart disease until the time such allegation was first publicized. I was not aware before that time of any published study, report, or literature that claimed that an association existed between Redux and/or Pondimin and valvular heart disease.

10.    I have made no representations regarding Redux, Pondimin, or the "fen-phen" combination, whether by way of promotion or advertising or otherwise, to the general public. I have never intentionally misrepresented the safety or efficacy of, or knowingly made any false statements or mispresentations about, Redux, Pondimn, or the "fen-phen" combination to any health care professional or anyone else.

11.    I have never had any contact or communications of any kind regarding Redux, Pondimin or phentermine with representatives of Medeva Pharmaceuticals, Inc., Fisons Corporation, Celltech Pharmaceuticals, Inc., Goldline Pharmaceuticals, Inc., Zenith-Goldline Pharmaceuticals, Inc., Rugby Laboratories, Inc., Ion Laboratories, Inc., or with any other representatives of phentermine manufacturers or distributors. I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with any of those entities or their representatives.

3

12.     I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with Indevus Pharmaceuticals, Inc., Interneuron Pharmaceuticals, Inc., or Eckerd Corporation or their representatives.

13.     I understand that I have been sued by the individuals listed on Schedule A, attached hereto.  To the best of my knowledge and recollection, I have never had any kind of communications or dealings of any kind with any of the individuals listed on Schedule A, attached hereto.

This 15th day of _____May_____ , 2004.

_____
TRACI MULLIS JOHNSON

STATE OF  Georgia            )
                             )          ACKNOWLEDGMENT
COUNTY OF  Lowndes           )

     I, Michael J. Young , Notary Public for the State of  Georgia    ,   do hereby certify that the above-named TRACI MULLIS JOHNSON, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

     Witness my hand and official seal this the  18th day of  May  , 2004.

_____
Notary Public for
My Commission Expires: March 24, 2005

Notary Public, Lowndes County, Georgia
My Commission Expires March 24, 2005

4

## SCHEDULE A

LISA ANGEL; BETTY BATES; THEOLA BATTLE; AGNES BOYD; MICHAEL BROWN; ANQUINETTE CARTER; JANELL CHISM; BERNICE HAWK COBB; MARY JO DIANA; BONNIE EIDSON; BETTY ELLINGER; JESSICA HARROD; ALLYSON JOHNSON; JONI LOVELACE; COLIN LUKE; ANGELA LUKE; CATHERINE MATARO; JOYCE PETTIT; LUANN PIERCE; BRENDA ROSSE; SUSAN SPOOR; MONIQUE ST. JULIEN; DEBORAH TERRELL; RAMONA WALKER; NAOMI WALKER; BRENDA WHITE; and MARTHA WIGGINS.

## AFFIDAVIT OF JANET P. JACKSON

Personally appeared before me, the undersigned officer duly authorized to administer oaths, **JANET P. JACKSON**, who, being duly sworn, states as follows:

1.     My name is Janet P. Jackson.  I am currently a resident of the state of Georgia. I am over 21 years of age, and I am suffering from no legal disability.  I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.     I began working for the Lederle division of American Home Products Corporation, now Wyeth, in 1985 and am still employed by Wyeth.  I am employed as a field sales representative, also known as a "detailer."  As a field sales representative, my job involves visits to physicians' offices to discuss (i.e., "detail") Wyeth products.  My job is to make sure that physicians are aware of Wyeth's products so as to determine whether to prescribe them for particular patients.

3.     I am not a medical doctor or pharmacist.  Wyeth provides me with the FDA-approved package inserts and other materials regarding the drugs I detail for me to give to the physicians I visit.

4.    As part of my job responsibilities in 1996 and 1997, I detailed Redux with physicians in Georgia.  I have never had any job responsibilities or performed any work in relation to Redux in any state other than Georgia.

5.    With respect to Pondimin and phentermine, during the time relevant to this litigation, I did not detail Pondimin or phentermine, and had no job responsibilities for those products in any state.  I was not involved in the development of package inserts or promotional materials for the sale of Pondimin or phentermine, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Pondimin or phentermine.

6.    I was not involved in the development of package inserts or promotional materials for the sale of Redux, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Redux.

7.    I never sold or distributed Redux to any physicians or pharmacies, or anyone else.

8.    I was not involved in the regulatory approval process with the FDA for Redux or Pondimin.  Nor did I have any responsibilities for communicating or interacting with any state or federal regulatory agencies concerning Redux or Pondimin.

~Doc# 557809.01~

9.    I was not aware of any alleged association between Redux and/or Pondimin and valvular heart disease until the time such allegation was first publicized.  I was not aware before that time of any published study, report, or literature that claimed that an association existed between Redux and/or Pondimin and valvular heart disease.

10.    I have made no representations regarding Redux, Pondimin, or the "fen-phen" combination, whether by way of promotion or advertising or otherwise, to the general public.  I have never intentionally misrepresented the safety or efficacy of, or knowingly made any false statements or mispresentations about, Redux, Pondimn, or the "fen-phen" combination to any health care professional or anyone else.

11.    I have never had any contact or communications of any kind regarding Redux, Pondimin or phentermine with representatives of Medeva Pharmaceuticals, Inc., Fisons Corporation, Celltech Pharmaceuticals, Inc., Goldline Pharmaceuticals, Inc., Zenith-Goldline Pharmaceuticals, Inc., Rugby Laboratories, Inc., Ion Laboratories, Inc., or with any other representatives of phentermine manufacturers or distributors.  I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with any of those entities or their representatives.

3

~Doc# 557899.01~

12.     I have never entered into any type of agreement, arrangement or conspiracy

regarding Redux, Pondimin, or phentermine with Indevus Pharmaceuticals,

Inc., Interneuron Pharmaceuticals, Inc., or Eckerd Corporation or their

representatives.

13.     I understand that I have been sued by the individuals listed on Schedule A,

attached hereto.  To the best of my knowledge and recollection, I have never

had any kind of communications or dealings of any kind with any of the

individuals listed on Schedule A, attached hereto.

This _17_ day of ____May____, 2004.

_____
JANET P. JACKSON

STATE OF  Georgia    )
                     )          ACKNOWLEDGMENT
COUNTY OF Gwinnett   )

I, __Mohini Salim__, Notary Public for the State of __Georgia__,   do
hereby certify that the above-named JANET P. JACKSON, personally appeared before me this
day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal this the _17_ day of ___May___, 2004.

_____
Notary Public for
My Commission Expires: __5-28-07__

4

## AFFIDAVIT OF AVERY T. LANIUS

Personally appeared before me, the undersigned officer duly authorized to administer oaths, **AVERY T. LANIUS,** who, being duly sworn, states as follows:

1.     My name is Avery T. Lanius.  I am currently a resident of the state of Georgia. I am over 21 years of age, and I am suffering from no legal disability.  I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.     In 1991, I began working for the Wyeth-Ayerst Laboratories division and subsequently worked for the A.H. Robins division of American Home Products Corporation, now Wyeth, and am still employed by Wyeth.  I am employed as a field sales representative, also known as a "detailer."  As a field sales representative, my job involves visits to physicians' offices to discuss (i.e., "detail") Wyeth products.  My job is to make sure that healthcare practitioners are aware of Wyeth's products so as to determine whether to prescribe them for particular patients.

3.     I am not a medical doctor or pharmacist.  Wyeth provides me with the FDA-approved package inserts and other materials regarding the drugs I detail for me to give to the healthcare practitioners I visit.

4.      As part of my job responsibilities in 1996 and 1997, I detailed Redux with physicians in Georgia.  I have never had any job responsibilities or performed any work in relation to Redux in any state other than Georgia.

5.      With respect to Pondimin and phentermine, during the time relevant to this litigation, I did not detail Pondimin or phentermine, and had no job responsibilities for those products in any state.  I was not involved in the development of package inserts or promotional materials for the sale of Pondimin or phentermine, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Pondimin or phentermine.

6.      I was not involved in the development of package inserts or promotional materials for the sale of Redux, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Redux.

7.      I never sold or distributed Redux to any physicians or pharmacies, or anyone else.

8.      I was not involved in the regulatory approval process with the FDA for Redux or Pondimin.   Nor did I have any responsibilities for communicating or interacting with any state or federal regulatory agencies concerning Redux or Pondimin.

9.     I was not aware of any alleged association between Redux and/or Pondimin and valvular heart disease until the time such allegation was first publicized.  I was not aware before that time of any published study, report, or literature that claimed that an association existed between Redux and/or Pondimin and valvular heart disease.

10.     I have made no representations regarding Redux, Pondimin, or the "fen-phen" combination, whether by way of promotion or advertising or otherwise, to the general public.  I have never intentionally misrepresented the safety or efficacy of, or knowingly made any false statements or mispresentations about, Redux, Pondimn, or the "fen-phen" combination to any health care professional or anyone else.

11.     I have never had any contact or communications of any kind regarding Redux, Pondimin or phentermine with representatives of Medeva Pharmaceuticals, Inc., Fisons Corporation, Celltech Pharmaceuticals, Inc., Goldline Pharmaceuticals, Inc., Zenith-Goldline Pharmaceuticals, Inc., Rugby Laboratories, Inc., Ion Laboratories, Inc., or with any other representatives of phentermine manufacturers or distributors.  I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with any of those entities or their representatives.

12.     I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with Indevus Pharmaceuticals, Inc., Interneuron Pharmaceuticals, Inc., or Eckerd Corporation or their representatives.

This _18 TH_ day of _____MAY_____, 2004.

_Avery T. Lanius_
**AVERY T. LANIUS**


STATE OF G̲E̲O̲R̲G̲I̲A̲          )
                              )          ACKNOWLEDGMENT
COUNTY OF G̲w̲I̲N̲N̲E̲T̲T̲        )

I, _Todd Sanchez_, Notary Public for the State of _G̲E̲O̲R̲G̲I̲A̲_,     do hereby certify that the above-named AVERY T. LANIUS, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal this the _18_ day of _MAY_, 2004.

_____
Notary Public for
My Commission Expires: _5/5/08_



## AFFIDAVIT OF DAVID E. WILKES

Personally appeared before me, the undersigned officer duly authorized to administer oaths, **DAVID E. WILKES**, who, being duly sworn, states as follows:

1.  My name is David E. Wilkes.  I am currently a resident of the state of Georgia.  I am over 21 years of age, and I am suffering from no legal disability.  I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.  I began working for the Lederle division of American Home Products Corporation, now Wyeth, in 1991 and left Wyeth in 1996.  I was employed as a field sales representative, also known as a "detailer."  As a field sales representative, my job involved visits to physicians' offices to discuss (i.e., "detail") Wyeth products.  My job was to make sure that physicians were aware of Wyeth's products so as to determine whether to prescribe them for particular patients.

3.  I am not a medical doctor or pharmacist.  Wyeth provided me with the FDA-approved package inserts and other materials regarding the drugs I detailed for me to give to the physicians I visited.

4.  As part of my job responsibilities in 1996, I detailed Redux with physicians in Georgia and Florida.  I have never had any job responsibilities or performed any work in relation to Redux in any state other than Georgia and Florida.

5.      With respect to Pondimin and phentermine, during the time relevant to this litigation, I did not detail Pondimin or phentermine, and had no job responsibilities for those products in any state.  I was not involved in the development of package inserts or promotional materials for the sale of Pondimin or phentermine, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Pondimin or phentermine.

6.      I was not involved in the development of package inserts or promotional materials for the sale of Redux, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Redux.

7.      I never sold or distributed Redux to any physicians or pharmacies, or anyone else.

8.      I was not involved in the regulatory approval process with the FDA for Redux or Pondimin.  Nor did I have any responsibilities for communicating or interacting with any state or federal regulatory agencies concerning Redux or Pondimin.

9.      I was not aware of any alleged association between Redux and/or Pondimin and valvular heart disease until the time such allegation was first publicized.  I was not aware before that time of any published study, report, or literature that claimed that an association existed between Redux and/or Pondimin and valvular heart disease.

~ Doc# 519809.02 ~

10.    I have made no representations regarding Redux, Pondimin, or the "fen-phen" combination, whether by way of promotion or advertising or otherwise, to the general public. I have never intentionally misrepresented the safety or efficacy of, or knowingly made any false statements or mispresentations about, Redux, Pondimn, or the "fen-phen" combination to any health care professional or anyone else.

11.    I have never had any contact or communications of any kind regarding Redux, Pondimin or phentermine with representatives of Medeva Pharmaceuticals, Inc., Fisons Corporation, Celltech Pharmaceuticals, Inc., Goldline Pharmaceuticals, Inc., Zenith-Goldline Pharmaceuticals, Inc., Rugby Laboratories, Inc., Ion Laboratories, Inc., or with any other representatives of phentermine manufacturers or distributors. I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with any of those entities or their representatives.

12.    I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with Indevus Pharmaceuticals, Inc., Interneuron Pharmaceuticals, Inc., or Eckerd Corporation or their representatives.

13.    I understand that I have been sued by the individuals listed on Schedule A, attached hereto. To the best of my knowledge and recollection, I have never had any kind of communications or dealings of any kind with any of the individuals listed on Schedule A, attached hereto.

~ Doc# 519809.02 ~

This __4__ day of __9_____, 2003.

**DAVID E. WILKES**

4

## SCHEDULE A

**Topolski, Frank**; Martha Hammond; Ronnie Lynch; Helen Ruth Woodard; Betty J. Wolfenbarger; Lois Quiggins; Terry Towe; Emma Capone; Cynthia Kay Bien; Teresa Newsome; and Charlotte F. Gauntt;

**Hopper, Kathleen**; Karen E. Sheeran; Virginia McCook; Francis Saddler; Janice Passantino, Susan Kimmons, Judy Allen; Inez Bowe; Andrea Hansley; Vicki Sargent; Judy Foster; Elizabeth Miles; Bonnie Petersen; Barbara Reid; Elizabeth Totman; Jo Leggett; Mamie Davenport; Carmen Sand Olph; Ida Prejean; Carol Bankowsi, J Ocie Abrams; Margarjte Pinder; and Terri Dobson;

**Sanford, Amy**; Kristina East; Marsha Fairchild; Ladoris Mcmullen; Tammy Rogers; Faye Stinnett; Tammy Rogers; Faye Stinnett; Pamela Grigsby; Margaret Allen; Michelle Vincent; Kimberly Cheek; Cynthia Coones; Levonne Hearon; Paula Johnson; Mellissa Hatley; Ray Kirkpatrick; Carol Newberry; Gayle States; Brenda Wideman; Mary Albright; Mary Anderson; Elsie Andus; Brenda Barrington; Nelda Bedair-Heath; Julia Bennett; Marvin Berry; Bonita Blackstock; Hazal Boone; Debbie Boyte; Carol Brackett; Pamela Bridger; Juanita Broseh; Brenda Bryant; Gerita Campos; Bette Carpenter; Anna Carvajal; Carolyn Causey; Carolyn Clark; Joann Crawford; Terrie Crawford; Peggy Curtis; Kay Davidson; Dalores Davis; Patricia Davis; Barbara Derderian; Joseph Derderian; Reba Dorsey; Carolyn Downs; Nancy Ellis; Debra Elzen; Marsha Mayfield; Katherine Farris; Velma Finley; Earnestine Fisher; Shirley Floyd; Brenda Garrett; Linda Gibson; Traci Gilbert; Kasey Gillespie; Carla Gilliam; Carmen Gomez; Donna Goodwin; Mary Grice; Melinda Hatlich; Vesta Harris; Terry Hatfield; Bernice Hefley; Marsha Hill; Pamela Hogg; David Huddleston; Donna Hughes; Virginia Humphrey; Mary Hyatt; Linda Johns; Jerilyn Jones; Vicki Jones; Rita Kay Joyner; Linda Keebaugh; Pam Knox; Vicky Knutsen; Mary Lamberson; Carolyn Lawson; Mary Mandrell; Daryl Mcdearman; Jack Mcdearman; Ivy McCleary; Betsy Mcneal; Eva Medina; Pamela Mills; Kelli Moerschell; Vicki Moore; Lynn Murillo; Carol Oberrender; Joel Owens; Pamela Parker; Bobbi Patton; Gloria Pittman; Marla Reynolds; Cheryl Rhodes; Victor Robles; Linda Romero; Johnny Rowell; Janette Ryan; Mary Salinas; Mary Sena; Kathy Shank; Bonnie Shaw; Ruby Shoffner; Annie Smith; Art Spikes; Bettie Stephens; Harold Stephens; Victoria Stewart; Gayla Stokes; Pamela Swain; Twanda Taylor; Elizabeth Thomas; Linda Thrasher; Lois Townsend; Diana Valdez; Arlene Wagner; Linda Waller; Deborah Weaver; Brenda Wideman; Rhonda Wilkins; Mary Williams; Rhonda Wilshire; Janell Wilson; Shirley Wilson; Randy Wood; Carol York; James Smallwood; Eloise Washington; Juanita Harris; Sue Zan Thompson; Dorothy Gaunt; and Diana Keena;

**Tate, Debra**, Irma Chiota, Christine Allen, Debbie Brown, Diane Cole, Ricky Dodds, Patricia Dyson, Vanessa Harris, Teresa Hooper, Chrystal Parks, Gema Puga, Judith Quintana, Renee

Sanders, Deborah Stever, Leasa Taylor, Bridgett Willis, Jean Heno, Andra Miller, Patricia Hutyra and Robin Wilson.

2

STATE OF      )
          )    ACKNOWLEDGMENT
COUNTY OF     )

I, _Delilah R. Donaldson_, Notary Public for the State of _Georgia_, do hereby certify that the above-named DAVID E. WILKES, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal this the _4th_ day of _Sept._, 2003.

_Delilah R. Donaldson, CPC_

Notary Public for
My Commission Expires:

DELILAH R. DONALDSON, C PC
Notary Public, Tift County, Georgia
My Commission Expires April 26, 2007

## AFFIDAVIT OF WOODFORD W. MOSS

Personally appeared before me, the undersigned officer duly authorized to administer oaths, **WOODFORD W. MOSS**, who, being duly sworn, states as follows:

1.      My name is Woodford W. Moss.  I am currently a resident of the state of Georgia.  I am over 21 years of age, and I am suffering from no legal disability. I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.      I began working for the A.H. Robins division of American Home Products Corporation, now Wyeth, in 1977 and am still employed by Wyeth.  I am employed as a field sales representative, also known as a "detailer."  As a field sales representative, my job involves visits to physicians' offices to discuss (i.e., "detail") Wyeth products.  My job is to make sure that physicians are aware of Wyeth's products so as to determine whether to prescribe them for particular patients.

3.      I am not a medical doctor or pharmacist.  Wyeth provides me with the FDA-approved package inserts and other materials regarding the drugs I detail for me to give to the physicians I visit.

4.      As part of my job responsibilities in 1996 and 1997, I detailed Redux with physicians in Georgia and South Carolina.   I have never had any job

9.   I was not aware of any alleged association between Redux and/or Pondimin and valvular heart disease until the time such allegation was first publicized. I was not aware before that time of any published study, report, or literature that claimed that an association existed between Redux and/or Pondimin and valvular heart disease.

10.  I have made no representations regarding Redux, Pondimin, or the "fen-phen" combination, whether by way of promotion or advertising or otherwise, to the general public. I have never intentionally misrepresented the safety or efficacy of, or knowingly made any false statements or mispresentations about, Redux, Pondimn, or the "fen-phen" combination to any health care professional or anyone else.

11.  I have never had any contact or communications of any kind regarding Redux, Pondimin or phentermine with representatives of Medeva Pharmaceuticals, Inc., Fisons Corporation, Celltech Pharmaceuticals, Inc., Goldline Pharmaceuticals, Inc., Zenith-Goldline Pharmaceuticals, Inc., Rugby Laboratories, Inc., Ion Laboratories, Inc., or with any other representatives of phentermine manufacturers or distributors. I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with any of those entities or their representatives.

3

12.     I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with Indevus Pharmaceuticals, Inc., Interneuron Pharmaceuticals, Inc., or Eckerd Corporation or their representatives.

13.     I understand that I have been sued by the individuals listed on Schedule A, attached hereto.  To the best of my knowledge and recollection, I have never had any kind of communications or dealings of any kind with any of the individuals listed on Schedule A, attached hereto.

This _18_ day of _May_____, 2004.

_Woodford W. Moss_____
**WOODFORD W. MOSS**

STATE OF  _Georgia_        )
                                              )          **ACKNOWLEDGMENT**
COUNTY OF  _Columbia_   )

        I, _Crystal Johnson_, Notary Public for the State of _Georgia_,    do hereby certify that the above-named WOODFORD W. MOSS, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

        Witness my hand and official seal this the _18_ day of _May_____, 2004.

_Crystal Johnson_____
Notary Public for
My Commission Expires: _3|25|06_

4

## SCHEDULE A

LISA ANGEL; BETTY BATES; THEOLA BATTLE; AGNES BOYD; MICHAEL BROWN; ANQUINETTE CARTER; JANELL CHISM; BERNICE HAWK COBB; MARY JO DIANA; BONNIE EIDSON; BETTY ELLINGER; JESSICA HARROD; ALLYSON JOHNSON; JONI LOVELACE; COLIN LUKE; ANGELA LUKE; CATHERINE MATARO; JOYCE PETTIT; LUANN PIERCE; BRENDA ROSSE; SUSAN SPOOR; MONIQUE ST. JULIEN; DEBORAH TERRELL; RAMONA WALKER; NAOMI WALKER; BRENDA WHITE; and MARTHA WIGGINS.

FRANKIE AUSTIN; ROBIN BLACK; HARRIET BOATRIGHT; MARY BRANCH; SHARON CLEMONS; JANIS E. CORBIN; GAIL FAUSCETT; JUDITH FLOURNOY; ANGELA FRANKLIN; JOAN P. HANNAH; BOBBIE HOLLEY; LENA JACKSON; ANN JARRELL; FAYE D. LANCE; JANICE MANDARIS; DONNA MANTOOTH; SUSAN MAY (DUFF); WANDA MILLER; BRENDA PETTY; VANESSA SMITH; PEGGY SQUIRES; LISA SUNDERLAND; KATHY THOMPSON; BRENDA C. WORLEY; and ELISE YOUMANS.

## AFFIDAVIT OF MICHAEL E. WINTERS

Personally appeared before me, the undersigned officer duly authorized to administer oaths, **MICHAEL E. WINTERS**, who, being duly sworn, states as follows:

1.  My name is Michael E. Winters.  I am currently a resident of the state of Georgia.  I am over 21 years of age, and I am suffering from no legal disability. I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.  I began working for A.H. Robins in 1976.  In 1995, I began working for the Lederle division of American Home Products Corporation, now Wyeth, and am still employed by Wyeth.  I am employed as a field sales representative, also known as a "detailer."  As a field sales representative, my job involves visits to physicians' offices to discuss (i.e., "detail") Wyeth products.  My job is to make sure that physicians are aware of Wyeth's products so as to determine whether to prescribe them for particular patients.

3.  I am not a medical doctor or pharmacist.  Wyeth provides me with the FDA-approved package inserts and other materials regarding the drugs I detail for me to give to the physicians I visit.

4.  As part of my job responsibilities in 1996 and 1997, I detailed Redux with physicians in Georgia and South Carolina.  I have never had any job

responsibilities or performed any work in relation to Redux in any state other than Georgia and South Carolina.

5.    With respect to Pondimin and phentermine, during the time relevant to this litigation, I did not detail Pondimin or phentermine, and had no job responsibilities for those products in any state.  I was not involved in the development of package inserts or promotional materials for the sale of Pondimin or phentermine, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Pondimin or phentermine.

6.    I was not involved in the development of package inserts or promotional materials for the sale of Redux, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Redux.

7.    I never sold or distributed Redux to any physicians or pharmacies, or anyone else.

8.    I was not involved in the regulatory approval process with the FDA for Redux or Pondimin.  Nor did I have any responsibilities for communicating or interacting with any state or federal regulatory agencies concerning Redux or Pondimin.

9.      I was not aware of any alleged association between Redux and/or Pondimin and valvular heart disease until the time such allegation was first publicized.  I was not aware before that time of any published study, report, or literature that claimed that an association existed between Redux and/or Pondimin and valvular heart disease.

10.     I have made no representations regarding Redux, Pondimin, or the "fen-phen" combination, whether by way of promotion or advertising or otherwise, to the general public.  I have never intentionally misrepresented the safety or efficacy of, or knowingly made any false statements or mispresentations about, Redux, Pondimn, or the "fen-phen" combination to any health care professional or anyone else.

11.     I have never had any contact or communications of any kind regarding Redux, Pondimin or phentermine with representatives of Medeva Pharmaceuticals, Inc., Fisons Corporation, Celltech Pharmaceuticals, Inc., Goldline Pharmaceuticals, Inc., Zenith-Goldline Pharmaceuticals, Inc., Rugby Laboratories, Inc., Ion Laboratories, Inc., or with any other representatives of phentermine manufacturers or distributors.  I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with any of those entities or their representatives.

~Doc# 557822 01~

12.    I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with Indevus Pharmaceuticals, Inc., Interneuron Pharmaceuticals, Inc., or Eckerd Corporation or their representatives.

13.    I understand that I have been sued by the individuals listed on Schedule A, attached hereto.  To the best of my knowledge and recollection, I have never had any kind of communications or dealings of any kind with any of the individuals listed on Schedule A, attached hereto.

This 14 day of _MAY_, 2004.

_Michael E. Winters_ (signature)

**MICHAEL E. WINTERS**

STATE OF _Georgia_ )
                          )       ACKNOWLEDGMENT
COUNTY OF _Richmond_ )

I, _Kimberly B. Lewis_, Notary Public for the State of _Georgia_, do hereby certify that the above-named MICHAEL E. WINTERS, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal this the _14th_ day of _May_, 2004.

_Kimberly B Lewis_ (signature)
Notary Public (or)
My Commission Expires: _____

Kimberly B. Lewis
Notary Public-Richmond County, Georgia
My Commission Expires February 24, 2008

~Doc# 557822 01~

## SCHEDULE A

LISA ANGEL; BETTY BATES; THEOLA BATTLE; AGNES BOYD; MICHAEL BROWN; ANQUINETTE CARTER; JANELL CHISM; BERNICE HAWK COBB; MARY JO DIANA; BONNIE EIDSON; BETTY ELLINGER; JESSICA HARROD; ALLYSON JOHNSON; JONI LOVELACE; COLIN LUKE; ANGELA LUKE; CATHERINE MATARO; JOYCE PETTIT; LUANN PIERCE; BRENDA ROSSE; SUSAN SPOOR; MONIQUE ST. JULIEN; DEBORAH TERRELL; RAMONA WALKER; NAOMI WALKER; BRENDA WHITE; and MARTHA WIGGINS.

FRANKIE AUSTIN; ROBIN BLACK; HARRIET BOATRIGHT; MARY BRANCH; SHARON CLEMONS; JANIS E. CORBIN; GAIL FAUSCETT; JUDITH FLOURNOY; ANGELA FRANKLIN; JOAN P. HANNAH; BOBBIE HOLLEY; LENA JACKSON; ANN JARRELL; FAYE D. LANCE; JANICE MANDARIS; DONNA MANTOOTH; SUSAN MAY (DUFF); WANDA MILLER; BRENDA PETTY; VANESSA SMITH; PEGGY SQUIRES; LISA SUNDERLAND; KATHY THOMPSON; BRENDA C. WORLEY; and ELISE YOUMANS.

## AFFIDAVIT OF DAVID DOWNING

Personally appeared before me, the undersigned officer duly authorized to administer oaths, DAVID DOWNING, who, being duly sworn, states as follows:

1.      My name is DAVID DOWNING.  I am currently a resident of the State of Georgia.  I am over 21 years of age, and I am suffering from no legal disability.  I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.      I worked for Interneuron Pharmaceuticals, Inc., now Indevus Pharmaceuticals, Inc., beginning in mid-1996 until early 1998.  I have never been employed by Wyeth.  It is my understanding, however, that Wyeth and Interneuron were co-promoters of the drug Redux during my employment with Interneuron.

3.      During my employment with Interneuron, I was a field sales representative, also known as a "detailer."  As a field sales representative, my job involved visits to physicians' offices to discuss (i.e., "detail") Redux. My job was to make sure that physicians were aware of Redux so as to determine whether to prescribe that drug product for particular patients.

4.      I am not a medical doctor or pharmacist.  Interneuron provided me with the FDA-approved package inserts and other materials regarding the drugs I detailed for me to give to the physicians I visited.

5.      I detailed Redux with physicians in Georgia.  I have never had any job responsibilities or performed any work in relation to Redux in any state other than Georgia.

6.      During the time relevant to this litigation, I did not detail Pondimin or phentermine and had no job responsibilities for those products in any state.   I was not involved in the development of package inserts or promotional materials for the sale of Pondimin or phentermine and had no control over the content of those or other written warnings to be provided to physicians.   I was not involved in the design, manufacture, testing, or labeling of Pondimin or phentermine.

7.      I was not involved in the development of package inserts or promotional materials for the sale of Redux and had no control over the content of those or other written warnings to be provided to physicians.   I was not involved in the design, manufacture, testing, or labeling of Redux.

8.      I never sold or distributed Redux to any physicians or pharmacies, or anyone else.

9.      I was not involved in the regulatory approval process with the FDA for Redux or Pondimin, nor did I have any responsibilities for communicating or interacting with any state or federal regulatory agencies concerning Redux or Pondimin.

10.     I was not aware of any alleged association between Redux and/or Pondimin and valvular heart disease until the time such allegation was first

2

publicized.  I was not aware before that time of any published study, report, or literature that claimed that an association existed between Redux and/or Pondimin and valvular heart disease.

11.    I have made no representations regarding Redux, Pondimin, or the "fen-phen" combination, whether by way of promotion or advertising or otherwise, to the general public.  I have never intentionally misrepresented the safety or efficacy of, or knowingly made any false statements or mispresentations about, Redux, Pondimin, or the "fen-phen" combination to any health care professional or anyone else.

12.    I have never had any contact or communications of any kind regarding Redux, Pondimin, or phentermine with representatives of Medeva Pharmaceuticals, Inc.; Fisons Corporation; Celltech Pharmaceuticals, Inc.; Goldline Pharmaceuticals, Inc.; Zenith-Goldline Pharmaceuticals, Inc.; Rugby Laboratories, Inc.; Ion Laboratories, Inc.; or with any other representatives of phentermine manufacturers or distributors.  I have never entered into any type of agreement, arrangement, or conspiracy regarding Redux, Pondimin, or phentermine with any of those entities or their representatives.

13.    I have never entered into any type of agreement, arrangement, or conspiracy regarding Redux, Pondimin, or phentermine with Eckerd Corporation or its representatives.

3

14.     I understand that I have been sued by the individuals listed on Schedule

A, attached hereto.  To the best of my knowledge and recollection, I have

never had any kind of communications or dealings of any kind with any of

the individuals listed on Schedule A, attached hereto.

This _11th_ day of _September_ , 2003.

_David L. Downing_
DAVID DOWNING

STATE OF                              )
                                      )          ACKNOWLEDGMENT
COUNTY OF                             )

I, _Shirley S. Peck_ , Notary Public for the State of _Georgia_ ,   do
hereby certify that the above-named, DAVID DOWNING, personally appeared before
me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal this the _11th_ day of _September_ ,
2003.

_Shirley S. Peck_
Notary Public for
My Commission Expires: _____

NOTARY PUBLIC, FULTON COUNTY, GA
MY COMMISSION EXPIRES JULY 12, 2005

SHIRLEY S. PECK
NOTARY
PUBLIC
FULTON COUNTY, GEORGIA

4

~Doc# 521386.02~

## SCHEDULE A

**Hopper, Kathleen**; Karen E. Sheeran; Virginia McCook; Francis Saddler; Janice Passantino; Susan Kimmons; Judy Allen; Inez Bowe; Andrea Hansley; Vicki Sargent; Judy Foster; Elizabeth Miles; Bonnie Petersen; Barbara Reid; Elizabeth Totman; Jo Leggett; Mamie Davenport; Carmen Sand Olph; Ida Prejean; Carol Bankowsi; J Ocie Abrams; Margarite Pinder; and Terri Dobson;

**Mauser, Eleanor**; Vince Buono; Karen Landers; Bettie Sue Jones; Nina Walker; Sheila Miller; Norma Frausto; Bonnie Barton; John Gibson; Laurie Griffin; Lawrence Heugel; Janice Landrum; Ellen Reynolds; Dennis Yorgensen; Shirley White; Marie Farrington; Marlene Allen; Barbara Abbott; Donna Angelone; Debra Jewell; Rebecca Simmons; Beverly Hargett; and Gertrude Furnace;

**Davis, Benita**; Dana Hamby; Cheryl Macy; Rebecca Watkins; Anita Metts; A. Lee Snow, as Surviving Spouse and as Executor of the Estate of Janice Sue Snow, Deceased; Charlene Minnis; Mary Ray; Valerie Sewell; Melody Wilson.

# AFFIDAVIT OF ROBIN W. JONES

Personally appeared before me, the undersigned officer duly authorized to administer oaths, **ROBIN W. JONES**, who, being duly sworn, states as follows:

1.    My name is Robin W. Jones.  I am currently a resident of the state of Georgia. I am over 21 years of age, and I am suffering from no legal disability.  I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.    I began working for the A.H. Robins division of American Home Products Corporation, now Wyeth, in 1991 and left Wyeth in 1997.  I was employed as a field sales representative, also known as a "detailer."  As a field sales representative, my job involved visits to physicians' offices to discuss (i.e., "detail") Wyeth products.  My job was to make sure that healthcare practitioners were aware of Wyeth's products so as to determine whether to prescribe them for particular patients.

3.    I am not a medical doctor or pharmacist.  Wyeth provided me with the FDA-approved package inserts and other materials regarding the drugs I detailed for me to give to the healthcare practitioners I visited.

4.     As part of my job responsibilities from June 1996 until March 1997, I detailed Redux with physicians in Georgia.  I have never had any job responsibilities or performed any work in relation to Redux in any state other than Georgia.

5.     With respect to Pondimin and phentermine, during the time relevant to this litigation, I did not detail Pondimin or phentermine, and had no job responsibilities for those products in any state.  I was not involved in the development of package inserts or promotional materials for the sale of Pondimin or phentermine, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Pondimin or phentermine.

6.     I was not involved in the development of package inserts or promotional materials for the sale of Redux, and had no control over the content of those or other written warnings to be provided to physicians.  I was not involved in the design, manufacture, testing, or labeling of Redux.

7.     I never sold or distributed Redux to any physicians or pharmacies, or anyone else.

8.     I was not involved in the regulatory approval process with the FDA for Redux or Pondimin.  Nor did I have any responsibilities for communicating or interacting with any state or federal regulatory agencies concerning Redux or Pondimin.

9.     I was not aware of any alleged association between Redux and/or Pondimin and valvular heart disease until the time such allegation was first publicized.  I was not aware before that time of any published study, report, or literature that claimed that an association existed between Redux and/or Pondimin and valvular heart disease.

10.    I have made no representations regarding Redux, Pondimin, or the "fen-phen" combination, whether by way of promotion or advertising or otherwise, to the general public.  I have never intentionally misrepresented the safety or efficacy of, or knowingly made any false statements or mispresentations about, Redux, Pondimn, or the "fen-phen" combination to any health care professional or anyone else.

11.    I have never had any contact or communications of any kind regarding Redux, Pondimin or phentermine with representatives of Medeva Pharmaceuticals, Inc., Fisons Corporation, Celltech Pharmaceuticals, Inc., Goldline Pharmaceuticals, Inc., Zenith-Goldline Pharmaceuticals, Inc., Rugby Laboratories, Inc., Ion Laboratories, Inc., or with any other representatives of phentermine manufacturers or distributors.  I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with any of those entities or their representatives.

12.    I have never entered into any type of agreement, arrangement or conspiracy regarding Redux, Pondimin, or phentermine with Indevus Pharmaceuticals, Inc., Interneuron Pharmaceuticals, Inc., or Eckerd Corporation or their representatives.

This _18_ day of _May_____, 2004.

_____
**ROBIN W. JONES**

STATE OF   GEORGIA           )
                             )
COUNTY OF  GWINNETT          )        ACKNOWLEDGMENT

I, _TODD SANCHEZ_, Notary Public for the State of _GEORGIA_____,   do hereby certify that the above-named ROBIN W. JONES, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal this the _18_ day of _MAY_____, 2004.

_____
Notary Public for
My Commission Expires: _5/5/08_

*WYETH-AYERST* **W** *LABORATORIES*

*P O BOX 8299, PHILADELPHIA, PA 19101-8299*                              *Division of American Home Products Corporation*

*MARC W DEITCH, M.D.*
*SENIOR VICE PRESIDENT MEDICAL AFFAIRS*
*AND MEDICAL DIRECTOR*

July 24, 1997

Dear Health Care Provider:

We are writing to advise you of labeling changes being developed with the U.S. Food and Drug Administration (FDA) for two Wyeth-Ayerst products, PONDIMIN® (fenfluramine hydrochloride) tablets C-IV and REDUX™ (dexfenfluramine hydrochloride capsules) C-IV. The revised labeling is the result of heightened concern regarding potential side effects which have been reported with concomitant use of fenfluramine and phentermine ("fen/phen").

A boxed warning will be added to the physician and patient labeling discussing a potentially serious and unusual form of valvular heart disease which has been reported in patients taking fenfluramine and phentermine. The symptoms of this disease may include dyspnea, reduced exercise tolerance and/or lower extremity edema. If patients develop these symptoms during therapy or develop a new heart murmur, physicians are advised to perform a complete cardiovascular evaluation.

The labeling for dexfenfluramine (Redux) will also include new warning language because it is a related chemical compound to fenfluramine.

Evidence of a causal relationship between the treatment of obesity with fenfluramine and phentermine combination therapy and valvular heart disease is inconclusive. Wyeth-Ayerst is initiating scientific studies to supplement currently available data.

The warning will also contain information from the current labeling on the small risk of developing primary pulmonary hypertension (PPH), an often-fatal disorder which has been associated with the use of prescription weight loss medications. PPH has symptoms which are similar to those of cardiac valvular disease.

Wyeth-Ayerst will send you the revised labeling with the boxed warning when the wording is finalized with the FDA.

Concomitant use of Pondimin tablets with other weight-loss agents is not recommended. The addition of phentermine to Pondimin ("fen/phen") is *not* an approved use of Pondimin.

*4*

- 2 -

Obesity is a serious medical condition, which now afflicts one in three adult Americans and has grown at alarming rates in recent years. Antiobesity drugs can play an important role in treating clinically obese patients when properly prescribed as part of a program that also includes a regulated diet and increased physical exercise. We are committed to ensuring that physicians and patients have as much information as possible to make an individualized benefit/risk decision.

Please contact Wyeth-Ayerst Medical Affairs Department at 1-800-934-5556 if you have any questions or concerns about this information.

Sincerely,

Marc W. Deitch, M.D.

DEC - 4 2000

11/30/00

Baten

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TIMOTHY JAMES, individually
and on behalf of all others
similarly situated,

        Plaintiff,

                                      CIVIL ACTION NO.

v.                                    1:00-CV-1203-JEC

PARKE-DAVIS, A Division of
the Warner-Lambert Company;
WARNER-LAMBERT COMPANY;
WARREN L. SCHULTZ; AND TONY
PATERNOSTRO,

        Defendants.

                            ORDER

    This case is presently before the Court on plaintiff's
Motion to Remand [11], plaintiff's Motion to Strike [33], and
defendant's Motion for Leave to File a Supplemental Memorandum
in Opposition to Plaintiff's Motion to Remand [35].  The Court
has reviewed the record and the arguments of the parties and,
for the reasons set forth below, concludes that plaintiff's
Motion to Remand [11] should be DENIED, plaintiff's Motion to
Strike [33] should be GRANTED, and defendant's Motion for
Leave to File a Supplemental Memorandum in Opposition to
Plaintiff's Motion to Remand [35] should be GRANTED.

AO 72A

BACKGROUND

Plaintiff Timothy James, a citizen of Georgia, brought this suit in the State Court of Fulton County, Georgia against defendants Parke-Davis,[1] a division of Warner-Lambert Company, Warner-Lambert Company, Warren L. Schultz, and Tony Paternostro. Warner-Lambert, a New Jersey corporation with its principal place of business in New Jersey as well, is a pharmaceutical company that manufactures and markets prescription and over the counter drugs, including the drug Rezulin, which was pulled from the market at the request of the FDA earlier this year.[2] Warren Schultz and Tony Paternostro, both residents of Georgia, are employed by defendant Warner-Lambert, through its Parke-Davis Division, as sales personnel and/or supervisors in Parke-Davis's sales and marketing division. (Pl.'s Compl. [1] at 4; Notice of Removal [1] at Aff. of Warren Schultz, Aff. of Tony Paternostro.)

---

[1] Warner-Lambert Co. states that Parke-Davis is a division of Warner-Lambert Co. and is not a separate corporation or other legal entity. (Notice Of Removal [1] at 1 n.1.) Throughout this Order, the Court often refers to these defendants collectively as "defendant Warner-Lambert/Parke-Davis."

[2] See Chris Adams and Gabriella Stern, Warner-Lambert to Remove Rezulin From Market Following FDA Reviews, WALL ST. J., March 22, 2000, at A3. The FDA asked Warner-Lambert to remove Rezulin from the market after it determined that two new diabetes drugs were now available that had the same benefits, but did not have the "rare, but potentially serious liver problems linked to [Rezulin]." Id.

2

Plaintiff was prescribed Rezulin in the State of Georgia and claims he was thereby exposed to the harmful effects of Rezulin, which effects were known to the defendants. (*Id.* at 1.) Plaintiff filed a complaint in state court alleging claims of strict liability, negligence, breach of implied warranty, and punitive damages, as well as a bad faith claim for attorney fees and expenses of litigation.

Subsequent to the filing of the plaintiff's complaint, defendant Warner-Lambert/Parke-Davis filed a Notice of Removal on May 12, 2000, pleading diversity on the ground that the Georgia defendants, Schultz and Paternostro, were fraudulently joined solely to defeat diversity. The case was removed to this Court, and plaintiff responded with a Motion to Remand filed on June 8, 2000. (Mot. to Remand [11].) Defendants Schultz and Paternostro did not expressly join the Notice of Removal, but have filed motions to dismiss on very similar grounds, asserting that plaintiff has failed to state a claim against either of them. (Mot. to Dismiss Def. Warren L. Schultz [4]; Mot. to Dismiss Def. Tony Paternostro [5].) Plaintiff asserts that his complaint clearly states a cause of action against the Georgia defendants. Further, plaintiff maintains that, in their motions to dismiss, defendants Schultz and Paternostro have brought in matters outside the pleadings, which indicates the existence of a factual dispute

3

as to the non-diverse defendants.   In addition, plaintiff contends that the Notice of Removal is defective because not all defendants consented to its removal.  This Order addresses only the motion for remand and two companion motions.

## DISCUSSION

I.   Consent of All Defendants to Removal

Plaintiff's   first   objection   to   defendant   Warner-Lambert/Parke-Davis's removal of this action to federal court is that defendant did so without the express consent of the other defendants.   (Mot. to Remand [11] at 3, 14-15.) Plaintiff is correct in stating that the general rule is that removal is permissible only if all defendants named in the state action join the petition for removal and so communicate their consent to removal within the thirty day period mandated by 28 U.S.C. §§1446(b).  *See Tri- Cities Newspapers, Inc. v. Tri-Cities Printing Pressmen and Assistants' Local 349*, 427 F.2d 325, 326-27 (5th Cir. 1970)[3]; *Holder v. City of Atlanta*, 925 F. Supp. 783, 785 (N.D. Ga. 1996); *Kuhn v. Brunswick Corp.*, 871 F. Supp. 1444, 1467-47 (N.D. Ga. 1994); *Clyde v. National Data Corp.*, 609 F. Supp. 216, 218 (N.D. Ga. 1985). Because removal is a purely statutory right, removal statutes

---

[3] The Eleventh Circuit has adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.  *See Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*).

4

should be strictly construed in favor of state court jurisdiction. *Clyde*, 609 F. Supp. at 219.

Despite this general rule, the consent of all defendants is not required when some defendants have been fraudulently joined. *See Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 815 (5th Cir. 1993); *Williams v. Atlantic Coast Line Co.*, 294 F. Supp. 815, 816 (D. Ga. 1968) (`It is contended that the removal is defective because of the failure of the resident defendant . . . to join in the petition for removal. [While s]uch a joinder is generally required, [a]n exception to this general rule in diversity cases is where a plaintiff sues a 'nominal' or 'formal' or 'improper' party. Such parties need not join in or consent to the removal.") (citations omitted). Therefore, the failure of defendants Schultz and Paternostro to formally consent to the notice of removal is not fatal to defendant Warner-Lambert/Parke-Davis's notice. The issue of whether the notice of removal was procedurally defective turns on the same question as the substantive issue in this case: are Schultz and Paternostro proper defendants? If the answer is no, it is of no import that they did not join in the notice of removal. If the answer is yes, there is no diversity of citizenship, and the notice of removal fails on its merits.

II.  Diversity and Fraudulent Joinder

removing party, in this case the plaintiff. *Id.* There are

three situations where joinder may be deemed fraudulent.

> The first is when there is no possibility that the
> plaintiff can prove a cause of action against the
> resident (non-diverse) defendant. *Coker v. Amoco
> Oil Co.*, 709 F.2d 1433, 1440 (11th Cir. 1983),
> *superceded by statute on other grounds as stated in
> Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 991
> F.2d 1533 (11th Cir. 1993). The second is when
> there is outright fraud in the plaintiff's pleading
> of jurisdictional facts. *Coker*, 709 F.2d at 1440.
> In *Tapscott*, 77 F.3d at 1355 (11th Cir. 1996), a
> third situation of fraudulent joinder was
> identified--*i.e.*, where a diverse defendant is
> joined with a nondiverse defendant as to whom there
> is no joint, several or alternative liability and
> where the claim against the diverse defendant has
> no real connection to the claim against the
> nondiverse defendant. *Id.* at 1360

*Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th

Cir. 1998). Defendant Warner-Lambert/Parke-Davis premises its

claim of fraudulent joinder on the first situation--where

there is no possibility that plaintiff can prove a cause of

action against the non-diverse defendants. (Notice of Removal

[1] at 3-6.)

In *Pacheco*, the court emphasized that "[t]he burden of

establishing fraudulent joinder is a heavy one" and stated

that "[w]here a plaintiff states even a colorable claim

against the resident defendant, joinder is proper and the case

should be remanded to state court." *Pacheco*, 139 F.3d at 1379

(citing *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997);

*Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1562 (11th Cir.

1989)).  In determining whether a resident defendant has been
fraudulently joined, this Court may look at the plaintiff's
pleadings at the time of removal, as well as any affidavits
and deposition transcripts submitted by the parties.  *See id.*
"In making its determination, the district court must evaluate
factual allegations in the light most favorable to the
plaintiff and resolve any uncertainties about the applicable
law in the plaintiff's favor."  *Id.*   In fact, the Eleventh
Circuit has held that:

> "If there is even a possibility that a state court
> would find that the complaint states a cause of
> action against any one of the resident defendants,
> the federal court must find that the joinder was
> proper and remand the case to the state court."
> *Coker*, 709 F.2d at 1440-41 (emphasis added).   The
> plaintiff need not have a winning case against the
> allegedly fraudulent defendant; he need only have a
> possibility of stating a valid cause of action in
> order for the joinder to be legitimate.

*Triggs*, 154 F.3d at 1287.

In the Notice of Removal, defendant Warner-Lambert/Parke-
Davis argues that plaintiff failed to state a claim against
defendants Schultz and Paternostro because he failed to allege
any act or omission that was out of the ordinary scope of
their employment.   (Notice of Removal [1] at 5.)
Specifically, defendant contends that the plaintiff failed to
allege that either of the two resident defendants "made any
representations, by way of promotion or advertising or
otherwise, or any statements whatsoever regarding Rezulin® to

8

any Plaintiff or to the general public, outside their scopes of employment." (*Id.*) Further, defendant contends that the two men "at all relevant times, were agents for a disclosed principal,"⁴ "acted in the ordinary course and scope of their employment," and "had no duty to warn or otherwise inform Plaintiff or the general public regarding Rezulin®™." (*Id.*) Lastly, defendant Warner-Lambert/Parke-Davis asserts that the "Learned Intermediary Doctrine" excepts defendants Schultz and Paternostro from liability.

Plaintiff counters that defendants Schultz and Paternostro are proper plaintiffs because they are liable as individual tortfeasors for their actions. (Mot. to Remand [11] at 9.) Plaintiff states that under Georgia law, a "servant" who commits a tort within the scope of his "master's" business is individually liable, even if the master is liable as well. (*Id.*) Plaintiff cites *McClurd v. Reddick*, 135 Ga. App. 136, 217 S.E.2d 163 (1975) and *Gay v. Piggly-Wiggly Southern, Inc.*, 183 Ga. App. 175, 358 S.E.2d 468 (1987), for this proposition. *McClurd* and *Gay* certainly stand for that principle. It is important to note, however, that the cases also stand for the proposition that a servant is not

---

⁴ This is an argument made predominantly by defendants Schultz and Paternostro in their motions to dismiss. This is actually a rule of contract law, and not tort. *See Fitzgerald Forest Prods., L.P., v. Durand Raute Corp. of Oregon*, 932 F. Supp. 293 (M.D. Ga. 1996).

9

liable simply because his master is; rather, a servant is liable if he is the actual tortfeasor--if he acted negligently and caused the actual injury to the plaintiff.[5]  Accordingly, plaintiff cannot state a claim against defendants Schultz and Paternostro based solely on their position as servants of Warner-Lambert/Parke-Davis.  Instead, plaintiff must be able to state a claim that they are liable as individual tortfeasors.

III. Plaintiff's Claims

Plaintiff's complaint makes the following allegations against Schultz and Paternostro:

> The Defendants Schultz and Paternostro are adult
> resident citizens of the State of Georgia and are
> now, and were at all times relevant hereto,

---

[5] In *McClurd*, the plaintiff was injured while standing next to a log shaving machine being operated by some of the defendants.  135 Ga. App. at 136, 217 S.E.2d at 165.  The jury returned a verdict against two of the five defendants, J.M. McClurd and McClurd Enterprises.  On appeal, the court affirmed that there was sufficient evidence to support a jury verdict against Mr. McClurd because the machinery at issue had ben installed under his supervision and he had designed and supervised the 'control shack" from where the machinery was operated.  In doing so, he had been negligent in designing a control center 'in such a manner that the operator could not see anyone standing where plaintiff was when the machinery was put into motion."  *Id.* at 138-39, 217 S.E.2d at 166.

In *Gay*, plaintiff was struck, and died as a result of the injuries incurred, by a truck being driven by a Piggly-Wiggly driver.  183 Ga. App. 175, 358 S.E.2d 468.  At the time of the injury, the driver was acting within the ordinary scope of his employment.  There was no question that he was an appropriate defendant, however, because he had been the original tortfeasor.  That is, he was the person actually driving the truck in a negligent manner so as to cause plaintiff's injury.

employed by the defendants Parke-Davis and Warner-Lambert as sales personnel and/or supervisors in the Defendants Parke-Davis and Warner-Lambert's Sales and Marketing Division and on information and belief held positions of Sales Representatives or Division or Territory Managers. Defendants Schultz and Paternostro were authorized by the defendants to act as their agents, and each and all of the things herein alleged to have been done by them were done in the capacity of, and as agents for defendants Parke-Davis and Warner-Lambert, as well as in their individual capacities. At all times relevant hereto, Defendants Schultz and Paternostro and other agents and employees of defendants Parke-Davis and Warner-Lambert acting on behalf of defendants Parke-Davis and Warner-Lambert, engaged in wrongful conduct with regard to Rezulin throughout Georgia as is more fully set forth hereinafter.

(Class Action Compl. [1] at ¶ 9.) The complaint alleges that Schultz and Paternostro are liable for negligence and breach of implied warranty.[6] (Class Action Compl. [1] at ¶¶ 22-33.) Plaintiff charges that the defendants were negligent and careless in

(a) . . . manufacturing, compounding, testing, inspecting, packaging, labeling, distributing, marketing, examining, selling, and preparing [Rezulin] in such a manner that it was likely to injure the user.

(b) . . . manufacturing, compounding, testing, inspecting, packaging, labeling, and distributing Rezulin which was unsafe when it reached the hands

---

[6] Count One of the complaint is a claim of strict liability against Parke-Davis and Warner-Lambert. (Class Action Compl. [1] at ¶¶ 19-21.) This claim was not brought against defendants Schultz and Paternostro, and could not have been as Georgia's strict liability statute, O.C.G.A. § 51-1-11(b)(1), requires a defendant to be a manufacturer in order to be held strictly liable in a products liability case.

11

of the consuming public, including the Plaintiff
and the putative class.

(c) . . . failing to warn and/or to adequately warn
physicians of all of the risks associated with the
use of said drugs.

(d) . . . failing to warn the consuming public
directly and through their prescribing physicians
of the unreasonably dangerous defects associate
with such drug after said defendants had knowledge
of the same thereby breaching the continuing duty
to warn.

(e) . . . failing to adequately test and evaluate
Rezulin prior to placing it into the general stream
of commerce.

(*Id.* at ¶ 23.)

As to Schultz and Paternostro in particular, plaintiff
alleges that they "knew or should have known that the Rezulin
which they marketed and sold was defective and unreasonably
dangerous" and that they were "obligated to use reasonable
means and efforts to ascertain the truth of the
representations that they were making to medical doctors and
others in their marketing campaign, and [they] failed to use
ordinary and reasonable care to communicate the dangers to the
prescribing physicians." (*Id.* at ¶ 25.) Plaintiff also
asserts that the defendants violated certain Georgia statutes,
including O.C.G.A. §§ 26-3-3, 26-3-8, 26-3-13, and 26-3-14,
which constitutes negligence per se. (*Id.* at ¶¶ 26-27.) As
to the claim of breach of implied warranty, plaintiff alleges
that defendants Schultz and Paternostro marketed, sold, and

12

alleges that defendants Schultz and Paternostro violated
Georgia law, including O.C.G.A. § 26-3-3,[9] which prohibits the
sale of adulterated or misbranded drugs, § 26-3-8,[10] which

-----

585 (1921), negligence per se was found in the
violation of a state statute making it a
misdemeanor to sell a pistol to a minor. The court
concluded the legislature's purpose was twofold: to
protect minors and "to prevent injuries resulting
from negligence in the handling of these dangerous
weapons by irresponsible persons. Knowledge of
this purpose in a legal sense was chargeable to the
defendants when they violated the law by selling
the pistol to the minor." *Id.* at 588.

*Decker,* 679 F.2d at 214.

[9] Section 26-3-3 reads, in part:

The following acts and the causing thereof within
this state are prohibited:

(1) The manufacture, sale or delivery, or holding
or offering for sale of any drug, device, or
cosmetic that is adulterated or misbranded;
(1.1) The holding of any drug, device, or cosmetic
that is adulterated or misbranded;
(2) The adulteration or misbranding of any drug,
device, or cosmetic;
(3) The receipt in commerce of any drug, device, or
cosmetic that is adulterated or misbranded and the
delivery or proffered delivery thereof for pay or otherwise;
(4) The sale, delivery for sale, holding for sale,
or offering for sale of any article in violation of
Code Section 26-3-10;
(5) The dissemination of any false advertisement;
(6) The refusal to permit entry or inspection or to
permit the taking of a sample as authorized by Code
Section 26-3-17.

O.C.G.A. § 26-3-3(1)-(6).

[10] Section 26-3-8 reads, in part:

(a) A drug or device shall be deemed to be misbranded:
(1) If its labeling is false or misleading in any particular;

14

defines "misbranded," § 26-3-13,[11] which prohibits the false

. . . .
(9) (A) If it is a drug and its container is so made, formed, or filled as to be misleading;
(B) If it is an imitation of another drug; or
(C) If it is offered for sale under the name of another drug;
. . . .
(b) Any drug dispensed by filling or refilling a written or oral prescription of a practitioner licensed by law to administer such drug shall be exempt from the requirements of this Code section except paragraphs (1) and (9) of subsection (a) of this Code section if the drug bears a label containing the name and address of the dispenser, the serial number and date of the prescription or of its filling, the name of the prescriber, and, if stated in the prescription, the name of the patient and the directions for use and cautionary statements, if any, contained in such prescription. This exemption shall not apply to any drug dispensed in the course of the conduct of a business of dispensing drugs pursuant to diagnosis by mail or to a drug dispensed in violation of paragraph (11) of subsection (a) of this Code section.

O.C.G.A. § 26-3-8.

[11] Section 26-3-13 reads:

(a) An advertisement of a drug, device, or cosmetic shall be deemed to be completely false if it is false or misleading in any particular.
(b) For the purpose of this chapter the advertisement of a drug or device representing it to have any effect in . . . diabetes . . . shall also be deemed to be false, except that no advertisement not in violation of subsection (a) of this Code section shall be deemed to be false under this subsection if it is disseminated only to members of the medical, dental, or veterinary professions, appears only in the scientific periodicals of these professions, or is disseminated only for the purpose of public health education by persons not commercially interested directly or indirectly in the sale of such drugs or

15

advertising of drugs, and § 26-3-14,[12] which addresses how to make the determination of whether a drug is misbranded or falsely advertised.

None of these statutes have been discussed by the Georgia courts. In fact, the Court could locate only one case even

---

devices, provided that whenever the State Board of Pharmacy determines that an advance in medical science has made any type of self-medication safe as to any of the diseases named in this subsection, the board shall by regulation authorize the advertisement of drugs having curative or therapeutic effect for such disease subject to such conditions and restrictions as the board may deem necessary in the interest of public health, provided that this subsection shall not be construed as indicating that self-medication for diseases other than those named herein is safe or efficacious.

O.C.G.A. § 26-3-8.

[12] Section 26-3-14 reads:

If an article is alleged to be misbranded because the labeling is misleading or if an advertisement is alleged to be false because it is misleading, then in determining whether the labeling or advertisement is misleading there shall be taken into account, among other things not only representations made or suggested by statement, word, design, device, sound, or any combination thereof, but also the extent to which the labeling or advertisement fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling or advertisement relates under the conditions of use prescribed in the labeling or advertisement thereof or under such conditions of use as are customary or usual.

16

mentioning any of these four provisions.[13]   Without any guidance from the Georgia courts, this Court simply cannot say that these statutes were meant to impose criminal liability on drug representatives conducting sales calls to physicians regarding FDA approved drugs, even when a drug they support is later withdrawn from the market due to adverse effects. Accordingly, an alleged violation of these statutes by defendants Schultz and Paternostro cannot be used to establish a finding of negligence per se.

   B.   *Negligence*

   The Court now turns to the question of whether plaintiff has otherwise presented a colorable claim against defendants Schultz and Paternostro for negligence or breach of implied warranty.   Plaintiff maintains that he is able to state a claim for negligence against these defendants because they 'are alleged to have been directly involved in developing and implementing the Rezulin sales strategy in Georgia and to have done so negligently" because they knew or should have known of Rezulin's possible dangerous side effects.   (Mot. for Remand [11] at 12.)   Defendant Warner-Lambert/Parke-Davis counters

---

[13] The case is *Walker v. Jack Eckerd Corp.*, 209 Ga. App. 517, 434 S.E.2d 63 (1993), and mentions O.C.G.A. § 26-3-8 only in passing, and only to state that subsection (b) 'specifically excepts certain prescription drugs from various statutory labeling and warning requirements." *Id.* at 521, 434 S.E.2d at 67.

that, even if a tort was committed, defendants Schultz and Paternostro did not personally participate in its commission. (Def. Warner-Lambert Co.'s Mem. of Law in Opp'n to Pl.'s Mot. to Remand [27] at 11.)

Certainly some degree of personal participation is required for an employee to be held liable for a corporation's wrongdoing.   Otherwise, as defendant Warner-Lambert/Parke Davis points out, 'the mere status of the employee would expose virtually every employee to personal liability for products liability (and other) claims asserted against his corporate employer." (*Id.* at 12.) Defendant points the Court to the Fifth Circuit case *Mozingo v. Correct Manufacturing Corp.*, 752 F.2d 168 (5th Cir. 1985), in which a Fifth Circuit panel found that a corporate officer, who had expressed concern about the safety of construction equipment he authorized and his company manufactured, could not be held personally liable when such equipment proved to be faulty and caused plaintiff's injury.   In affirming the lower court's finding of no liability as a matter of law, the court stated that to be personally liable, a corporate officer 'must have some direct, personal participation in the tort 'as where the defendant was the 'guiding spirit" behind the wrongful conduct . . . or the 'central figure" in the challenged corporate activity.'" *Id.* at 174 (quoting *Escrude Cruz v. Ortho Pharm.*

18

*Corp.*, 619 F.2d 902, 907 (1st Cir. 1980)). This is the law in Georgia as well--a corporate officer or an employee must have direct, personal participation in the challenged corporate activity to be held personally liable. While the doctrine of respondeat superior may make a master liable for the torts of its employee merely because of their relationship, the converse does not hold true--a servant is not liable for the torts of his master unless he committed the tort personally.

The cases cited by plaintiff are distinguishable in that it is clear that the employee at issue was the "guiding spirit" or "central figure" in the tortious act. For example, in *McClurd*, 135 Ga. App. 136, 217 S.E.2d 163, the employee had personally designed and overseen the installation of the machinery that caused the plaintiff's injury, and in *Gay*, 183 Ga. App. 175, 358 S.E.2d 468, the employee was the driver of the truck that struck the plaintiff. In the present case, there is no such allegation of direct participation. In fact, there is no connection made between plaintiff and defendants Schultz and Paternostro. Plaintiff does not assert that these two defendants had any personal contact with him or his physicians. In fact, in their affidavits, the two defendants aver that not only did they play no role in the "research, development, testing, formulation, manufacturing, labeling,

19

examining, packaging and/or shipping" of Rezulin, they have never `sold" the drug to an individual or entity, including physicians, pharmacies, and wholesalers, either. (Notice of Removal [1] at Aff. of Warren Schultz at ¶¶ 5-6, Aff. of Tony Paternostro at ¶¶ 6-7.)

Under plaintiff's theory of liability, every single employee of Warner-Lambert/Parke-Davis who played a role in the production and marketing of Rezulin could be held personally liable. Not only is this result counter to common sense, but plaintiff has failed to cite a single case where a court allowed such a claim. Accordingly, the Court concludes that plaintiff has failed to state a negligence claim against defendants Schultz and Paternostro.

C.   *Breach of Implied Warranty*

Lastly, regarding the breach of implied warranty claim, plaintiff has failed to state a claim against Schultz or Paternostro because they were neither sellers of the Rezulin nor in privity with plaintiff, two requirements under Georgia law for this cause of action.   *See* O.C.G.A. § 11-2-314(1);[14]

---

[14] Section 11-2-314(1) reads: `(1) Unless excluded or modified (Code Section 11-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.  Under this Code section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale."

20

*Stewart v. Gainesville Glass Co., Inc.*, 131 Ga. App. 747, 751, 206 S.E.2d 857, 859 (1974) ("But the law as to liability under a warranty still requires privity.")  The breach of warranty claim as to Schultz and Paternostro, therefore, fails as a matter of law.

Because there is no possibility that plaintiff can establish a cause of action against Schultz and Paternostro, the Court concludes that these two defendants were fraudulently joined.  Without Schultz and Paternostro, complete diversity of citizenship exists.  The requirements of federal subject matter diversity jurisdiction have been met, and removal was appropriate.  Accordingly, the Court DENIES plaintiff's Motion to Remand.

<u>CONCLUSION</u>

For the foregoing reasons, the Court finds that plaintiff's Motion to Remand [11] is DENIED, plaintiff's Motion to Strike [33] is GRANTED, and defendant's Motion for Leave to File a Supplemental Memorandum in Opposition to Plaintiff's Motion to Remand [35] is GRANTED.

SO ORDERED, this 30 day of November, 2000.

_____
JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

21

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CHAMBERS
THOMAS W. THRASH JR
U. S. D. C.  Atlanta

JAN  3 2003

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

DANIEL JOHNSON and JANATH
DAVIS,

    Plaintiffs,

    v.

WYETH CORPORATION, fka
American Home Products Corporation,
et al.,

    Defendants.

CIVIL ACTION FILE

NO. 1:02-CV-1368-TWT

## ORDER

This is a products liability action.  It is before the Court on the Plaintiffs' Motion

to Remand [Doc. 8].  For the reasons set forth below, the motion is denied.

## I.  BACKGROUND

Plaintiffs are citizens of Texas and Oklahoma.  They contend that they were

injured by use of the diet drugs fenfluramine and dexfenfluramine manufactured by the

Defendant Wyeth.  Wyeth is a citizen of New Jersey and Delaware.  Plaintiffs filed this

action on April 19, 2002, in the Superior Court of Fulton County, Georgia.  On May

20, 2002, Wyeth filed a Notice of Removal in this Court.  In the Notice, Wyeth alleged

that the Defendants Rugby Laboratories and Molnar and Scott were fraudulently joined

6

to defeat Wyeth's right of removal and the likely transfer of this action to the MDL proceeding in the Eastern District of Pennsylvania.

The Court held a hearing in this matter on June 19, 2002. At that time, the Court granted Wyeth's Motion for Expedited Discovery on the jurisdictional issues. Specifically, the Court allowed Wyeth to take a Rule 30(b)(6) deposition of a Rugby Laboratories representative with respect to the location of its principal place of business. Thereafter, Wyeth and Rugby Laboratories submitted a Stipulation stating that the principal place of business of Rugby Laboratories was in California. Rugby also filed a motion seeking permission to file an Amended Answer withdrawing the admission that its principal place of business was located in Georgia. The Defendants Molnar and Scott were deposed. The parties then filed supplemental briefs.

## II. DISCUSSION

In their Supplemental Brief, Plaintiffs concede that Rugby Laboratories did not maintain its principal place of business in Georgia at the time that this action was filed. Therefore, this case is very different from the three other cases decided in this district where the cases were remanded based upon the Georgia citizenship of Rugby Laboratories. The issue to be addressed in this case is whether the Defendants Robert L. Scott and John A. Molnar, both Georgia residents, were fraudulently joined to defeat removal. Scott and Molnar are employees of Wyeth. Scott was employed as

Regional Manager, State Government Affairs. Molnar was Associate Director of State Government Affairs. Plaintiffs do not allege that Scott or Molnar made any misrepresentations to them or their doctors. They do allege that Scott and Molnar made misrepresentations to various state medical boards and regulatory entities for the purpose of increasing the availability of the diet drugs by removing certain restrictions on their sale and consumption.

"[R]emoval jurisdiction is no exception to a federal court's obligation to inquire into its own jurisdiction." University of South Alabama v. American Tobacco Co., 168 F.3d 405, 410 (11th Cir. 1999). "[A]ll doubts about jurisdiction should be resolved in favor of remand to state court." Id. at 411. "The burden of establishing subject matter jurisdiction falls on the party invoking removal." Id. at 411-12. "The test for determining whether or not a defendant has been fraudulently joined is twofold: (1) look to see whether there is no possibility the plaintiff can establish any cause of action against the resident defendant; and (2) look to see whether plaintiff has fraudulently pled jurisdictional facts in order to bring the resident defendant into state court." Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989). "In addressing the issue of fraudulent joinder, the district court should resolve all questions of fact and controlling law in favor of the plaintiff and can consider any submitted affidavits and/or deposition transcripts." Id.

Plaintiffs assert claims for negligence, negligent misrepresentation, fraud and conspiracy against Defendants Scott and Molnar.  These Defendants were engaged in activities relating to Wyeth's unsuccessful efforts to have the diet drugs descheduled at the state and national level.  It is undisputed that neither of these Defendants engaged in any other activities related to the advertising or promotion of the diet drugs.  It is undisputed that neither of them contacted physicians in any state to persuade them to prescribe the diet drugs.  Plaintiffs have no possibility to recover on their theories of negligence or fraud against these Defendants because they cannot show misrepresentations by these Defendants that were relied upon by the Plaintiffs or their physicians.  White v. BDO Seidman, LLP, 249 Ga. App. 668, 670-73 (2001); Ali v. Fleet Finance, Inc. of Georgia, 232 Ga. App. 13, 14 (1998).  They have no possibility of recovery against these Defendants on a civil conspiracy claim because a corporation cannot conspire with its own employees acting within the scope of their employment. Nalley Northside Chevrolet, Inc. v. Herring, 215 Ga. App. 185, 188 (1994).  Plaintiffs have not produced any evidence of another conspiracy involving these Defendants that resulted in harm to the Plaintiffs.  It is quite apparent that the only reason for joining these Defendants in this case was to defeat Wyeth's legitimate right to remove the case to federal court. The fact that a written consent to removal was not filed for each of the drug manufacturing Defendants does not defeat removal.  Plaintiffs have not shown

that, in fact, there was no consent to removal by these Defendants.   The Plaintiffs'

Motion to Remand [Doc. 8] is DENIED.

SO ORDERED, this __3__ day of January, 2003.

_Thomas W. Thrash_
THOMAS W. THRASH, JR.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS                       :       MDL DOCKET NO. 1203
(PHENTERMINE, FENFLURAMINE,             :
DEXFENFLURAMINE) PRODUCTS               :
LIABILITY LITIGATION                    :
                                        :
THIS DOCUMENT RELATES TO:               :
                                        :
_____:
                                        :
AUDREY ALEXANDER v. WYETH, et al.       :       CIVIL ACTION NO. 03-20206
                                        :
IDA HAYNES v. WYETH, et al.             :       CIVIL ACTION NO. 03-20143
                                        :
RUTH HIGGINBOTTOM v. WYETH, et al.      :       CIVIL ACTION NO. 03-20142
                                        :
THOMAS JARRELL v. WYETH, et al.         :       CIVIL ACTION NO. 03-20144
                                        :
CYNTHIA KANODE v. WYETH, et al.         :       CIVIL ACTION NO. 03-20145
                                        :
LINDA TRISVAN v. WYETH, et al.          :       CIVIL ACTION NO. 03-20141

## MEMORANDUM AND PRETRIAL ORDER NO. _____

Bartle, J.                                      January   , 2004

        Before the court are the motions of class members

Audrey Alexander, Ida Haynes, Ruth Higginbottom, Thomas Jarrell,

Cynthia Kanode, and Linda Trisvan to remand to the appropriate

Virginia state courts their actions against defendants Wyeth,[1]

the physicians who have prescribed Wyeth's diet drugs Pondimin

and/or Redux for them, the physicians' respective practice

groups, and John Does 1-3 -- anonymous detail persons and

_____

1.  Wyeth was previously known as American Home Products
Corporation ("AHP").

marketing representatives of Wyeth.[2]  The state court actions
were captioned:  <u>Audrey Alexander v. Wyeth, et al.</u>, No. CL03-
023905-00 (Va. Cir. Ct. Lynchburg filed Feb. 24, 2003); <u>Ida
Haynes v. Wyeth, et al.</u>, No. LP-2596-1 (Va. Cir. Ct. Richmond
filed Oct. 30, 2002); <u>Ruth Higginbottom v. Wyeth, et al.</u>, No. LP-
2564-1 (Va. Cir. Ct. Richmond filed Oct. 25, 2002); <u>Thomas
Jarrell v. Wyeth, et al.</u>, No. LP-2664-4 (Va. Cir. Ct. Richmond
filed Nov. 7, 2002); <u>Cynthia Kanode v. Wyeth, et al.</u>, No. LP-
2577-3 (Va. Cir. Ct. Richmond filed Oct. 25, 2002); <u>Linda Trisvan
v. Wyeth, et al.</u>, No. CL024996 (Va. Cir. Ct. Greensville filed
Oct. 28, 2002).

    The plaintiffs in these actions have exercised their
right of back-end opt-out under the Nationwide Class Action
Settlement Agreement ("Settlement Agreement") in <u>Brown v.
American Home Products Corporation</u>, CIV.A. No. 99-20593 (E.D. Pa.
Aug. 28, 2000) ("Pretrial Order ("PTO") No. 1415"), which
encompassed persons who ingested Wyeth's diet drugs Pondimin and
Redux.  <u>See</u> <u>e.g.</u>, Settlement Agreement at § IV(A),(B), and
(D)(4).  Under the Settlement Agreement, those who have exercised
a back-end opt-out may sue Wyeth for compensatory damages in the
tort system rather than obtain benefits from the AHP settlement
trust.  Unlike initial opt-outs, these plaintiffs were class

---

2.  Plaintiffs Ruth Higginbottom, Cynthia Kanode, and Linda
Trisvan have also brought claims against Interneuron
Pharmaceuticals, Inc. ("Interneuron"), the Massachusetts-based
pharmaceutical company that promoted Redux.  Because plaintiffs
do not assert the joinder of Interneuron as a ground for remand,
we need not address plaintiffs' claims against Interneuron.

members at the time of the approval of the class action settlement and continue to be so even though they now have separate lawsuits pending.

These six plaintiffs are all represented by the same counsel. Their motions for remand are before the undersigned as the transferee judge in MDL 1203, the mass tort litigation involving Wyeth's diet drugs commonly known as fen-phen. No federal claim for relief is alleged. Because these motions present nearly identical legal and factual issues, we will address them together.

I.

In brief summary, plaintiffs, all residents of the Commonwealth of Virginia, filed suit for injuries sustained as a result of their use of the diet drugs known as Pondimin and/or Redux. The defendant Wyeth, the manufacturer of Pondimin and Redux, is a party of diverse citizenship from the plaintiffs.[3] The defendant physicians[4] who have prescribed Pondimin and/or

---

3. Plaintiffs in their original state court pleadings claim that Wyeth is also a non-diverse defendant. Wyeth responds, and we agree, that at all relevant times, Wyeth was and still is a citizen of Delaware, where it is incorporated, and of New Jersey, where its principal place of business is located. See Notice of Removal at ¶ 6 (citing affidavit of John Alivernini, Assistant Secretary of Wyeth-Ayerst Laboratories). Plaintiffs provide no evidence to the contrary.

4. Specifically, plaintiffs have brought claims against the following physicians and their practice groups: Audrey Alexander claims that Thomas W. Eppes, Jr., M.D. and Central Virginia Family Physicians, Inc. prescribed Pondimin for her; Ida Haynes claims that Vanessa O. Johnson, M.D. and U.S. Medical Weight Loss Centers prescribed Pondimin for her; Ruth Higginbottom claims that Eric Joel DeMaria, M.D. prescribed Pondimin for her; Thomas
(continued...)

Redux for plaintiffs are residents of Virginia while the defendant physicians' respective practice groups also have their principal places of practice there.  Finally, plaintiffs aver that the John Does 1-3, fictitious detail persons and marketing representatives, are adult citizens of Virginia.

Plaintiffs originally filed their motions for judgment[5] in the Virginia state courts between October 2002 and February 2003, more than five years after fen-phen was withdrawn from the market in September, 1997.  Wyeth timely removed the actions to the several United States District Courts in Virginia.[6]  The Virginia federal courts deferred ruling on plaintiffs' remand

_____

4.(...continued)
Jarrell claims that James C. Barr, M.D. and Virginia Physicians, Inc. prescribed Redux for him; Cynthia Kanode claims that John R. Partridge, M.D., Corinne N. Tuckey-Larus, M.D., and Virginia Physicians for Women, Ltd. prescribed Pondimin, Redux, and/or Phentermine for her; and Linda Trisvan claims that Thomas Walker, M.D. prescribed Redux for her.

5.  An action at law before a Virginia Circuit Court is commenced by the filing of a "motion for judgment".  See Va. Sup. Ct. R. 3:3 (2003).

6.  The specific date and place of plaintiffs' filings of motions for judgment and Wyeth's removal are as follows:  Audrey Alexander filed on February 24, 2003 in the Circuit Court for the City of Lynchburg, Virginia, and Wyeth removed this action to the United States District Court for the Western District of Virginia on March 19, 2003.  Ida Haynes, Ruth Higginbottom, Thomas Jarrell, and Cynthia Kanode filed respectively on October 30, 2002, October 25, 2002, November 7, 2002, and October 25, 2002, all in the Circuit Court for the City of Richmond, Virginia, and Wyeth removed these actions to the United States District Court for the Eastern District of Virginia between November 12 and November 14, 2002.  Linda Trisvan instituted suit on October 28, 2002 in the Circuit Court for the County of Greensville, Virginia, and Wyeth removed this action to the United States District Court for the Eastern District of Virginia on November 13, 2002.

motions, and the cases were then transferred to this court as part of MDL 1203.

The plaintiffs maintain that remand is appropriate because complete diversity does not exist as required under 28 U.S.C. § 1332(a). Wyeth counters that the non-diverse physicians and physicians' practice groups were fraudulently joined because the applicable two-year statute of limitations bars plaintiffs' claims against these non-diverse defendants.[7] See Va. Code Ann. § 8.01-243(A) (West 2003). Thus, Wyeth argues, plaintiffs' claims against the non-diverse defendants should be disregarded for purposes of determining diversity of citizenship of the parties. Plaintiffs respond that the statute of limitations has not expired because they discovered their injuries less than two years prior to filing their motions for judgment against the non-diverse defendants.

II.

Under the federal removal statute, " ... any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court .... "  28 U.S.C. § 1441(a). Federal district courts have original jurisdiction over all civil actions between citizens of different

---

7. The statute of limitations is not an issue in plaintiffs' claims against Wyeth, which has waived its right to assert the statute of limitations defense in return for the plaintiffs giving up their right to sue Wyeth for "punitive, exemplary, or multiple damages." Settlement Agreement § IV.D.3.c; see PTO No. 2625 and PTO No. 2680.

-5-

states if the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a)(1). Complete diversity, of course, is required. State Farm Fire & Cas. Co. v. Tashire, 386 U.S. 523, 530-31 (1967). If an action originally instituted in a state court could have been brought in federal court pursuant to diversity jurisdiction, the defendants may remove it to federal court provided certain procedures are followed and certain conditions met. 28 U.S.C. §§ 1441 and 1446. Similarly, if the federal court subsequently determines that it does not have subject matter jurisdiction over a removed action, it must remand the action to the state court where it originated. 28 U.S.C. § 1447(c). A plaintiff or a defendant may seek to remand the case, or the court may do so on its own motion. Am. Fire & Cas. Co. v. Finn, 341 U.S. 6, 16-19 (1951); 16 Moore's Federal Practice, § 107.41[1][b][i] (Matthew Bender 3d ed.); see also Moses v. Ski Shawnee, Inc., 2000 WL 1053568, at *2 (E.D. Pa. July 31, 2000).

The presence of a party fraudulently joined cannot defeat removal. Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921). Under our Court of Appeals' decision in Boyer v. Snap-on Tools Corporation, 913 F.2d 108, 111 (3d Cir. 1990), joinder is fraudulent "where there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendant or seek a joint judgment."

-6-

As an MDL court sitting within the Third Circuit, we must apply our Court of Appeals' fraudulent joinder standard. See In re Korean Airlines Disaster, 829 F.2d 1171, 1174 (D.C. Cir. 1987); In re Ikon Office Solutions, Inc. Secs. Litig., 86 F. Supp. 2d 481, 485 (E.D. Pa. 2000). As discussed above, we must decide whether there is a "reasonable basis in fact or colorable ground supporting the claim against the joined defendant." Boyer, 935 F.2d at 111.

We recognize that the burden on Wyeth to establish fraudulent joinder is a heavy one. See Wilson, 257 U.S. at 111. While we "must resolve all contested issues of substantive fact in favor of plaintiff," we do not take this to mean we must blindly accept whatever the party seeking remand may say no matter how incredible or how contrary to the overwhelming weight of the evidence. Id. We are also cognizant that the removal statute must be construed narrowly, and "all doubts should be resolved in favor of remand." Steel Valley Auth. v. Union Switch and Signal Div., 809 F.2d 1006, 1010 (3d Cir. 1987). The Supreme Court made it clear in Wilson that if a plaintiff contests a defendant's assertion that joinder of another defendant was a sham to defeat removal, the District Court must determine the facts from the evidence. Wilson, 257 U.S. at 98. We are not to decide automatically in favor of remand simply because some facts may be said to be in dispute.

On matters of substantive law, "[i]f there is even a possibility that a state court would find that the complaint

-7-

states a cause of action against any one of the resident
defendants, the federal court must find that joinder was proper
and remand the case to state court." Boyer, 913 F.2d at 111
(citation omitted).  We are mindful that our inquiry into Wyeth's
claim of fraudulent joinder is less searching than that
permissible when a party seeks to dismiss a claim under Rule
12(b)(6) of the Federal Rules of Civil Procedure.  Batoff v.
State Farm Ins. Co., 977 F.2d 848, 852 (3d Cir. 1992); see also
Gaul v. Neurocare Diagnostic, Inc., No. 02-CV-2135, 2003 WL
230800, at *2 (E.D. Pa. Jan. 1, 2003).  In other words, simply
because a claim against a party may ultimately be dismissed for
failure to state a claim does not necessarily mean that the party
was fraudulently joined.  The test is whether this court thinks
there is a "reasonable basis" for finding the claim to be
colorable, that is, whether it is "wholly insubstantial and
frivolous." Batoff, 977 F.2d at 852.

III.

The key issue for present purposes is whether the
prescribing physicians and their respective practice groups, all
purportedly Virginia citizens, were fraudulently joined as
defendants for the purpose of destroying diversity of citizenship
and preventing removal.  Plaintiffs have brought claims for
medical negligence against all of these non-diverse defendants.

Wyeth argues that plaintiffs' motions for judgment do
not state colorable claims against these defendants because
plaintiffs' claims are barred by the Virginia statute of

-8-

limitations.  It reads in pertinent part that "every action for personal injuries, whatever the theory of recovery, and every action for damages resulting from fraud, shall be brought within two years after the cause of action accrues." VA. CODE ANN. § 8.01-243(A).  The Virginia Code further provides that "[i]n every action for which a limitation period is prescribed, the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person." VA. CODE ANN. § 8.01-230 (West 2003).  Virginia courts have found that the injury is deemed to occur and the statute of limitations begins to run whenever any injury, however slight, is sustained.  St. George v. Pariser, 484 S.E.2d 888, 889 (Va. 1997) (citation omitted).  Moreover, even if a plaintiff suffers substantial effects from the injury only at a later date, the statute begins to run when the injury is first incurred.  Lo v. Burke, 455 S.E.2d 9, 13 (Va. 1995).

Unlike some states that have adopted discovery rules, "Virginia law does not calculate statute of limitations in personal injury from the date of diagnosis." Wade v. Danek Medical Inc., 5 F. Supp. 2d 379, 382 (E.D. Va. 1998) (citations omitted).  Instead, "a cause of action can accrue before a disease ... manifests itself by symptoms, since it is the onset of the disease itself that triggers the running of the limitation period." Hollingsworth v. Shenandoah Med. Imaging, Inc., 1996 WL 1065478, at *5 (Va. Cir. Ct. Jan. 18, 1996) (citation omitted).

-9-

Under Virginia law, a cause of action accrues when all essential elements are present. Locke v. Johns-Manville Corp., 275 S.E.2d 900, 904 (Va. 1981). Here, where the plaintiffs claim medical negligence, the cause of action accrues when (1) the defendants have a legal obligation to the plaintiffs, (2) the defendants violate or breach that duty, and (3) harm or damage occurs as a proximate result of the breach or violation. See id. Accordingly, the statue of limitations begins to run when there is injury to the plaintiffs, "without which no cause of action would come into existence." Id.

The crucial issue we must resolve is the time when the plaintiffs were first injured. See Locke, 275 S.E.2d at 905. Wyeth claims that the last possible date on which plaintiffs could have sustained injuries was September 15, 1997, or shortly thereafter, when fen-phen was pulled from the market. Plaintiffs, on the other hand, contend that their respective injuries did not accrue until they were diagnosed with various heart problems within the past two years.[8] To determine when

---

8. Plaintiffs, in their motions for judgment, aver that their injuries are as follows: Audrey Alexander claims that an echocardiogram in May, 2002 reveals moderate mitral regurgitation as a result of her usage of Pondimin; Ida Haynes maintains that an echocardiogram in March, 2002 reveals moderate mitral regurgitation with left atrium enlargement as a result of her usage of Pondimin; Ruth Higginbottom claims that an echocardiogram in July, 2002 reveals moderate mitral regurgitation with left atrium enlargement as a result of her usage of Pondimin; Thomas Jarrell asserts that he became FDA positive (moderate or greater mitral regurgitation) within the past two years as a result of his usage of Redux; Cynthia Kanode claims that an echocardiogram in July, 2002 reveals moderate mitral regurgitation with left atrium enlargement as a result of
(continued...)

-10-

plaintiffs' alleged injuries occurred, it is necessary to examine the relevant medical evidence. See id. "The 'time plaintiff was hurt' is to be established from available competent evidence, produced by a plaintiff or a defendant, that pinpoints the precise date of injury with a reasonable degree of medical certainty." Id. Because Wyeth claims that plaintiffs' claims are barred by the statute of limitations, it "bears the burden of proving the date on which the injury was sustained with a reasonable degree of medical certainty." St. George, 484 S.E.2d at 890. Wyeth is "not required to establish as a matter of law the exact date that the injury was first sustained; [it] need only to establish that it was more probable than not that it occurred more than two years prior to the filing of suit." Wade, 5 F. Supp. 2d at 383. To support their position that their injuries occurred within two years of filing their motions for judgment, plaintiffs each submit an affidavit from either Dr. Emeki Nkadi or Dr. Peter S. Ro, board certified cardiologists, which states that "within a reasonable degree of medical probability and certainty, ... the plaintiff in this action sustained the injury to her heart that is the basis of this lawsuit within two years prior to the filing of this suit," Nkadi Decls. at ¶ 5, or "that the plaintiff in this action was injured

---

8. (...continued)
her usage of Pondimin, Redux, and/or Phentermine; and Linda Trisvan maintains that an echocardiogram in July, 2002 reveals moderate aortic regurgitation as a result of her usage of Redux.

and became FDA+ within two years prior to the filing of this
suit."  Ro Decl. at ¶ 5.[9]

 Wyeth, on the other hand, points out that Judge
Louis C. Bechtle,[10] in PTO No. 1415, determined that Pondimin and
Redux did not cause latent heart valve injuries but that the
injury occurred at or near the time of last use.[11]  See PTO
No. 1415, Brown v. American Home Products Corporation, CIV.A. No.
99-20593 (E.D. Pa. Aug. 28, 2000).  After a full hearing, Judge
Bechtle found:

> Pondimin and Redux were withdrawn from the
> market in September 1997 accompanied by an
> unprecedented amount of publicity which
> effectively warned diet drug users that they
> may have developed valvular lesions which
> could be detected through non-invasive
> echocardiograms.  Also, these lesions are not
> latent.  If they are going to occur, they are
> going to occur during drug use (or shortly
> thereafter) and be demonstrable on
> echocardiogram.

PTO No. 1415 at 41.  In reaching this conclusion, Judge Bechtle
considered a number of studies that tracked former Pondimin
and/or Redux patients for a number of years to find that "there
was no emergence of new disease after some latency period."  Id.

_____

9.  Plaintiff Thomas Jarrell submitted an affidavit from Dr. Ro.
The rest of the plaintiffs submitted an affidavit from Dr. Nkadi.

10.  Judge Bechtle was the original MDL 1203 judge who presided
over the class action settlement in Brown.  He retired on
June 30, 2001.

11.  Plaintiff Cynthia Kanode claims damages resulting from
Redux, Pondimin, and Phentermine, "either individually or in
combination."  Kanode Mot. for J. at ¶ 18.  Because Judge Bechtle
determined in PTO No. 1415 that the ingestion of Phentermine did
not cause damage, we need not address Ms. Kanode's allegations of
damages resulting from Phentermine.

at 106-07.  In addition, Judge Bechtle relied upon the experts
who testified in the case, all of whom agreed that Pondimin,
Redux, and the fen-phen combination "do not cause latent valvular
regurgitation" and "that there is no evidence of significant
progression among such patients after they cease taking the
drugs."  Id. at 108.

          Importantly, class counsel, whom this court determined
adequately represented all class members including plaintiffs
here, had an opportunity but did not object to the contentions or
the finding of "no latency."  Judge Bechtle found that those who
did object ("objectors") "presented no evidence from any study to
support the contrary view that [heart disease] is either latent
or that it progresses in most former patients."  PTO No. 1415 at
107.  Judge Bechtle carefully analyzed the studies cited by the
objectors and determined that the studies did not support the
objectors' argument for latency.[12]  Specifically, one study cited
by the objectors found that "the prevalence and severity of [diet
drug] associated [heart problems] fifteen years after exposure is
similar to published reports of patients with recent exposure,
suggesting a lack of significant regression or progression of
[heart problems] over time."  PTO No. 1415 at 129.  Another study
cited by the objectors similarly noted that there does not appear
to be a progression of diet drug related heart problems.  Id.
The "competent medical evidence," as presented by Wyeth and

_____

12.   Judge Bechtle reviewed the studies of Eichelberger and
Fischer.  See PTO No. 1415 at 129 (citing Ex. P-118; Ex. P-119).

-13-

reviewed in detail by Judge Bechtle in PTO No. 1415, establishes "with a reasonable degree of medical certainty" that the diet drugs Pondimin and Redux do not create latent injuries. Locke, 275 S.E.2d at 905.

Wyeth contends that the principle of collateral estoppel, that is issue preclusion, prevents the plaintiffs from relitigating the question when class members first suffered injuries from Pondimin and Redux. Collateral estoppel bars the relitigation of an issue which has already been tried between the same parties or their privies. It applies when "(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment." Nat'l R.R. Passenger Corp. v. Pennsylvania Public Util. Comm'n, 342 F.3d 242, 252 (3d Cir. 2003) (citation omitted).

Here, the plaintiffs are class members and were thus parties to the Settlement Agreement. The issue of latency was actually litigated in the fairness hearing and is the same issue that the plaintiffs are now raising to defeat the bar of the statute of limitations. Judge Bechtle's determination of no latency, that is that class members' injuries occurred within a short time after ingesting fen-phen, was an essential finding, for it directly affected the adequacy of class representation. See PTO No. 1415 at 104-08. Finally, PTO No. 1415, in which Judge Bechtle approved the Settlement Agreement, is a final and

-14-

valid judgment, upheld on appeal.  Thus, plaintiffs are
collaterally estopped from relitigating the issue of latency
through the affidavits of Dr. Ro and Dr. Nkadi.

        Based on the record in this nationwide class action as
set forth in PTO No. 1415, we find that plaintiffs' injuries were
sustained and the cause of action accrued, at the latest, shortly
after September 15, 1997, when fen-phen was withdrawn from the
market.  Plaintiffs' motions for judgment were filed in the
Virginia state courts over five years after September 1997 and
thus over five years after their respective physicians prescribed
these drugs.  Accordingly, there is "no reasonable basis in fact
or colorable ground" that plaintiffs' motions for judgment
against the defendant physicians and their practice groups were
timely.  Boyer, 913 F.2d at 111.

IV.

        Plaintiffs also bring claims against John Does 1-3 --
anonymous detail persons and marketing representatives of Wyeth
whom plaintiffs believe to be citizens of Virginia.  Plaintiffs
appear to join John Does 1-3 in an effort to defeat diversity.
However, the removal statute, in relevant part, provides that
"the citizenship of defendants sued under fictitious names shall
be disregarded."  28 U.S.C. § 1441(a).  Thus, for the purposes of
determining whether complete diversity exists so that these
actions may remain in federal court, the citizenship of John Does
1-3 is irrelevant.

V.

Finally, we turn to the issue of whether a statute of limitations defense may be considered in support of a fraudulent joinder claim. We previously answered this question in the affirmative in PTO No. 2710 in Price v. American Home Products, CIV.A. No. 02-20229 (E.D. Pa. Jan. 17, 2003) and PTO No. 3207 in Ross v. Wyeth, et al., CIV.A. No. 03-20362 (E.D. Pa. Jan. 12, 2004), which are also part of the nationwide diet drug litigation. Because we have previously ruled on the same legal issue, we need not revisit it here. Instead, we refer the parties to our prior analysis of this issue. See e.g., PTO No. 3207 at 11-12.

We find that Wyeth has met its burden of proving that the statute of limitations defense "unquestionably" precludes plaintiffs from obtaining relief from their respective physicians and the physicians' practice groups. See Gaul, supra, 2003 WL 230800, at *3. Plaintiffs' attempts to join their physicians as defendants are improper efforts to prevent Wyeth from exercising its statutory right under 28 U.S.C. § 1441 to remove cases based on diversity of citizenship to federal court. Because Wyeth has met its heavy burden of establishing fraudulent joinder, we will deny plaintiffs' motions to remand these actions to the several Virginia state courts and dismiss plaintiffs' claims against defendant physicians, their respective practice groups, and John Does 1-3. Plaintiffs' motions for costs are without merit and will be denied.

-16-

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS                    :    MDL DOCKET NO. 1203
(PHENTERMINE, FENFLURAMINE,          :
DEXFENFLURAMINE) PRODUCTS            :
LIABILITY LITIGATION                 :
                                     :
THIS DOCUMENT RELATES TO:            :
_____  :
                                     :
AUDREY ALEXANDER v. WYETH, et al.   :    CIVIL ACTION NO. 03-20206
                                     :
IDA HAYNES v. WYETH, et al.          :    CIVIL ACTION NO. 03-20143
                                     :
RUTH HIGGINBOTTOM v. WYETH, et al.  :    CIVIL ACTION NO. 03-20142
                                     :
THOMAS JARRELL v. WYETH, et al.     :    CIVIL ACTION NO. 03-20144
                                     :
CYNTHIA KANODE v. WYETH, et al.     :    CIVIL ACTION NO. 03-20145
                                     :
LINDA TRISVAN v. WYETH, et al.      :    CIVIL ACTION NO. 03-20141

### PRETRIAL ORDER NO. _____

AND NOW, this       day of January, 2004, for the
reasons set forth in the accompanying Memorandum, it is hereby
ORDERED that:

(1)   the motion of plaintiff Audrey Alexander in
Audrey Alexander v. Wyeth, et al., CIV.A. No. 03-20206 (E.D. Pa.)
to remand to the Circuit Court for the City of Lynchburg,
Virginia is DENIED;

(2)   the claims against defendants Thomas W. Eppes,
Jr., M.D., Central Virginia Family Physicians, Inc., and John
Does 1-3 in Audrey Alexander v. Wyeth, et al. are DISMISSED;

(3)   the motion of plaintiff Ida Haynes in <u>Ida Haynes</u>
<u>v. Wyeth, et al.</u>, CIV.A. No. 03-20143 (E.D. Pa.) to remand to the
Circuit Court for the City of Richmond, Virginia is DENIED;

(4)   the claims against defendants Vanessa O. Johnson,
M.D., U.S. Medical Weight Loss Centers, and John Does 1-3 in
<u>Ida Haynes v. Wyeth, et al.</u> are DISMISSED;

(5)   the motion of plaintiff Ruth Higginbottom in <u>Ruth</u>
<u>Higginbottom v. Wyeth, et al.</u>, CIV.A. No. 03-20142 (E.D. Pa.) to
remand to the Circuit Court for the City of Richmond, Virginia is
DENIED;

(6)   the claims against defendants Eric Joel DeMaria,
M.D. and John Does 1-3 in <u>Ruth Higginbottom v. Wyeth, et al.</u> are
DISMISSED;

(7)   the motion of plaintiff Thomas Jarrell in <u>Thomas</u>
<u>Jarrell v. Wyeth, et al.</u>, CIV.A. No. 03-20144 (E.D. Pa.) to
remand to the Circuit Court for the City of Richmond, Virginia is
DENIED;

(8)   the claims against defendants James C. Barr,
M.D., Virginia Physicians, Inc., and John Does 1-3 in <u>Thomas</u>
<u>Jarrell v. Wyeth, et al.</u> are DISMISSED;

(9)   the motion of plaintiff Cynthia Kanode in <u>Cynthia</u>
<u>Kanode v. Wyeth, et al.</u>, CIV.A. No. 03-20145 (E.D. Pa.) to remand
to the Circuit Court for the City of Richmond, Virginia is
DENIED;

(10)   the claims against defendants John R. Partridge,
M.D., Corinne N. Tuckey-Larus, M.D., Virginia Physicians for

Women, Ltd., and John Does 1-3 in <u>Cynthia Kanode v. Wyeth, et al.</u>
are DISMISSED;

(11)  the motion of plaintiff Linda Trisvan in <u>Linda
Trisvan v. Wyeth, et al.</u>, CIV.A. No. 03-20141 (E.D. Pa.) to
remand to the Circuit Court for the County of Greensville,
Virginia is DENIED;

(12)  the claims against defendants Thomas Walker, M.D.
and John Does 1-3 in <u>Linda Trisvan v. Wyeth, et al.</u> are
DISMISSED; and

(13)  the motions of all plaintiffs for costs pursuant
to 28 U.S.C. § 1447(c) are DENIED.

BY THE COURT:

_____ J.

07/21/03  21:59 FAX 202 942 5999        A & P FAX CTR DC #6                    ☒002

## DECLARATION OF SHARON TAYLOR

I, the undersigned, declare as follows:

1.      My name is Sharon L. Taylor, and I am over the age of 18.  I am an attorney with the law firm of Arnold & Porter, licensed to practice law in the District of Columbia and Maryland.  Arnold & Porter is national counsel for Wyeth[1] in the diet drug litigation.

2.      I submit this declaration in support of Wyeth's Notice of Removal to provide the Court with a small but illustrative sample of the extensive public information linking diet drugs with heart valve problems that was available in 1997-2000.  I have personal knowledge of the materials described herein.

3.      Wyeth is not endorsing the accuracy of these or any other public reports; it is merely documenting the extent of publicity the diet drugs received.

4.      This declaration specifically describes a small but illustrative portion of the massive nationwide and local publicity concerning (1) the July 1997 announcements about the possible association between certain diet drugs and valvular heart disease; (2) the withdrawal of those diet drugs from the market in September 1997; (3) the U.S. Department of Health and Human Services' warning in November 1997 that diet drug users should

---

[1] American Home Products Corporation changed its name to Wyeth on March 11, 2002.

visit their doctors for evaluation; and (4) diet drug litigation and the
nationwide class action settlement of that litigation in 1999 and 2000.

## I.   Publicity Concerning the July 1997 Announcements About the Possible Association Between Diet Drugs and Valvular Heart Disease

On July 8, 1997, the Mayo Clinic issued a press release describing
health risks possibly associated with the use of diet drugs.[2]  The United
States Department of Health and Human Services issued a similar press
release that same day.[3]

### A.   National Publicity About the Announcements

5.     The contents of the Mayo Clinic announcement were widely
reported in the national press.  For example, *USA Today* and the *New York
Times* both ran front-page articles concerning the report on July 9, 1997,
bearing the headlines "Diet Drug Patients Get Heart Warning" and "2
Popular Diet Pills Linked to Problems With Heart Valves."[4]  *The Wall Street
Journal* likewise ran an article that same day announcing that "Diet Drug
Mix May Damage Heart Valves."[5]  *USA Today* ran similar follow-up articles

---

[2] Press release, Mayo Clinic, Valvular Heart Disease Associated with Fenfluramine-Phentermine (July 8, 1997), attached as Exhibit 1.

[3] Press release, U.S. Dept. Health and Human Servs., Health Advisory on Fenfluramine/Phentermine for Obesity (July 8, 1997), attached as Exhibit 2.

[4] Nancy Hellmich, *Diet Drug Patients Get Heart Warning*, USA TODAY, at 1A, July 9, 1997, attached as Exhibit 3; Gina Kolata, *2 Popular Diet Pills Linked to Problems With Heart Valves*, N.Y. TIMES, at A1, July 9, 1997, attached as Exhibit 4.

[5] Robert Langreth & Bruce Ingersoll, *Pharmaceuticals: Diet-Drug Mix May Damage Heart Valves*, WALL ST. J., at B1, July 9, 1997, attached as Exhibit 5.

on July 10[6] and the *New York Times* addressed the issue again with an article published on July 11.[7]

### B.   Local Publicity About the Announcements

6.      The Mayo Clinic announcement also received substantial publicity in local newspapers and television news broadcasts throughout the country.

7.      News of the Mayo Clinic announcement was featured on the front pages of newspapers in the western United States.  For example, on July 9, 1997, the *San Francisco Chronicle* ran a front-page story entitled "Diet Drug Mix May Be Deadly, FDA Warns" and provided extensive detail of the Mayo Clinic's findings.[8]  The *Los Angeles Times* published an equally in-depth feature on the same date under the headline "Fen-Phen May Cause Damage to Heart Valves."[9]  Other California newspapers ran comparable articles.[10]

---

[6] Nancy Hellmich, *Diet Drug Warning Puts Patients in Limbo*, USA TODAY, July 10, 1997, at 1D, attached as Exhibit 6; Nanci Hellmich, *Diet Drug Risks Are a Balancing Act; Fen-Phen's Link to Heart-Valve Problems Raises Other Concerns*, USA TODAY, July 10, 1997, at 10D, attached as Exhibit 7.

[7] Dana Canedy, *Diet Centers Reconsider Prescription Drug Use*, N.Y. TIMES, July 11, 1997, at D4, attached as Exhibit 8.

[8] Chris Tomlinson, *Diet-Drug Mix May be Deadly FDA Warns; 'Fen-Phen' Linked to Heart, Lung Damage*, SAN FRANCISCO EXAMINER, July 9, 1997, at A1, attached as Exhibit 9.

[9] Terence Monmaney, *Fen-Phen May Cause Damage to Heart Valves*, LOS ANGELES TIMES, July 9, 1997, at A1, attached as Exhibit 10.

[10] *See, e.g.*, Sharline Chiang & Yvette Cabrera, *Doctors, Diet Experts Split on Fen-Phen*, LOS ANGELES DAILY NEWS, July 9, 1997, at N8, attached as Exhibit 11; Angela La Voie, *Diet-Drug Danger: Heart Ailment Linked to Fen-Phen*, LOS ANGELES DAILY NEWS, July 9, 1997, at N1, attached as Exhibit 12; Michelle Nicolosi, *Mayo Study Links Heart Disease, 'Fen-Phen' Diet; Medicine: Doctors Are Warned About Wildly Popular Drugs*, ORANGE COUNTY REG. (Cal.), July 9, 1997, at A01, attached as Exhibit 13; Chris

[Footnote continued on next page]

8.     Papers in other western states published similar articles.  For example, the *Salt Lake Tribune* published a front-page article with the headline, "Deadly Diet?: With 'Fen-Phen,' You Might Lose More Than Pounds."[11]  The article noted that the Mayo Clinic announcement might cause users to reevaluate the risks and benefits of the medication.[12]

9.     In the Northeast, numerous newspapers—in addition to the *New York Times* with its nationwide circulation—reported the findings of the Mayo Clinic announcement.[13]  For instance, the *Times Union* in Albany,

---

[Footnote continued from previous page]
Tomlinson, *Diet-Drug Combination 'Fen-Phen' Linked to Heart, Lung Damage*, METROPOLITAN NEW-ENTERPRISE (Los Angeles, Cal.), July 9, 1997, attached as Exhibit 14; *Diet Pill Users File Civil Suit*, SAN FRANCISCO CHRON., July 10, 1997, at A24, attached as Exhibit 15; *Lawsuit Filed Against Fen-Phen Firms*, LOS ANGELES TIMES, July 10, 1997, at D2, attached as Exhibit 16; Michelle Nicolosi, *Warning Weighs on O.C. Dieters; Health: Talk at Obesity Clinics Centers Around Purported 'Fen-Phen' Problems*, ORANGE COUNTY REG. (Cal.), July 10, 1997, at B01, attached as Exhibit 17; Ed Bond, *Is Fen-Phen Too Dangerous to Prescribe?*, LOS ANGELES TIMES, July 15, 1997, at B2, attached as Exhibit 18; *Orange County Fen-Phen Users React to the News of Possible Health Effects; People: Many Believe the Drugs Caused Dizziness or Heart Problems; Others Say the Risks of Obesity Represent the Greater Danger*, ORANGE COUNTY REG. (Cal.), July 16, 1997, at E04, attached as Exhibit 19; Kathleen Doheny, *Diet Doctors Watching Fen-Phen; Health: Some Centers Have Abandoned the Weight-Loss Drug Combo; But at Others, It's Merely Getting a Closer Look*, LOS ANGELES TIMES, July 16, 1997, at E1, attached as Exhibit 20.

[11] *Deadly Diet?: With 'Fen-Phen' You Might Lose More Than Pounds*, SALT LAKE TRIB. July 9, 1997 at A1, attached as Exhibit 21.

[12] *Id.*

[13] *See, e.g.*, David Brown, *Doctors Report 2 Diet Drugs May Be Linked to Heart Disease*, BUFFALO NEWS, July, 9, 1997, at A4, attached as Exhibit 22; Roger Field, *Docs Link Diet Pill to Heart Ailments*, N.Y. POST, July 9, 1997, at 15, attached as Exhibit 23; Gina Kolata, *2 Popular Diet Pills Linked to Problems with Heart Valves*, N.Y. TIMES, July 9, 1997, at A1, attached as Exhibit 24; *'Fen-Phen' Suit Targets Diet Pill Combination*, BUFFALO NEWS, July 10, 1997, at A6, attached as Exhibit 25; Sandra Boodman, *Tipping the Scale with Different Drugs*, BUFFALO NEWS, Sept. 23, 1997, at D3, attached as Exhibit 26; *9 News at 10:00* (WWOR-TV television broadcast, July 8, 1997), transcript attached as Exhibit 27; *11 News at 10:00* (WPIX-TV television broadcast July 8, 1997), transcript attached as Exhibit 28; *4 News at 5:00* (WNBC-TV television broadcast, July 9, 1997), transcript attached as Exhibit 29; *7 News This Morning* (WABC-TV television broadcast, July 9, 1997), transcript attached as Exhibit 30.

New York, printed a story entitled "Study Links Diet Drug Combination to
Heart Valve Disease" and quoted a Mayo Clinic researcher who cautioned
people not to use diet drugs for cosmetic purposes; rather, the researcher
recommended that only obese people with health risks should use diet
drugs.[14]  The Mayo Clinic announcement also was the subject of news
broadcasts in New York City as well as elsewhere in the state.  One New
York news broadcast warned:  "If you or someone you know are taking
phen-fen to lose weight, this is a story you must hear.  Researchers say the
pills could put your health at risk."[15]  After a clip of a Mayo Clinic
researcher, the reporter continued: "Researchers are warning people they
don't know what is worse, obesity or a drug combination used to treat it."[16]
New York City's Fox News reported the heart trouble of an area woman
who had open heart surgery after she took fen-phen and reported that "Mayo
Clinic and [FDA] are warning millions of patients about taking the diet pill
combination."[17]

      10.    Another northeastern newspaper, the *Boston Herald*, printed a
front-page report explaining the Mayo Clinic announcement and the
possibility of "requiring warning labels on the drugs" in light of the Mayo

---

[14] Dolores Kong, *Study Links Diet Drug Combination to Heart Value Disease*, TIMES
UNION (Albany, N.Y.), July 9, 1997, at A3, attached as Exhibit 31.

[15] *2 News This Morning* (WCBS-TV television broadcast, July 9, 1997), transcript
attached as Exhibit 32.

[16] *Id.*

[17] *5 News at 10:00* (WNYW-TV television broadcast, July 8, 1997), transcript attached as
Exhibit 33.

Clinic findings.[18]  The Mayo Clinic announcement was published in the

*Boston Globe* as well as other newspapers in smaller markets around

Massachusetts.[19]

      11.    Other examples of northeastern media coverage of the Mayo

Clinic announcement appeared in the *News Journal* of Wilmington,

Delaware, and *Delaware State News*.  Both printed front-page stories with

headlines, "Diet-Drug Combo May Be Deadly" and "Pill May Carry Extra

Weight," respectively.[20]  The *News Journal* explained the Mayo Clinic

results and the forthcoming *New England Journal of Medicine* article, and

both articles addressed potential side effects of the diet drugs.[21]

      12.    In addition, the Mayo Clinic announcement was the subject of

massive media attention throughout the South.  For example, the Ft.

Lauderdale *Sun-Sentinel* printed a front-page article providing readers with

the typical symptoms of heart valve problems and recommending that

---

[18] Michael Lasalandra, *Study Links Diet Pill Fen-Phen to Heart Problems*, BOSTON
HERALD, July 9, 1997, at 01, attached as Exhibit 34.

[19] *See, e.g.*, Dolores Kong, *Blend of Diet Drugs Tied to Heart Disease*, BOSTON GLOBE,
July 9, 1997, at A1, attached as Exhibit 35; *Obesity Cure May Harm Lungs and Heart*,
PATRIOT LEDGER (Quincy, Mass.), July 9, 1997, at 04, attached as Exhibit 36; Judy
Foreman, *Doctors Move Away from Prescribing 'Fen-Phen' Pairing*, BOSTON GLOBE,
July 10, 1997, at B2, attached as Exhibit 37; *Obesity-Drug Makers Sued*, PATRIOT
LEDGER (Quincy, Mass.), July 10, 1997, at 04, attached as Exhibit 38.

[20] *Diet-Drug Combo May Be Deadly*, NEWS J. (Wilmington, Del.), July 9, 1997, at A1,
attached as Exhibit 39; Kimberly Quillen, *Pill May Carry Extra Weight: 'Fen-Phen' May
Cause Heart Problems*, DEL. STATE NEWS, July 10, 1997, at 1, attached as Exhibit 40.

[21] *Diet-Drug Combo May Be Deadly*, NEWS J. (Wilmington, Del.), July 9, 1997, at A1,
attached as Exhibit 41.

patients using the medication "[d]iscuss the findings with [their] doctor[s]."[22]
The *Tampa Tribune*, the *Orlando Sentinel*, and the *Miami Herald*, among
others, published similar news reports about the Mayo Clinic's
announcement.[23]

13.    The Georgia media published comparable stories.  For instance,
the *Atlanta Journal* and the *Atlanta Constitution* published articles warning
about diet drugs in July 1997 and early September 1997.[24]  One such article
appearing in the *Atlanta Journal* and entitled "Researcher: Weigh Risks
Before Taking 'Phen-Fen,'" included an interview with Dr. Jack Crary, one
of the physicians who participated in the Mayo Clinic research.[25]  The
possible association of valvular heart disease and diet drugs received further

---

[22] Nancy McVicar & Glenn Singer, *Study: Diet Drugs May Be Associated With Heart Disease 'Fen-Phen' Could Damage Valves, Doctors Conclude*, SUN-SENTINEL (Ft. Lauderdale, Fla.), July 9, 1997, at 1A, attached as Exhibit 42.

[23] *See, e.g.*, *Drug Combo Dangerous For Dieters*, TAMPA TRIB., July 9, 1997, at 2, attached as Exhibit 43; *Fen-Phen May Hurt Heart and Lungs: The Millions Using the Diet Drugs Should be Checked for Heart-Valve Problems, The FDA Said*, ORLANDO SENTINEL, July 9, 1997, at A1, attached as Exhibit 44; Dolores Kong, *Warning: Diet-Drug Mix May Damage Heart Valves*, MIAMI HERALD, July 9, 1997, A1, attached as Exhibit 45; *Scientists: Fen-phen is Risky*, FLA. TIMES-UNION, July 9, 1997, at A1, attached as Exhibit 46; Editorial, *Set Definite Limits on Diet Pills*, ST. PETERSBURG TIMES (Fla.), July 10, 1997, at 18A, attached as Exhibit 47; Craig S. Palosky, *Heart Problems May Lead State to Tougher Rules for Diet Pills*, TAMPA TRIB., Aug. 2, 1997, at 1, attached as Exhibit 48.

[24] *See, e.g.*, Tomoko Hosak, *Diet Centers Watching, Waiting*, ATLANTA J., July 10, 1997, at G2, attached as Exhibit 49; *Fen-Phen Pulled*, ATLANTA CONST., Sept. 4, 1997, at D3, attached as Exhibit 50; *Fen-Phen Ban*, ATLANTA CONST., Sept. 10, 1997, attached as Exhibit 51.

[25] *See* Ann Hardie, *Research: Weigh Risks Before Taking 'Phen-Fen': Recent Study Found Heart-Valve Problems in Users of Diet Drugs*, ATLANTA J., July 10, 1997, attached as Exhibit 52.

attention on Georgia television stations in August 1997.[26] For example, both the CBS and the Fox affiliates began their nightly news programs with features on the Mayo Clinic announcement.[27]

14. The Mayo Clinic's announcement also was widely reported in Louisiana, including newspapers in New Orleans and Baton Rouge.[28] For instance, a July 9, 1997, New Orleans *Times-Picayune* article entitled "Diet Drug Combination May Be Bad For Heart" explained the chemical mechanisms of fenfluramine and vividly described the appearance of heart valve disease.[29] A follow-up article on July 12, 1997, cautioned readers to weigh the risks and the benefits of taking the drug.[30]

15. Newspapers across North Carolina—including the Raleigh-Durham-Chapel Hill area and Charlotte—also published reports about the Mayo Clinic's announcement.[31] For example, a July 9, 1997, article in the

---

[26] See *Eyewitness News PrimeTime* (WAGA-TV television broadcast, Aug. 27, 1997), transcript attached as Exhibit 53; *WGNX News Tonight* (WGNX-TV television broadcast, Aug. 27, 1997), transcript attached as Exhibit 54.

[27] *Id.*

[28] See, e.g., Chris Tomlinson, *Report Says Diet Drug Combo May Damage Heart, Lungs*, BATON ROUGE ADVOC. (La.), July 9, 1997, at 4A, attached as Exhibit 55; *The Obese Should Weigh Diet Drug Risks*, NEW ORLEANS TIMES-PICAYUNE, July 10, 1997, at A2, attached as Exhibit 56.

[29] David Brown, *Diet-Drug Combination May Be Bad For Heart*, NEW ORLEANS TIMES-PICAYUNE, July 9, 1997, at A5, attached as Exhibit 57.

[30] Michelle Boorstein, *Dieters Must Weigh Fen-Phen Side Effects*, NEW ORLEANS TIMES-PICAYUNE, July 12, 1997, at A13, attached as Exhibit 58.

[31] *Popular Diet-Drug Mix May Damage Heart Valves*, GREENSBORO NEWS & REC. (N.C.), July 9, 1997, at A6, attached as Exhibit 59; *Study Links Heart, Lung Ills to 'Fen-Phen' Diet Drugs; FDA Asks Doctors to Check Patients, Report Any Problems*, NEWS & OBSERVER (Raleigh, N.C.), July 9, 1997, at A4, attached as Exhibit 60; Chris Tomlinson, *'Fen-Phen' Diet Drugs Combo Can Be Dangerous*, CHARLOTTE OBSERVER, July 9, 1997, at 6A, attached as Exhibit 61.

changed her opinion of the drugs.[35]  Furthermore, the story quoted a Mayo

Clinic researcher as saying that this announcement shifts the risks and

benefits of taking the drugs by showing increased risks for the diet drug

treatment.[36]

## II.     Publicity Concerning the Withdrawal of Diet Drugs From the Market in September 1997

17.     When Wyeth withdrew Pondimin and Redux from the market

on September 15, 1997, Wyeth issued a press release stating that the

company was withdrawing the drugs based on "new, preliminary

information regarding heart valve abnormalities in patients using these

medications."[37]  The press release detailed this new information:

> On Friday afternoon, September 12, 1997, the
> FDA provided Wyeth-Ayerst with new summary
> information concerning abnormal echocardiogram
> findings in asymptomatic patients seen in five
> centers.  These patients had been treated with
> fenfluramine or dexfenfluramine for up to 24
> months, most often in combination with
> phentermine.  Abnormal echocardiogram findings
> were reported in 92 of 291 subjects evaluated,
> including 80 reports of aortic regurgitation (mild
> or greater) and 23 reports of mitral regurgitation
> (moderate or greater).[38]

---

[35] Sue Goetinck, *FDA Warns Doctors About Diet Drug Combo 24 Phen/Fen Users Have Same Heart Disease*, DALLAS MORNING NEWS, July 9, 1997, at 1A, attached as Exhibit 67.

[36] *Id.*

[37] Press Release, Wyeth-Ayerst Laboratories, Pondimin and Redux to be Voluntarily Withdrawn (Sept. 15, 1997), attached as Exhibit 68.

[38] *Id.*

The press release accordingly advised: "Patients who have used either of these products should contact their physicians."[39]

18.    In addition to its press release, Wyeth took out full-page advertisements in leading national and regional newspapers announcing its decision to withdraw those diet drugs from the market. The advertisements ran in approximately 150 newspapers nationwide.[40] These ads led with a banner in large print declaring: "An Important Message To Patients Who Have Used Pondimin or Redux."[41] The ads then emphasized: "Patients who have used either Pondimin or Redux should contact their physicians."[42] The ads also informed readers of new information concerning abnormal heart valve findings in individuals without symptoms who had taken Redux or Pondimin.[43] The advertisement provided a toll-free number for patients to use if they had any questions.

19.    Wyeth also sent a "Dear Health Care Provider Letter" to approximately *450,000* doctors and pharmacists informing them of the withdrawal of the diet drugs from the market and their potential association

---

[39] *Id.*

[40] *See* Letter from P. Wygonik to C. Greenberg, (Oct. 8, 1997) AHP-X-00050044 (listing 150 newspapers that published the advertisement), attached as Exhibit 69.

[41] *An Important Message to Patients Who Have Used Pondimin or Redux* (newspaper advertising copy), attached as Exhibit 70.

[42] *Id.*

[43] *Id.*

with heart valve damage.[44]  The letter stated that "[p]atients will be advised

to contact their physicians."[45]

      20.     The FDA issued a press release on September 15, 1997,

announcing the withdrawal of Pondimin and Redux.[46]  The FDA press

release explained that the drugs were being withdrawn based on

echocardiogram findings in diet drug users:

> These findings indicate that approximately 30
> percent of patients who were evaluated had
> abnormal echocardiograms, even though they had
> no symptoms.  This is a much higher than expected
> percentage of abnormal test results.[47]

The FDA also advised that "[u]sers of these two products should contact

their doctors to discuss their treatment."[48]

### A.    National Publicity About the Market Withdrawal

      21.     The press releases and Wyeth's newspaper advertisements

accompanying the withdrawal of Pondimin and Redux in September 1997

led to massive publicity in both the national and local media.  Reports about

the withdrawal of Redux and Pondimin from the market led the major

---

[44] Letter from Marc W. Deitch, M.D., Senior Vice President, Medial Affairs, Wyeth-Ayerst Laboratories to Healthcare Providers (Sept. 15, 1997), attached as Exhibit 71; *see* Wyeth Press Release (stating that letter was mailed to approximately 450,000 health care providers), attached as Exhibit 72.

[45] *See* Letter from Marc W. Deitch, M.D., Senior Vice President, Medial Affairs, Wyeth-Ayerst Laboratories to Healthcare Providers (Sept. 15, 1997), attached as Exhibit 71.

[46] Press Release, Food and Drug Administration, FDA Announces Withdrawal of Fenfluramine and Dexfenfluramine (Sept. 15, 1997), attached as Exhibit 73.

[47] *Id.*

[48] *Id.*

television network news broadcasts.  On September 15, 1997, Tom Brokaw

began the "NBC Nightly News" with an announcement about the market

withdrawal and reports of heart problems:

> Good evening.  Two of the most popular diet drugs
> in America are off the market tonight, recalled by
> their manufacturers after a wave of reports that
> they can bring on heart problems.[49]

Dan Rather led the "CBS Evening News" with a similar announcement:

> Good evening.  Two diet drugs used by millions of
> Americans have been withdrawn from sale
> nationwide.  One is fenfluramine, half the diet drug
> combination known as fen-phen for short.  It sold
> under the brand name Pondimin.  Redux is the
> other drug yanked from the market.  Federal health
> officials finally concluded that the two pills,
> among other things, may indeed cause heart valve
> damage.[50]

    22.   The following day, the national network morning shows also

prominently featured the withdrawal of Pondimin and Redux and the

possibility that those diet drugs could cause heart valve damage.  Ann Curry

on the "Today" show introduced an extensive story on these diet drugs with

a blunt declaration:

> A serious warning from the Food and Drug
> Administration.  If you are using two popular diet

---

[49] *NBC Nightly News* (NBC television broadcast, Sept. 15, 1997), transcript attached as
Exhibit 74.

[50] *CBS Evening News* (CBS television broadcast, Sept. 15, 1997), transcript attached as
Exhibit 75.

> drugs, stop.  The drugs are being recalled because
> they could cause heart problems.[51]

After the news report, the "Today" show hosts continued to discuss the story

with weatherman Al Roker.  Roker reported that he had taken the diet drugs

and lost twenty or twenty-five pounds.  Katie Couric replied, "[s]o you

might want to just get an echocardiogram."[52]

    23.    The "CBS Morning News" also prominently announced the

market withdrawal.  Its report began with this introduction:

> Millions of overweight Americans are caught in a
> bind this morning now that the nation's two most
> popular diet drugs have been pulled from the
> market.  Sales of Redux and fenfluramine have
> been linked to serious heart problems and anyone
> who has been taking the drugs is urged to see a
> doctor.[53]

The "CBS Morning News" continued with an interview of the acting head of

the FDA, as well as with Dr. Heidi Connolly from the Mayo Clinic, about

the potential association between the drugs and heart valve problems.[54]

    24.    The withdrawal and potential heart valve problems were

covered just as extensively in the national print media.  On September 16,

1997, *USA Today* ran a front-page story entitled "Diet Drugs Pulled Off

---

[51] *Today* (NBC television broadcast, Sept. 16, 1997), transcript attached as Exhibit 76.
[52] *Id.*

[53] *CBS Morning News* (CBS television broadcast, Sept. 16, 1997), transcript attached as Exhibit 77.
[54] *Id.*

Market."[55]  *USA Today* published two follow-up articles later that month on the withdrawal of Pondimin and Redux from the market.[56]

25.    The *New York Times* likewise published a front-page story about the withdrawal on September 16, 1997, under the headline "2 Top Diet Drugs Are Recalled Amid Reports of Heart Defects."[57]  The *New York Times* published a follow-up article the next day.[58]

26.    The *Washington Post* also ran a front-page story about the withdrawal of Redux and Pondimin.  The headline was "2 Diet Drugs Are Pulled Off Market," and the subheading read "Health Concerns Grow After FDA Links Pills To Rare Heart Problem."[59]

27.    *The Wall Street Journal* reported that a Wyeth hotline had received calls from 100,000 people in three days after it had been set up and that a spokeswoman for the company had stressed the importance that people "see their doctors."[60]

---

[55] Nanci Hellmich and Steve Sternberg, *Diet Drugs Pulled Off Market*, USA TODAY, Sept. 16, 1997 at 1A, attached as Exhibit 78.

[56] *Other Combinations Draw Interest*, USA TODAY, Sept. 22, 1997, attached as Exhibit 79; *Withdrawal of Drugs Leaves Dieters in Quandary*, USA TODAY, Sept. 22, 1997, attached as Exhibit 80.

[57] Gina Kolata, *2 Top Diet Drugs Are Recalled Amid Reports of Heart Defects*, N.Y. TIMES, Sept. 16, 1997, at A1, attached as Exhibit 312.

[58] Carey Goldberg, *Recall of Drugs Leaves Many Dieters Hopeless*, N.Y. TIMES, Sept. 17, 1997, at A16, attached as Exhibit 313.

[59] John Schwartz, *2 Diet Drugs Are Pulled Off Market*, WASHINGTON POST, Sept. 16, 1996, at A1, attached as Exhibit 81.

[60] Barbara Carton and Laura Johannes, *American Home Reports 100,000 Calls to Hot Line Since Recall of Diet Drugs*, WALL ST. J., Sept. 18, 1997, attached as Exhibit 82.

28.     On October 8, 1997, *USA Today* ran a further story with the headline "Study Supports Diet Drug Recall" and the subheading "Early data turn up heart-valve defects." [61]  The article stated that after Redux and Pondimin were pulled from the market, preliminary evidence suggested that the two drugs may be "responsible for heart-valve defects."[62]  Another article in *USA Today* a month later provided more information about possible heart valve problems.  It ran under the  headline "Study Supports Halting Sales of Two Diet Drugs" and declared that "[n]ew evidence from a government-funded study indicates that 25% of patients who took popular diet drugs developed heart-valve problems."[63]

29.     Soon after the withdrawal of the drugs, newspapers around the country began reporting about possible and pending diet drug lawsuits.  For example, *The Wall Street Journal* reported that lawsuits were multiplying, fueling expectations of a lengthy legal battle over the diet drugs and that about 100 suits already had been filed around the country.[64]

---

[61] Nanci Hellmich, *Study Supports Diet Drug Recall*, USA TODAY, Oct. 8, 1997, at D1, attached as Exhibit 83.

[62] *Id.*

[63] Nanci Hellmich, *Study Supports Halting Sales of Two Diet Drug*, USA TODAY, Nov. 12, 1997, at 20A, attached as Exhibit 84.

[64] Laura Johannes and Richard B. Schmitt, *Lawyers Prepare for Deluge of Diet-Drug Suits*, WALL STREET J., Sept. 17, 1997, attached as Exhibit 314.

### B.   Local Publicity About the Market Withdrawal

30.    The withdrawal of diet drugs from the market and possible

heart problems also received similar, massive and high-profile coverage in

local news media throughout the United States.

31.    The market withdrawal and possible heart problems were

publicized in newspapers and local news broadcasts in the West. For

example, the front page of the *Los Angeles Times* included an article with

the headline "2 Diet Drugs Tied to Heart Problems Taken Off the Market."[65]

The caption underneath identified both fenfluramine and dexfenfluramine.

The article stated the "diet drugs were removed from the market . . . after

new evidence linked them to potentially serious heart valve problems,

effectively ending the commonly known fen-phen combination."[66] The

article further provided an "800" number and a series of guidelines that

instructed users to "[i]mmediately stop taking pills . . . . [and] [s]ee a

doctor."[67] Other California newspapers ran articles echoing this advice and

similarly instructing users to stop using the medications and make an

appointment for an examination.[68] Numerous California television and radio

stations broadcast similar stories.[69]

---

[65] Marlene Cimons, *2 Diet Drugs Tied to Heart Problems Taken Off Market; Health: Firms Remove Fenfluramine and Dexfenfluramine Because New Evidence Raises Safety Concerns; Action Effectively Ends Fen-Phen Combination*, LOS ANGELES TIMES, Sept. 16, 1997, at A1, attached as Exhibit 85.

[66] *Id.*

[67] *Id.*

[68] *See, e.g.,* Lauran Neergaard, *FDA Health Concerns Yank Diet Drugs Off the Market*, SAN FRANCISCO EXAMINER, Sept. 16, 1997, at A7, attached as Exhibit 86; Lauran Neergaard, *Redux, Pondimin Taken Off Market After Being Linked to Heart Damage*,
[Footnote continued on next page]

32.     Another example of the coverage in the West appeared as a
front-page story in the *Salt Lake Tribune*. The article, entitled "Diet Seller
Pulls Its Diet Pills; FDA Says Review Suggests Drugs Are Not Heart
Healthy," attributed the withdrawal to abnormal echocardiogram results
found in patients without symptoms of heart disease.[70]

33.     Local television reports also provided extensive coverage of the
decision to withdraw the diet drugs from the market.[71] For example, one
western Fox affiliate advised listeners to stop taking the medicine and
consult a physician, and provided Wyeth's toll-free number.[72]

---

[Footnote continued from previous page]
METROPOLITAN NEWS-ENTERPRISE, July 16, 1997, attached as Exhibit 87; Ben Sullivan,
*Recall of 2 Diet Pills Breaks Up Fen-Phen*, LOS ANGELES DAILY NEWS, Sept. 16, 1997,
at N1, attached as Exhibit 88.

[69] *See, e.g., 2 News at 5:00* (KCBS-TV television broadcast, Sept. 15, 1997), transcript
attached as Exhibit 89; *4 News at 5:00* (KNBC-TV television broadcast, Sept. 15, 1997)
transcript attached as Exhibit 90; *4 News at 5:00* (KRON-TV television broadcast, Sept.
15, 1997), transcript attached as Exhibit 91; *5 News at 5:00* (KPIX-TV television
broadcast, Sept. 15, 1997), transcript attached as Exhibit 92; *5 News at 11:00* (KTLA-TV
television broadcast, Sept. 15, 1997) transcript attached as Exhibit 93; *7 News at 4:00*
(KABC-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 94; *7
News at 11:00* (KGO-TV television broadcast, Sept. 15, 1997), transcript attached as
Exhibit 95; *11 News at 10:00* (KTTV-TV television broadcast, Sept. 15, 1997), transcript
attached as Exhibit 96; *AM Drive News* (KCBS-AM radio broadcast, Sept. 15, 1997),
transcript attached as Exhibit 97.

[70] Norma Wagner, *Drug Seller Pulls Its Diet Pills; FDA Says Review Suggests Drugs Are
Not Heart-Healthy*, SALT LAKE TRIB., Sept. 16, 1997, at A1, attached as Exhibit 98.

[71] *See, e.g., 2 News at Noon* (KUTV-TV television broadcast, Sept. 15, 1997), transcript
attached as Exhibit 99; *4 News at 5:00* (KTVX-TV television broadcast, Sept. 15, 1997),
transcript attached as Exhibit 100; *2 News This Morning* (KUTV-TV television
broadcast, Sept. 16, 1997), transcript attached as Exhibit 101; *4 News Good Morning
Utah* (KTVX-TV television broadcast, Sept. 16, 1997), transcript attached as Exhibit
102; *13 News at 6:00* (KSTU-TV television broadcast, Sept. 16, 1997), attached as
Exhibit 103.

[72] *13 News at 12:00* (KSTU-TV television broadcast, Sept. 15, 1997), transcript attached
as Exhibit 104.

34.    The withdrawal story also was widely reported in newspapers and on television and radio in the Northeast.  The story was prominently featured on page one of the *Boston Globe* as well as in other newspapers throughout the area.[73]  The *Boston Herald's* article entitled "FDA Warning Sparks Recall of Top Diet Pills" relayed information regarding the withdrawal of diet drugs as well as Wyeth's attempt to contact patients about it.[74]  A Boston area television news broadcast further reported that Pondimin and Redux "were touted as miracle drugs for a country obsessed with weight, but health concerns about the diet drugs Fen-Phen and Redux have consumed news reports lately, and yesterday [the date of the withdrawal] the drug markers announced that they are pulling them off the market."[75]

---

[73] *See, e.g.*, Richard A. Knox, *2 Diet Drugs Pulled as Fears Grow*, BOSTON GLOBE, Sept. 16, 1997, at A1, attached as Exhibit 105; *Redux, Pondimin Pulled Off Market*, TELEGRAM & GAZETTE (Worcester, Mass.), Sept. 16, 1997, at A1, attached as Exhibit 106; Ronald Rosenberg, *Interneuron to Take Charge on Redux Loss*, BOSTON GLOBE, Sept. 16, 1997, at D1, attached as Exhibit 107; *4 News at 11:00* (WBZ-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 108; *7 News at 11:00* (WHDH-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 109; *25 News at 10:00* (WFXT-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 110; *38 Prime News* (WSBK-TV Sept. 15, 1997), transcript attached as Exhibit 111; Channel 2 (WGBH-TV Sept. 15, 1997), transcript attached as Exhibit 112; *Newscenter 5 Tonight* (WCVB-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 113; *Prime Time* (NECN-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 114; *The Ten O'Clock News* (WLVI-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 115; WBZ-AM (radio broadcast, Sept. 15, 1997), transcript attached as Exhibit 116; *5 News Opener* (WCVB-TV television broadcast, Sept. 16, 1997), transcript attached as Exhibit 117; *7 News Today in New England* (WHDH-TV television broadcast, Sept. 16, 1997), transcript attached as Exhibit 118.

[74] Michael Lasalandra, *FDA Warning Sparks Recall of Top Diet Pills*, BOSTON HERALD, Sept. 16, 1997, at 02, attached as Exhibit 119.

[75] *5 News Opener* (WCVB-TV television broadcast, Sept. 16, 1997), transcript attached as Exhibit 120.

35.   The *New York Times* published a front-page article addressing

the withdrawal of the diet drugs.[76]  The Buffalo News also reported that the

FDA advised dieters to "immediately stop taking the drugs and see a

doctor."[77]  The article further stated that people could have questions

answered by calling a toll free hotline number.[78]  Numerous other newspaper

articles and television broadcasts throughout the state of New York

contained similar stories.[79]  For example, the NBC evening news in New

York City began with the following: "They're practically household names,

[76] Gina Kolata, *Companies Recall 2 Top Diet Drugs at FDA's Urging; 'Fen' in Fen-Phen Pulled*, N.Y. TIMES, Sept. 16, 1997, at A1, attached as Exhibit 121.

[77] Lauran Neergaard, *Recall Spurs Dieters to Seek Heart Tests*, BUFFALO NEWS, Sept. 25, 1997, at A8, attached as Exhibit 122.

[78] *Id.*

[79] *See, e.g., Heart Damage Prompts Recall of Two Diet Drugs*, BUFFALO NEWS, Sept. 15, 1997, at A1, attached as Exhibit 123; *Fat-Fighter Fen-Phen Drugs Pulled Off Market*, N.Y. POST, Sept. 16, 1997, at 5, attached as Exhibit 124; Susan Ferraro, *Two Top Diet Drugs Pulled*, N.Y. DAILY NEWS, Sept. 16, 1997, at 5, attached as Exhibit 125; Lauran Neergaard, *Dieters' Options Trimmed by Recall of Two Drugs*, BUFFALO NEWS, Sept. 16, 1997, at A4, attached as Exhibit 126; *2 News at 5:00* (WCBS-TV television broadcast Sept. 15, 1997), transcript attached as Exhibit 127; *5 News at 10:00* (WNYW-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 128; *7 News at 5:00* (WABC-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 129; *9 News at 10:00* (WWOR-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 130; *11 News at 10:00* (WPIX-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 131; *55 News at 10:00* (WLNY-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 132; *1010 Noon News* (WINS-AM radio broadcast, Sept. 15, 1997), transcript attached as Exhibit 133; *Nighttime Edition* (NTLI-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 134; *13 News at 6:00* (WNET-TV television broadcast, Sept. 16, 1997), transcript attached as Exhibit 135; *88 News Radio* (WCBS-AM radio broadcast, Sept. 16, 1997), transcript attached as Exhibit 136; *Good Day New York* (WNYW-TV television broadcast, Sept. 16, 1997), transcript attached as Exhibit 137; *Howard Stern Show* (WXRK-FM radio broadcast, Sept. 16, 1997), transcript attached as Exhibit 138.

the diets drugs Phen-Fen and Redux . . . . are being pulled off the market. They have been linked to serious heart damage."[80]

36.    Newspapers in Delaware similarly reported on the withdrawal of Pondimin and Redux from the market.  For example, the *News Journal* ran a front-page article entitled "Diet Drugs Pulled Off the Market," explaining that after the Mayo Clinic announcement caused sales to markedly decline, more reports of heart disease surfaced, prompting the decision to withdraw the diet drugs from the market.[81]

37.    Widespread media publicity accompanied the withdrawal of Pondimin and Redux in the South as well.  One such article published in the *Florida Times Union* reported, one day after the withdrawal, that "[d]rug companies pulled two highly popular diet drugs off the market yesterday because of new evidence that nearly one-third of people who take the medications might develop heart valve damage."[82]  On the same day, the *Miami Herald* ran a front-page article entitled "Two Popular Diet Drugs Pulled From the Market," and reported that "[FDA] cited new studies showing that the drugs might cause irreversible and sometimes fatal damage

---

[80] *4 News at 5:00* (WNBC-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 139.

[81] Lauran Neergaard, *Diet Drugs Pulled Off the Market: Doctors Find Link to Heart Damage*, NEWS J. (Wilmington, Del.) Sept. 16, 1997, at A1, attached as Exhibit 140; *see also* Lauran Neergaard, *Popular Diet Drugs Removed from Market*, DEL. STATE NEWS, Sept. 16, 1997, at 1, attached as Exhibit 141.

[82] *2 Diet Drugs Removed Pondimin, Redux Affected*, FLA. TIMES-UNION, Sept. 16, 1997, at A1, attached as Exhibit 142.

turned diet drug users into lawyer magnets.[88]  The article expressed how
massive the litigation would be over the diet drugs and reported on a number
of class actions that were already pending as well as others expected to be
filed by plaintiff's attorneys.[89]

    39.    The story of the diet drug withdrawal received similar, high-
profile coverage in both the print and broadcast media in Georgia.  Coverage
included the FDA advisory to persons taking the diet drugs to stop
immediately and contact their doctors.[90]  The *Atlanta Constitution* printed an
article with the headline "Dieters Lose Drugs of Choice," explaining that
"[t]he action was necessary to stop abuses of the drugs, which have been
linked to serious heart problems."[91]  Georgia television stations also
provided a torrent of publicity concerning Wyeth's removal of diet drugs
from the market.  WGNX-TV, WXIA-TV, and WAGA-TV all broadcast
stories about the withdrawal that day.[92]  One such report began the broadcast
with a stern warning: "Tonight's big story—if you have been taking Redux

---

[88] Noreen Marcus, *Fen-Phen is Fat City for Lawyers: Attorneys are Hungry to Sue Over Diet Drugs*, SUN-SENTINEL (Ft. Lauderdale, Fla.), Sept. 28, 1997, attached as Exhibit 316.

[89] *Id.*

[90] *See, e.g.*, Ann Hardie, *Health Watch Special Focus: Diet Drugs*, ATLANTA CONST., Sept. 16, 1997, at B3, attached as Exhibit 158.

[91] Ann Hardie, *Dieter Lose  Drugs of Choice: Patients, Clinics Left Scrambling*, ATLANTA J., Sept. 16, 1997, at B1, attached as Exhibit 159.

[92] *News at Noon* (WGNX-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 160; *11 News at 5:00* (WXIA-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 161; *Eyewitness News at 5:00* (WAGA-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 162.

or fenfluramine, stop—immediately. Both diet drugs were recalled today after being linked to serious heart damage."[93]

40.   Soon after the withdrawal of the drugs, Georgia newspapers began reporting about possible and pending diet drug lawsuits. This coverage included reports of class-actions brought in other parts of the county, lawsuits brought by state residents, and a class action brought on behalf of Georgians who used the drugs.[94]

41.   News of the withdrawal was disseminated in print and on television in Louisiana as well.[95] For example, the New Orleans *Times-Picayune's* front-page article entitled "Heart Scare Stops Sale of 2 Diet Pills" reported that an FDA sample study found more heart valve problems in diet drug users than in the general population.[96]

42.   As in other southern states, news about the withdrawal of Pondimin and Redux from the market, and the health risks possibly associated with the drugs, was widely disseminated in North Carolina. For example, the *Charlotte Observer*, the *Greensboro News and Record*, and the

[93] *11 News at 5:00* (WXIA-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 163.

[94] Ron Martz, *Georgia Women Sues Makers of Diet Drug*, ATLANTA JOURNAL, Sept. 23, 1997, at C5, attached as Exhibit 317; Ron Martz, *Suits Against Fen-Phen Spread to Georgia*, ATLANTA CONSTITUTION, Sept. 25, 1997, at C2, attached as Exhibit 318.

[95] *Heart Scare Stops Sale of 2 Diet Pills*, THE NEW ORLEANS TIMES-PICAYUNE, Sept. 16, 1997, at A1, attached as Exhibit 164; 6 News Tonight (WDSU-TV television broadcast Sept. 15, 1997), attached as Exhibit 165; 8 News at 5:00 (WVUE-TV television broadcast Sept. 15, 1997), attached as Exhibit 166.

[96] *Heart Scare Stops Sale of 2 Diet Pills*, THE NEW ORLEANS TIMES-PICAYUNE, Sept. 16, 1997, at A1, attached as Exhibit 167.

*Raleigh News and Observer* all ran front-page stories on the withdrawal.[97]
The *Charlotte Observer's* story, "Heart Damage Pulls Plug on Diet Drugs
Redux and 'Fen,'" recommended that users "see their doctor for close heart
monitoring."[98]  Many local news stations led the broadcast with the story of
the withdrawal.[99]  For instance, one local news broadcast reported: "Two
popular diet drugs off the shelves.  They could kill you."[100]  The report
continued: "[FDA] yanked the products after discovering some pretty
alarming side effects."[101]

    43.    In the central United States, news of the withdrawal also was
widely publicized.[102]  For example, the story was featured prominently in

---

[97] *See, e.g.,* Lauran Neergaard, *Heart Damage Pulls Plug on Diet Drugs Redux and 'Fen'*, CHARLOTTE OBSERVER, Sept. 16, 1997, at 1A, attached as Exhibit 168; Lauran Neergaard, *Redux, Pondimin Pulled Off Shelves by Government*, GREENSBORO NEWS & REC. (N.C.), Sept. 16, 1997, at A1, attached as Exhibit 169; John Schwartz, *Popular Diet Drugs Removed from Market; The Food and Drug Administration Finds New Evidence that the Two Drugs May Cause Heart Valve Damage*, NEWS & OBSERVER (Raleigh, N.C.), Sept. 16, 1997, at 1, attached as Exhibit 170.

[98] Lauran Neergaard, *Heart Damage Pulls Plug on Diet Drugs Redux and 'Fen'*, CHARLOTTE OBSERVER, Sept. 16, 1997, at 1A, attached as Exhibit 171.

[99] *See, e.g., 3 News at 5:00* (WBTV-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 172; *5 News at 5:00* (WRAL-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 173; *11 News at 5:00* (WTVD-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 174; *22 News at 10:00* (WLFL-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 175; *36 News at 5:00* (WCNC-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 176; *50 News at 10:00* (WRAZ-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 177; *5 News at 11:00* (WRAL-TV television broadcast, Sept. 16, 1997), transcript attached as Exhibit 178; *11 News at 6:00* (WTVD-TV television broadcast, Sept. 16, 1997), transcript attached as Exhibit 179; *17 News Today* (WNCN-TV television broadcast Sept. 16, 1997), attached as Exhibit 180.

[100] *17 News at 11:00* (WNCN-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 181.

[101] *Id.*

[102] *See, e.g.,* Marlene Cimons, *FDA Calls for Recall of Popular Diet Drugs; Users of Fenfluramine, the 'Fen' in Fen-Phen, and Redux Warned Not to Use Medications; Heart*
[Footnote continued on next page]

major newspapers in cities such as Dallas, Houston, and San Antonio.  The
*Dallas Morning News* printed a front-page story entitled "Diet Drugs Taken
Off Market; Redux, 'Fen' Linked to Heart Problems."[103]  The article quoted
a Texas nutritionist as saying "I would tell people to flush their pills down
the toilet so they don't get tempted to take them again."[104]  The article also
described the symptoms of heart valve disease.[105]  Like other regional
television news stations, Texas stations extensively covered the news of the
withdrawal.[106]  One top story on a local broadcast in Houston told viewers

---

[Footnote continued from previous page]
*Valve Damage Suspected; FDA Says to Avoid Popular Diet Drugs*, AUSTIN AM.-
STATESMEN, Sept. 16, 1997, at B1, attached as Exhibit 182; Raja Mishra, *FDA Requests
Weight-Loss Drug Recall*, FORT WORTH STAR-TELEGRAM, Sept. 16, 1997, at 1, attached
as Exhibit 183; Lauran Neergaard, *2 Diet Drugs Pulled Off Market*, SAN ANTONIO
EXPRESS-NEWS, Sept. 16, 1997, at 01A, attached as Exhibit 184; Brigid Schulte, *FDA
Withdraws Two Diet Drugs; Redux and Portion of Fen-Phen Linked to Damage of Heart
Valves*, HOUSTON CHRON., Sept. 16, 1997, at 1A, attached as Exhibit 185; Karin Shaw,
*Requests for Pills Drop as Health Concerns Grow; Doctors Say Removal of Redux, 'Fen'
Not a Shock*, DALLAS MORNING NEWS, Sept. 16, 1997, at 4A, attached as Exhibit 186;
George Flynn, *Pair Sue Makers of Fen-Phen; 2 Houston Women Hit Lack of Warning*,
HOUSTON CHRON., Sept. 17, 1997, at 21, attached as Exhibit 187.

[103] Sue Goetinik, *Diet Drugs Taken Off Market; Redux, 'Fen' Linked to Heart Problems*,
DALLAS MORNING NEWS, Sept. 16, 1997, at 1A, attached as Exhibit 188.

[104] Id.

[105] *Id.*

[106] *See, e.g., 4 News at 9:00* (KDFW-TV television broadcast, Sept. 15, 1997), transcript
attached as Exhibit 189; *5 News at 5:00* (KXAS-TV television broadcast,Sept. 15, 1997),
transcript attached as Exhibit 190; *8 News Update* (WFAA-TV television broadcast, Sept.
15, 1997), transcript attached as Exhibit 191; *11 News at 5:00* (KHOU-TV television
broadcast, Sept. 15, 1997), transcript attached as Exhibit 192; *11 News at 6:00* (KTVT-
TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 193; *13 News at
5:00* (KTRK-TV television broadcast, Sept. 15, 1997), transcript attached as Exhibit 194;
*23 Noticias* (KUVN-TV television broadcast, Sept. 16, 1997), transcript attached as
Exhibit 195; *26 News at 12:30* (KRIV-TV television broadcast, Sept. 15, 1997),
transcript attached as Exhibit 196; *48 Noticiero* (KTMD-TV television broadcast, Sept.
15, 1997), transcript attached as Exhibit 197; *PM Drive News* (KTRH-AM radio
broadcast, Sept. 15, 1997), transcript attached as Exhibit 198; *Noon News* (WBAP-AM
radio broadcast, Sept. 15, 1997), transcript attached as Exhibit 199.

that "[t]wo of the country's most popular diet drugs are pulled from the shelves . . . . [E]vidence shows that they could seriously damage the heart."[107]

## III.  Publicity Concerning the Government Warning In November 1997

44.   On November 14, 1997, the United States Department of Health and Human Services published health warnings for former users of Pondimin and Redux.  That agency recommended that all former users of diet drugs should see their physicians.[108]  That recommendation led to another massive wave of publicity.

### A.   National Publicity About the Government Warning

45.   Tom Brokaw reported on the new recommendation for diet drug users on the "NBC Nightly News":

> Another warning tonight for the millions of Americans who took the diet drugs phen-fen.  The government is urging all of them to see their doctors, even if they feel fine.  The drugs were pulled off the market in September after they were shown to cause serious heart problems.  The experts say the dieters should be checked for any heart or lung problems.[109]

---

[107] 2 News at 5:00 (KPRC-TV television broadcast Sept. 15, 1997), attached as Exhibit 200.

[108] *Cardiac Valvulopathy Associated with Exposure to Fenfluramine or Dexfenfluramine: U.S. Department of Health and Human Services Interim Public Health Recommendations, November 1997,* 46 Morbidity and Mortality Weekly Report, 1061, 1061-65 (Nov. 14, 1997), attached as Exhibit 201.

[109] *NBC Nightly News* (NBC television broadcast, Nov. 13, 1997), transcript attached as Exhibit 202.

07/21/03  22:11 FAX 202 942 5999          A & P FAX CTR DC #6                              ☒030

that are thick and don't function properly."[114] Later that day, Joie Chen, a

CNN co-anchor, reported:

> The government is warning anyone who used the
> diet drugs fen-phen or Redux for any amount of
> time to see a doctor and get a physical exam, even
> if you feel fine.  This comes two months after the
> popular diet pills were pulled from the market, due
> to suspected links with potentially deadly heart
> valve damage.[115]

"CNN Headline News" further broadcast a story on the government's

recommendation:

> If you are one of the millions of Americans who
> turned to Phen/Fen or Redux to lose weight, it is
> time to make an appointment with your doctor.  In
> September, both prescription drugs were pulled
> from the market because the key ingredient was
> linked to heart valve damage.  Today the
> government began recommending that former
> users should have their hearts examined.  They
> should get an echocardiogram if symptoms are
> found.  They should use antibiotics before surgery
> or dental work if they have valve damage.[116]

"CNN Headline News" carried the story multiple times on November 14,

1997.[117]

---

[114] *Id.*

[115] *The World Today* (CNN television broadcast, Nov. 13, 1997). transcript attached as
Exhibit 207.

[116] *Headline News* (CNN Headline News television broadcast, Nov. 13, 1997), transcript
attached as Exhibit 208.

[117] *See CNN Headline News* (CNN Headline News television broadcast, Nov. 14, 1997),
transcript attached as Exhibit 209.

47.    The *Associated Press* reported on the government's recommendation on November 14, 1997, in an article entitled "Fenfluramine, Redux Dieters Are Urged to See Physicians."[118]  The article stated that "[a]nyone who has ever used the two recently recalled diet drugs for any length of time should see a physician and get a physical examination, the government said yesterday."[119]

48.    News about the government warning was also featured in national newspapers, including the *Washington Post, The Wall Street Journal, USA Today*, and the *New York Times*.[120]

**B.    Local Publicity About the Government Warning**

49.    News of the government's warning that diet drug users should see their doctors was widely published in newspapers and broadcast on television in the West.[121]  For example, a *Los Angeles Times* article entitled

---

[118] Associated Press, *Fenfluramine, Redux Dieters Are Urged to See Physicians*, WASHINGTON POST, Nov. 14, 1997 at A24, attached as Exhibit 210.

[119] *See id.*

[120] *Fenfluramine, Redux Dieters are Urged to See Physicians*, WASH. POST., Nov. 14, 1997, at A24, attached as Exhibit 319; *FDA Says Fen-Phen Users Need Doctor's Examination*, WALL STREET J., Nov. 14, 1997, at B13, attached as Exhibit 320; Nancy Hellmich, *Takers of Some Diet Drugs are Urged to Get Medical Exam*, USA TODAY, Nov. 14, 1997, at 3A, attached as Exhibit 321; Lawrence K. Altman, *Heart Checks Urged for Users of Diet Pills*, N.Y. TIMES, Nov. 14, 1997, attached as Exhibit 224.

[121] Sabin Russell, *Diet Drug Study Prompts Users' Hearts Concerns/ Uproar over Fen-Phen's Effect*, SAN FRANCISCO CHRON., Nov. 28, 1997, at A1, attached as Exhibit 211; *7 News at 6:00* (KGO-TV television broadcast, Nov. 13, 1997), transcript attached as Exhibit 212; *Eyewitness News* (KABC-TV television broadcast, Nov. 13, 1997), transcript attached as Exhibit 213; *Eyewitness News at Ten* (KPIX-TV television broadcast, Nov. 13, 1997), transcript attached as Exhibit 214; *Newscenter Four Nightbeat* (KRON-TV television broadcast, Nov. 13, 1997), transcript attached as Exhibit 215; *13 News at 10:00* (KCOP-TV television broadcast Nov. 14, 1997), transcript attached as Exhibit 216.

"Heart Tests Urged For Users of Fen-Phen," reported that "[a]nyone who took the drugs . . . should undergo an echocardiogram . . . whether or not they have symptoms of heart disease."[122]  Local news broadcasts relayed similar messages.  One, from a CBS affiliate in Los Angeles, stated that the government "says if you took [fenfluramine or Redux] for any amount of time, go see your doctor."[123]

50.  Major newspapers in other western states, such as Utah, published articles about the government's warnings concerning the possible risks of diet drugs.[124]  Additionally, the issue was reported on the local news.[125]  For example, the NBC station in Salt Lake City urged former users to undergo a physical because "as many as one in three former Fen-Phen and Redux users may have damaged heart valves."[126]

51.  Media outlets around the Northeast likewise carried the government's recommendation that diet drug users consult a physician.  For instance, the *New York Times* and the *New York Daily News*, as well as local

---

[122] Lawrence K. Altman, *Heart Tests Urged for Users of Fen-Phen*, LOS ANGELES DAILY NEWS, Nov. 14, 1997, at 16, attached as Exhibit 217.

[123] *2 News at 11:00* (KCBS-TV television broadcast Nov. 13, 1997), attached as Exhibit 218.

[124] *See, e.g., Diet-Drug Users Are Told to Get Physical Checkups*, SALT LAKE TRIB., Nov. 14, 1997, at A16, attached as Exhibit 219; *Taken 'Fen-Phen' or Redux? See Your Doctor, FDA says*, Deseret News (Salt Lake City, Utah), Nov. 15, 1997, attached as Exhibit 220.

[125] *See, e.g., 13 News at 9:00* (KSTU-TV television broadcast, Nov. 13, 1997), transcript attached as Exhibit 221; *2 News at 10:00* (KUTV-TV television broadcast, Nov. 22, 1997), transcript attached as Exhibit 222.

[126] *5 News at 6:30* (KSL-TV television broadcast, Nov. 13, 1997), transcript attached as Exhibit 223.

One of the television news broadcasts warned that former diet drug users should have a physical because "[b]y the time [a patient] develops symptoms, [the patient is] already at a point that may be in fact irreversible."[132]

53.   Like other newspapers in the region, Delaware newspapers such as Wilmington's *News Journal* ran articles recommending that diet drug users go see their physicians.[133] The *News Journal's* article entitled "Diet Drug Users Told to Get Physical Exam" instructed former diet drug users to "get a physical exam, even if they feel fine."[134]

54.   The same publicity about the government's warning in November 1997 occurred throughout the South.  For example, the *Sun-Sentinel* in Ft. Lauderdale, Florida, informed its readers that "[d]ieters who have used fen-phen or redux for any amount of time should see their doctor and get a physical exam, even if they feel fine."[135]  Many other Florida newspapers and television stations published and broadcast similar stories.[136]

---

[132] *7 News at 9:00* (WHDH-TV television broadcast, Nov. 15, 1997), attached as Exhibit 235.

[133] *Diet Drug Users Told to Get Physical Exam*, NEWS J. (Wilmington, Del.), Nov. 14, 1997, at A4, attached as Exhibit 236.

[134] *Id*

[135] *Taken Fen-Phen? See Your Doctor, FDA Warns*, SUN-SENTINEL (Ft. Lauderdale, Fla.), Nov. 14, 1997, at 3A, attached as Exhibit 237.

[136] *Fen-Phen, Redux Users Told to See Doctors*, TAMPA TRIB., Nov. 14, 1997, at 2, attached as Exhibit 238; *Taken Fen-Phen? Here's New Advice*, ORLANDO SENTINEL, Nov. 14, 1997, at A11, attached as Exhibit 239; *Users of Fen-Phen or Redux Urged to See Doctor*, FLA. TIMES-UNION, Nov. 14, 1997, at A1, attached as Exhibit 240; *4 News This Morning* (Miami, Fla.) (WFOR-TV television broadcast, Nov. 11, 1997), transcript abstract attached as Exhibit 241; *6 News Midday* (WTVJ-TV television broadcast, Nov. 14, 1997), transcript abstract attached as Exhibit 242; *Eyewitness News Daybreak*
[Footnote continued on next page]

55.    Georgia newspapers likewise reported on the government's warning. The *Atlanta Journal* and the *Atlanta Constitution* both published stories on November 14, 1997, urging Pondimin and Redux users to visit their doctors.[137] The *Atlanta Constitution* printed a front-page article with the headline "Checkups Urged for Takers or 2 Diet Drugs," which explained that "there have been enough reports of heart-valve damage associated with the appetite suppressants . . . to justify at least a physical exam for anyone who has taken the drugs."[138]

56.    Georgia television news programs also broadcast segments urging diet drug users to visit their doctors for evaluation.[139] On one such program, the Atlanta Fox station reported: "There's an important new warning tonight for anyone who has taken the diet drugs Fen-Phen and Redux. The Centers for Disease Control and Prevention says the drugs could cause heart problems. The CDC is encouraging dieters who used them to have their heart thoroughly checked by a doctor."[140]

---

[Footnote continued from previous page]
(WPLG-TV television broadcast, Nov. 14, 1997), transcript abstract attached as Exhibit 243.

[137] *See, e.g.*, M.A.J. McKenna, *Drugs Have Fallen From day in the Sun,"* ATLANTA JOURNAL, Nov. 14, 1997, at G4, attached as Exhibit 244; M.A.J. Mckenna, *Checkups Urged for Takers of 2 Diet Drugs*, ATLANTA CONST., Nov. 14, 1997, at A1, attached as Exhibit 245.

[138] *Id.*

[139] *See, e.g.*, *11 News at 5:00* (WXIA-TV television broadcast, Nov. 13, 1997), attached as Exhibit 246; *46 News Tonight* (WGNX-TV television broadcast, Nov. 13, 1997), attached as Exhibit 247.

[140] *Fox 5 Eyewitness News 10 PM* (WAGA-TV television broadcast Nov. 13, 1997), attached as Exhibit 248.

57.    The New Orleans *Times-Picayune* in Louisiana similarly published an article detailing the government's warning that diet drug users consult their doctors.[141]   The article, "Heart Checks Urged For Users of Diet Drugs," explained that the "new recommendations are a response to widespread confusion among patients and doctors about what they should do."[142]

58.    North Carolina newspapers and television stations also urged fen-phen and Redux users to visit their physicians.[143]   One newspaper reporting on the issue, the *Charlotte Observer*, emphasized that the new warning applies to anyone who has used the drug—not just those who are experiencing symptoms of heart valve damage.[144]   The article even stressed that former users undergoing a dental procedure should be examined.[145]

59.    Media in the central United States also relayed to the public the government's warning that diet drug users should consult their doctors.  For example, major newspapers in Texas prominently featured the story.[146]

---

[141] Lawrence K. Altman, *Heart Checks Urged for Users of Diet Drugs*, NEW ORLEANS TIMES-PICAYUNE, Nov. 14, 1997, at A20, attached as Exhibit 249.

[142] *Id.*

[143] *See, e.g.*, Tara Meyer, *Fen-Phen, Redux Users: See Doctor*, CHARLOTTE OBSERVER, Nov. 14, 1997, at 9A, attached as Exhibit 250; 3 News This Morning (WBTV-TV television broadcast Nov. 14, 1997), attached as Exhibit 251; 5 News at 12:00 (WRAL-TV television broadcast Nov. 14, 1997), attached as Exhibit 252; 11 News at 5:30 (WTVD-TV television broadcast Nov. 14, 1997), attached as Exhibit 253.

[144] Tara Meyer, *Fen-Phen, Redux Users: See Doctor*, CHARLOTTE OBSERVER, Nov. 14, 1997, at 9A, attached as Exhibit 254.

[145] *Id.*

[146] *See, e.g.*, *Diet Drug Users Urged to Undergo Examination*, AUSTIN AM-STATESMAN, Nov. 14, 1997, at A5, attached as Exhibit 255; Tara Meyer, *Fen or Phen Users Urged to Get Exams; Government Advice Follows Diet Drug Recall*, FORT WORTH STAR-

[Footnote continued on next page]

Local television news reports did the same.[147]  The *Dallas Morning News* ran a front-page article entitled: "Fen-Phen Cautions Widened; All Who Used Diet Aid Urged to Get Checkups."[148]  The article detailed the government recommendation and quoted insurance spokesmen claiming that the checkups would be covered by particular insurance plans.  News broadcasts in the region stressed the urgency of getting a physical to the former users of Redux and fenfluramine.  For example, the ABC affiliate in Dallas reported that "[m]any obesity experts insisted all along that patients should get a heart exam just as soon as the FDA raised questions about the drug."[149]

---

[Footnote continued from previous page]
TELEGRAM, Nov. 14, 1997, at 1, attached as Exhibit 256; Tara Meyer, *Fen-Phen Users Told to See a Doctor*, SAN ANTONIO EXPRESS-NEWS, Nov. 14, 1997, at 01A, attached as Exhibit 257; Tara Meyer, *Redux, Fen-Phen Users Advised to Get Checkup/FDA Urges Testing for Heart Valve Damage*, HOUSTON CHRON., Nov. 14, 1997, at 21, attached as Exhibit 258.

[147] *See, e.g., 2 News* (KPRC-TV television broadcast, Nov. 13, 1997), transcript attached as Exhibit 259; *11 News at 5:00* (KHOU-TV television broadcast, Nov. 14, 1997), transcript attached as Exhibit 260; *11 News This Morning* (KTVT-TV television broadcast, Nov. 14, 1997), transcript attached as Exhibit 261; *Eyewitness News at 5:30* (KTRK-TV television broadcast, Nov. 14, 1997), transcript attached as Exhibit 262; *Fox News at 6:00* (KRIV-TV television broadcast, Nov. 14, 1997), transcript attached as Exhibit 263; *Good Day Dallas* (CSPAN-2 television broadcast, Nov. 14, 1997), transcript attached as Exhibit 264.

[148] Lawrence K. Altman, *Fen-Phen Cautions Widened: All Who Used Diet Aid Urged to Get Checkups*, DALLAS MORNING NEWS, Nov. 14, 1997, at 1A, attached as Exhibit 265.

[149] *8 News Daybreak* (WFAA-TV television broadcast, Nov. 14, 1997), transcript attached as Exhibit 266.

## IV.  Publicity Concerning Diet Drug Litigation and the National Class Action Settlement in 1999 and 2000

60.    In August 1999, a jury in Texas awarded Plaintiff Debbie Lovett more than $23 million in damages for injuries allegedly caused by her ingestion of Pondimin.  CNN broadcast news about the Lovett verdict, including in its coverage the fact that the Lovett case was "the first of thirty-one hundred pending fen-phen cases."[150]  The "CBS Evening News" also aired a story on the Lovett verdict, explaining not only the possible association between Pondimin and heart valve damage, but also noting the withdrawal of the drug in 1997.[151]  Other major newspapers, including the *Washington Post* and *The Wall Street Journal*, published news of the verdict as well.[152]

61.    The verdict also was reported in various local newspapers around the country.[153]  The *Salt Lake Tribune* published a story about the

_____

[150] *CNN Headline News Second Watch* (CNN Headline News television broadcast, August 6, 1999), transcript attached as Exhibit 267; *CNN Headline News* (CNN Headline News television broadcast, Aug. 6, 1999), transcript attached as Exhibit 268.

[151] *CBS Evening News* (CBS television broadcast, Aug. 6, 1999), transcript attached as Exhibit 269.  *See also NBC Nightly News* (NBC television broadcast, Aug. 6, 1999), transcript attached as Exhibit 272.

[152] *See Fen-Phen User Awarded $23 Million*, WASHINGTON POST, Aug. 7, 1999, at A05, attached as Exhibit 270; Robert Langreth, *American Home Is Ordered to Pay $23.36 Million in Diet-Drug Suit*, WALL ST. J., Aug. 9, 1999, at A4, attached as Exhibit 271.

[153] *See, e.g., Fen-Phen Maker Ordered to Pay Texan $23 Million*, DESERET NEWS (Salt Lake City, Utah), Aug. 6, 1999, at A06, attached as Exhibit 273; *A 36-Year Old Woman Who Faces Lifelong Heart . . .*, NEWSDAY (N.Y.), Aug. 7, 1999, at A07, attached as Exhibit 274; *$23 Million Awarded in Diet Drug Lawsuit; Texas Case, First of Its Kind to Go to a Jury, Opens Way For Others*, AUSTIN AM.-STATESMAN, Aug. 7, 1999, at A1, attached as Exhibit 275; Sharon Bernstein & Paul Jacobs, *Woman Wins $23 Million in Suit Against Fen-Phen Company*, BUFFALO NEWS, August 7, 1999, attached as Exhibit 277;Mike Finger, *$23 Million Awarded in Fen-Phen Case*, SAN ANTONIO EXPRESS-NEWS, Aug. 7, 1999, at 02A, attached as Exhibit 278; *Fen-Phen User Awarded $23 Million*, NEWS J. (Wilmington, Del.), Aug. 7, 1999, attached as Exhibit 279; Mike Finger,
[Footnote continued on next page]

verdict on its front page.[154] The story also was front-page news in

newspapers from Los Angeles to Fort Worth to Orlando.[155]

62.    Less than two months later, there was another massive wave of

publicity in the national and local media, when a nationwide class action

settlement agreement (the "Settlement") between Wyeth and users of

Pondimin and/or Redux was tentatively approved by the United States

District Court for the Eastern District of Pennsylvania (the "MDL Court").

In the Settlement, Wyeth agreed to pay $3.75 billion – a virtually

unprecedented sum.  Not only was the Settlement highly publicized, but an

"elaborate and excessive plan of notice" was employed to ensure that notice

[Footnote continued from previous page]
*Fen-Phen User Draws $23M in First Award*, PATRIOT LEDGER, Aug. 7, 1999, at 04, attached as Exhibit 280; Mike Finger, *Texan Wins Suit Over Diet Drug Fen-Phen Maker to Appeal Big Award*, ATLANTA J. & ATLANTA CONST., Aug. 7, 1999, at A4, attached as Exhibit 282; Mike Finger, *Woman Wins $23 Million in Lawsuit over Fen-Phen; Jury Buys Claim That Diet Drug Damaged Heart*, NEW ORLEANS TIMES-PICAYUNE, Aug. 7, 1999, at A19, attached as Exhibit 285; Mike Finger, *Woman With Heart Woes Wins $23M in Diet Drug Case*, TIMES UNION (Albany, N.Y.), Aug. 7, 1999, at A5, attached as Exhibit 286; *Jury Pinches Fen-Phen Maker for $23 Million in Liability Case*, FLA. TIMES-UNION, Aug. 7, 1999, at A6, attached as Exhibit 287; Kate Perrotta, *Fat City for Fen-Phen Victim: Diet-Drug Jury Gives Texas Woman $23M*, N.Y. POST, Aug. 7, 1999, at 7, attached as Exhibit 288; *Women Wins $23 Million in Fen-Phen Case*, HOUSTON CHRON., Aug. 7, 1999, at 1, attached as Exhibit 289; *Woman Wins Diet Drug Case*, GREENSBORO NEWS & REC. (N.C.), Aug. 7, 1999, at A4, attached as Exhibit 290; *Woman Wins Diet-Drug Lawsuit*, TAMPA TRIB., Aug. 7, 1999, at 11, attached as Exhibit 291; Jim Yardley, *$23 Million Awarded in Diet-Pill Suit; Courts: A Texas Woman Says She Has Heart Damage after Taking 'Fen-Phen' to Lose Weight*, ORANGE COUNTY REG. (Cal.), Aug. 7, 1999, at A01, attached as Exhibit 292.

[154] See Mike Finger, *Fen-Phen User Wins $23 Million*, SALT LAKE TRIB., Aug. 7, 1999, at A1, attached as Exhibit 281.

[155] See Sharon Bernstein, *Jury Awards $23.3 Million in Fen-Phen Case*, LOS ANGELES TIMES, Aug. 7, 1999, at A1, attached as Exhibit 276; Mike Finger, *Woman Wins $23.36 Million in Fen-Phen Suit*, FORT WORTH STAR-TELEGRAM, Aug. 7, 1999, at 1, attached as Exhibit 284; Mike Finger, *Woman Awarded $23 Million in Diet-Drug Cases*, ORLANDO SENTINEL, Aug. 7, 1999, at A1, attached as Exhibit 283.

would reach all those affected by the settlement as practicably as possible, as Judge Bechtle explained in his subsequent opinion that approved the Settlement as fair, reasonable, and adequate.[156]

63.    The Settlement agreement was widely reported in the national news.[157] The *New York Times* featured on its front page in a story entitled "Fen-Phen Maker to Pay Billions in Settlement of Diet-Injury Cases."[158] The Settlement also received front page attention in *The Wall Street Journal*.[159]

64.    News of the Settlement also was reported in local media throughout the country.  Newspapers in a wide variety of states, such as California, Florida, Texas, North Carolina, Massachusetts, and Louisiana, all reported that Wyeth would pay "billions" to settle diet-drug lawsuits.[160]

---

[156] *See In re Diet Drugs Prod. Liab. Litig.*, Civ. A. No. 99-20593, 2000 WL 1222042, at *35 (E.D. Pa. Aug. 28, 2000), attached as Exhibit 309.  The Settlement was first announced when a Memorandum of Understanding was signed in October 1999, attached as Exhibit 310.  The final agreement was signed November 18, 1999 and tentatively approved by Judge Bechtle on November 23, 1999, attached as Exhibit 311.  *Id.* at *5.

[157] *See, e.g.*, David Segal, *Fen-Phen Firm to Pay $3.75 Billion; AHP Settlement Covers Current, Future Claims*, WASHINGTON POST, Oct. 8, 1999, at E01, attached as Exhibit 294; *American Home Products Diet-Drug Pact Advances*, WALL ST. J., Nov. 24, 1999, at A10, attached as Exhibit 296.

[158] David J. Morrow, *Fen-Phen Maker to Pay Billions in Settlement of Diet-Injury Cases*, N.Y. TIMES, Oct. 8, 1999, at A1, attached as Exhibit 293.

[159] *What's News*, WALL ST. J., Oct. 8, 1999, at A1, attached as Exhibit 295.

[160] *See, e.g.*, Sharon Bernstein & Paul Jacobs, *$4.83 Billion Offered to Settle Fen-Phen Claims; Pharmaceuticals: American Home Products Will Compensate Thousands of Patients Who May Have Suffered Heart Damage*, LOS ANGELES TIMES, Oct. 8, 1999, at C1, attached as Exhibit 297; *Diet-Drug Maker Agrees to Pay Up to $4.83 Billion*, ORLANDO SENTINEL, Oct. 8, 1999, at A3, attached as Exhibit 298; *Fen-Phen Marketer to Pay $3.75B to Settle Suits*, BOSTON HERALD, Oct. 8, 1999, at 7, attached as Exhibit 299; *Firm Agrees to Settle Fen-Phen Suits; $3.75 Billion is Set Aside For Claims*, NEW ORLEANS TIMES-PICAYUNE, Oct. 8, 1999, at C1, attached as Exhibit 300; Andy Geller, *Diet-Drug Maker to Pay Fen-Phen Victims $4.8B*, N.Y. Post, Oct. 8, 1999, at 4, attached
[Footnote continued on next page]

65.    In addition to this widespread national and local publicity concerning the Settlement, the MDL Court approved an elaborate notice program—running from November 1999 to February 2000—that employed sophisticated media techniques designed to reach all diet drug users.[161]  That campaign used television messages that were broadcast 106 times over a period of five weeks on network television, and were broadcast 781 times for six consecutive weeks on various cable networks.[162]  The text of the television message warned viewers about possible heart valve problems from diet drugs:

> If you took the diet drug combination known as FenPhen or the diet drugs Pondimin or Redux, you may have heart valve problems and not know it. As a result of the proposed class action settlement, you could be eligible for free medical testing and compensation. But you must act promptly. You must decide whether to participate in this settlement by March 30, 2000. If you do nothing,

---

[Footnote continued from previous page]
as Exhibit 301; Ron Nissimov, *$4.83 Billion Offered in Fen-Phen Suit; Lawyers Say Deal Could Unravel*, HOUSTON CHRON., Oct. 8, 1999, at 3, attached as Exhibit 302; Amy Westfeldt, *Company to Pay $4.83 Billion in Fen-Phen Settlement*, SAN ANTONIO EXPRESS-NEWS, Oct. 8, 1999, at 01A, attached as Exhibit 303; Amy Westfeldt, *Fen-Phen Payout May Top $4 Billion*, ATLANTA CONST., Oct. 8, 1999, at 1A, attached as Exhibit 304; Amy Westfeldt, *Fen-Phen Settlement is Largest Ever Offered in a Liability Case*, CHARLOTTE OBSERVER, at 4A, Oct. 8, 1999, attached as Exhibit 305; *Fen-Phen Nearly Settled*, BOSTON HERALD, at 17, Nov. 20, 1999, attached as Exhibit 306; *Judge Gives Initial OK to Fen-Phen Pact*, LOS ANGELES TIMES, at C4, Nov. 24, 1999, attached as Exhibit 307; *Preliminary Approval For Fen-Phen Settlement*, SAN FRANCISCO CHRON., Nov. 24, 1999, attached as Exhibit 308.

[161] *In re Diet Drugs*, 2000 WL 1222042, at *35, attached as Exhibit 309.
[162] *See id.*

your legal rights will be affected.  Call 1-800-386-2070 today.[163]

66.     A summary notice of the Settlement was also published in the print media throughout the United States.[164]  This notice appeared repeatedly in numerous and varied magazines, including *Parade, People, Time, Ladies Home Journal, Redbook,* and *Good Housekeeping.*[165]  Banner ads also were developed for use on the Internet.[166]  The summary notice was further published in several national and seventy-seven local newspapers, as well as in a variety of publications targeted to healthcare providers and pharmacists.[167]  In addition, notice was mailed to all pharmacists and doctors who were likely to have prescribed Pondimin or Redux or treated patients for complications resulting from their use.  That package included, among other things, a "counter card" which pharmacists and physicians could display to alert patients about the existence of the Settlement, with a toll-free number and website to contact for further information.[168]

67.     As the MDL Court concluded, "[t]he media program . . . was highly successful," in part because it was "greatly enhanced by the enormous publicity that has surrounding the diet drugs involved in this

---

[163] *See id.* at *35 n.11.

[164] *See id.; see also* Official Court Notice: Attention Anyone Who Took "Fen-Phen," Pondimin and/or Redux, attached as Exhibit 312.

[165] *See In re Diet Drugs,* 2000 WL 1222042, at *35 & n.12, attached as Exhibit 309.

[166] *See id.* at *35.

[167] *Id.* at *35-36.

[168] *Id.* at *36.

litigation and the publicity of this Settlement."[169]  In fact, according to a

media analysis, 97% of women between the ages of 25 and 54 viewed one or

more forms of televised or printed notice an average of 10 times, and almost

80% of women in the same age group were exposed to the televised or

printed notice a minimum of five times.[170]

*       *       *

I, the undersigned, declare under penalty of perjury that the facts set forth

herein concerning the publicity with respect to the health risks associated

with diet drugs are true and correct to the best of my knowledge, information

and belief.


Sharon L. Taylor
Executed in Washington, D.C.,
on July 21, 2003

---

[169] *Id.* at *36.

[170] *Id.* at *36 n.16.

Exhibits 1-321 to Exhibit 15 of the Notice of
Removal are contained in the Appendix,
which appears after Exhibits 1-18 of the
Notice of Removal

09-10-2003  03:55pm  From-

T-394  P.002/020  F-744

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS                    :    MDL DOCKET NO. 1203
(PHENTERMINE, FENFLURAMINE,          :
DEXFENFLURAMINE) PRODUCTS            :
LIABILITY LITIGATION                :
                                     :
THIS DOCUMENT RELATES TO:           :
                                     :
_____     :
LORETTA FERRELL                     :
                                     :
          v.                        :
                                     :
WYETH, et al.                       :    CIVIL ACTION NO. 03-20094

MEMORANDUM AND PRETRIAL ORDER NO. 2996

Bartle, J.                                September 5, 2003

          Before the court is the motion of plaintiff Loretta
Ferrell to remand this action to the Circuit Court of Montgomery
County, Alabama.  The motion is before the undersigned as the
transferee judge in MDL 1203, the mass tort litigation involving
the diet drugs commonly known as Fen-Phen.  No federal claim for
relief is alleged.[1]

          In brief summary, plaintiff, a citizen of Alabama,
filed suit for heart valve damage sustained as a result of her

_____
1.  Although plaintiff's complaint alleges that Wyeth was
negligent in violating sections of the Federal Food, Drug and
Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq., these contentions
are apparently included as a reference to a minimum standard of
care for the pharmaceutical industry towards its customers.
These claims do not create federal question jurisdiction because
there is no private right of action for FDCA violations.  21
U.S.C. § 337; Merrell Dow Pharmaceuticals Inc. v. Thompson, 478
U.S. 804, 811 (1986); In re: Orthopedic Bone Screw, 193 F.3d 781,
789 (3d Cir. 1999).

use of Pondimin,[2] one of the weight loss drugs.  The complaint
names as defendants:  (1) Wyeth,[3] the manufacturer of Pondimin
and a party of diverse citizenship from the plaintiff; and (2)
Dr. Kynard Adams, an Alabama physician who prescribed Pondimin to
the plaintiff.

While Pondimin was withdrawn from the market in
September, 1997, plaintiff alleges that she did not become aware
of her injuries until December 8, 2001, when she had an
echocardiogram.  Some nine months later, on August 15, 2002, she
filed her complaint in the state court.  On September 18, 2002,
Wyeth timely removed the action to the United States District
Court for the Middle District of Alabama, and plaintiff
thereafter moved to remand under 28 U.S.C. § 1446.  The Alabama
federal court deferred ruling on plaintiff's motion, and the case
thereafter was transferred to this court as part of MDL 1203.

The plaintiff maintains that remand is appropriate
because complete diversity does not exist as required under 28
U.S.C. § 1332(a).  Defendant Wyeth counters that plaintiff has
fraudulently joined Dr. Adams because the claims against him are
barred by the statute of limitations[4] incorporated in the Alabama

---

2.  Pondimin was the trade name under which Wyeth marketed
fenfluramine, half of the diet drug cocktail known as "Fen-Phen."
Dexfenfluramine, containing the same active ingredient as
fenfluramine, was also marketed by Wyeth, and was known under the
trade name Redux.

3.  Wyeth was previously known as American Home Products
Corporation.

4.  As part of the Nationwide Class Action Settlement presided
(continued...)

Medical Liability Act ("AMLA"), which governs all claims filed by patients against their physicians. Ala. Code § 6-5-482. Wyeth contends, therefore, that his citizenship should be disregarded for purposes of determining diversity of citizenship of the parties.

I.

Under the federal removal statute, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court." 28 U.S.C. § 1441(a). Federal district courts have original jurisdiction over all civil actions between citizens of different states if the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a)(1). Complete diversity, of course, is required. Owen Equip. and Erection Co., 437 U.S. 365, 373-74 (1978). If an action originally instituted in a state court could have been brought in federal court pursuant to diversity jurisdiction, the defendants may remove it to federal court provided certain procedures are followed and certain conditions met. 28 U.S.C. §§ 1441 and 1446. Similarly, if the federal court subsequently determines that it does not have subject matter jurisdiction over a removed action, it must remand

---

(...continued)
over by our predecessor Judge Louis C. Bechtle, Wyeth agreed "not to assert any defense based on any statute of limitations or repose" with respect to plaintiffs who exercised intermediate opt-out rights and who initiated lawsuits within one year of doing so. In return, plaintiffs may not seek punitive damages. Settlement Agreement at IV.D.3.c.

the action to the state court where it originated.   28 U.S.C.
§ 1447(c).  A plaintiff or a defendant may seek to remand the
case, or the court may do so on its own motion.  American Fire &
Cas. Co. v. Finn, 341 U.S. 6, 16-19 (1951); 16 Moore's Federal
Practice, § 107.41[1][a] & [b] (Matthew Bender 3d ed.).  See
Moses v. Ski Shawnee, Inc., 2000 WL 1053568 at *1 (E.D. Pa.
July 31, 2000).

     As an MDL court sitting within the Third Circuit, we
must apply our Court of Appeals' fraudulent joinder standard.
See In re Korean Airlines Disaster, 829 F.2d 1171, 1173-74 (D.C.
Cir. 1987); In re Ikon Office Solutions, Inc. Secs. Litig., 86 F.
Supp. 2d 481, 484 (E.D. Pa. 2000).  As set forth in Boyer v.
Snap-on Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990), "joinder
is fraudulent where there is no reasonable basis in fact or
colorable ground supporting the claim against the joined
defendant, or no real intention in good faith to prosecute the
action against the defendant or seek a joint judgment" (emphasis
added).  The presence of a party fraudulently joined cannot
defeat removal.  Wilson v. Republic Iron & Steel Co., 257 U.S.
92, 97 (1921).

     We recognize that the burden on Wyeth to establish
fraudulent joinder is a heavy one.  Boyer, 913 F.2d at 111.  We
"must resolve all contested issues of substantive fact in favor
of the plaintiff."  Id.  We are also cognizant that the removal
statute must be construed narrowly, and "all doubts should be
resolved in favor of remand."  Steel Valley Auth. v. Union Switch

-4-

and Signal Div., 809 F.2d 1006, 1010 (3d Cir. 1987) (citation
omitted).  The Supreme Court made it clear in Wilson that if a
plaintiff contests a defendant's assertion that joinder of
another defendant was a sham to defeat removal, the District
Court must determine the facts from the evidence.  Wilson, 257
U.S. at 97.  We are not to decide automatically in favor of
remand simply because some facts may be said to be in dispute.

On matters of substantive law, "[i]f there is even a
possibility that a state court would find that the complaint
states a cause of action against any one of the resident
defendants, the federal court must find that joinder was proper
and remand the case to state court."  Boyer, 913 F.2d at 111
(citation omitted).  We are mindful that our inquiry into Wyeth's
claim of fraudulent joinder is less searching than that
permissible when a party seeks to dismiss a claim under Rule
12(b)(6) of the Federal Rules of Civil Procedure.  Batoff v.
State Farm Ins. Co., 977 F.2d 848, 852 (3d Cir. 1992); see also
Gaul v. Neurocare Diagnostic, Inc., No. 02-CV-2135, 2003 WL
230800 at *2 (E.D. Pa. Jan. 3, 2003).  In other words, simply
because a claim against a party may ultimately be dismissed for
failure to state a claim, that party was not necessarily
fraudulently joined.  The test is whether this court thinks there
is a "reasonable basis" for finding the claim to be colorable,
that is, whether it is not "wholly insubstantial and frivolous."
Batoff, 977 F.2d at 852 (citation ommitted).

## II.

The issue before this court is whether plaintiff has
fraudulently joined Dr. Adams, the prescribing physician and a
citizen of Alabama, solely for the purpose of destroying
diversity of citizenship to prevent removal.  Plaintiff has
brought claims against him for fraud and fraudulent concealment
(count five) as well as for medical negligence (count six).
Wyeth argues that the complaint does not state a colorable claim
against Dr. Adams for either fraudulent concealment or
negligence, because both allegations are time-barred under the
AMLA, which states in relevant part:

> (a) All actions against physicians ... <u>must
> be commenced within two years</u> ... and not
> afterwards; provided, that if the cause of
> action is not discovered and could not
> reasonably have been discovered within such
> period, then the action may be commenced
> within six months from the date of such
> discovery or the date of discovery of facts
> which would reasonably lead to such
> discovery, whichever is earlier; provided
> further, that in no event may the action be
> commenced more than four years after such act
> ....
> (b) Subsection (a) of this section shall be
> subject to all existing provisions of law
> relating to the computation of statutory
> periods of limitation for the commencement of
> actions, namely, Sections ... 6-2-3 ...
> provided, that ... no action shall be
> commenced more than four years after the act,
> omission, or failure complained of ....

Ala. Code § 6-5-482 (emphasis added).  This statute governs all
claims by a patient against her physician arising from the
physician-patient relationship.  <u>Collins v. Ashurst</u>, 821 So.2d
173, 175 (Ala. 2001).  It sets forth a two-year limitations

-6-

period and a four-year statute of repose.  Ala. Code § 6-5-482.
While plaintiff concedes that roughly five years have elapsed
between the time when Pondimin was withdrawn from the market and
the time when she filed her lawsuit, she argues that either the
discovery rule or the doctrine of fraudulent concealment tolled
the limitations period.

                                III.

        The limitations period for a medical malpractice action
under the AMLA begins to run upon the accrual of a cause of
action, that is, when the act complained of results in legal
injury to the plaintiff.  See McCormick v. Aderholt, 293 F.3d
1254, 1260 (11th Cir. 2002) (applying Alabama law); Mobile
Infirmary v. Delchamps, 642 So.2d 954, 958 (Ala. 1994); Grabert
v. Lightfoot, 571 So.2d 293, 294 (Ala. 1990).  The key inquiry in
determining the accrual date of a claim is not the date of the
doctor's negligent act, or the date on which the plaintiff became
aware of her injury, but the time when she first suffered the ill
effect of the wrongful act.  Ex parte Sonnier, 707 So.2d 635, 637
(Ala. 1997).  Since there is no latency period between ingestion
of Pondimin and any injury,[5] plaintiff's injury at the latest

_____

5.  Judge Louis C. Bechtle, who presided over the fairness
hearing in connection with the approval of the Nationwide Class
Action Settlement, found that there is no latency period between
the time of diet drug use and injury.  In his August 20, 2000
Order approving the settlement, Judge Bechtle stated "[t]he
absence of a latency period between ingestion of [the diet drug]
and the development of clinically detectable [heart disease] is
... confirmed by a number of studies...  Each of these studies
finds that there was no emergence of new disease after some
latency period."  Memorandum and Pretrial Order No. 1415 at 106-
                                                (continued...)

                                -7-

commenced, and thus the limitations period began to run, shortly
after the diet drugs were pulled from the market in September,
1997.  Considering only the two-year limitations period,
plaintiff would have needed to file her complaint by late 1999.
Her August, 2002 filing is well beyond this deadline.

However, as stated above, if the cause of action is not
discovered and could not reasonably have been discovered within
the two-year period, § 6-5-482(a) permits plaintiff to commence
her action within six months from the time she discovers or
reasonably could have discovered her injury.  Plaintiff maintains
that she did not discover her injury until December 8, 2001 when,
on her own initiative, she underwent an echocardiogram.  Assuming
this to be true, the six-month safe harbor provided for in § 6-5-
482(a) expired by June 7, 2002.  Because plaintiff did not file
her complaint until August 15, 2002, more than eight months after
discovering her injury, we find she has no colorable claim in
medical negligence against Dr. Adams.

Plaintiff attempts to avoid the operation of the
statutory bar by asserting that "some of the conduct constituting
negligence - failing to inform the Plaintiff of the need for
action - continued to the point in time where such conduct
occurred well within the statutory limitations period."
Plaintiff's Reply to Defendant Wyeth's Opposition to Remand
(Oct. 22, 2002) at 6-7.  Plaintiff points to no additional facts

_____

(...continued)
07 (Aug. 28, 2000).

-8-

or authority in support of her position.  In her complaint,
however, plaintiff alleges that Dr. Adams failed to advise her to
have an echocardiogram or cardiovascular examination to determine
if she had sustained injuries after the United States Department
of Health and Human Services ("DHHS") issued treatment
recommendations to physicians regarding the diet drugs.
Plaintiff's Original Complaint ¶¶ 86, 87, 90, 92.  These
recommendations were first issued after the diet drugs were
withdrawn from the market in September, 1997 and later
republished by the American College of Cardiology in  November,
1998.  Id. ¶ 77.

        Plaintiff's argument is without merit.  Clearly, any
failure by Dr. Adams to inform plaintiff to have an
echocardiogram following the issuance of DHHS treatment
recommendations would have occurred more than two years before
suit was filed.  See id. at ¶ 92.  Moreover, as defendant Wyeth
points out, Dr. Adams last treated plaintiff in February, 1999,
more than three years before plaintiff commenced her action.  As
noted above, even assuming that the discovery rule of § 6-5-
482(a) applies to toll the running of the limitations period,
plaintiff's filing in August, 2002 occurred more than six months
after the December 8, 2001 echocardiogram, when she necessarily
discovered Dr. Adams' failure.

                           IV.

        The plaintiff also contends that she properly has
pleaded fraud and fraudulent concealment against Dr. Adams, and

                          -9-

therefore those claims are not barred by the statute of
limitations.  She alleges in her complaint that Dr. Adams
concealed the dangers of Pondimin, and failed to advise her to
get an EKG although he was "aware ..., or as a medical
practitioner, was under a duty to become aware" of the dangers of
the diet drug.

It constitutes fraud for a party intentionally not to
communicate a material fact to another who relies to her
detriment on the omission when the party possessing the material
fact has a confidential relationship with the other person.  Ala.
Code § 6-5-102; Johnson v. McMurray, 461 So.2d 775, 778 (Ala.
1984).  The Alabama Supreme Court has determined that the
relationship between a doctor and patient is a confidential one,
and therefore recognizes a patient's cause of action against a
physician for fraud or fraudulent concealment.  Id.; Horn v.
Citizens Hosp., 425 So.2d 1065, 1068-70 (Ala. 1984).  However,
once the confidential relationship ends, there is no continuing
duty to communicate a material fact learned thereafter.

Where there is fraud or concealment of tortious
conduct, the AMLA specifies that the "claim must not be
considered as having accrued until the discovery ... of the fact
constituting the fraud, after which [the aggrieved party] must
have two years within which to prosecute his [or her] action."
Ala. Code §§ 6-2-3, 6-5-482(b).  Fraud, however, does not toll
the statute of repose.  Notwithstanding any tolling provision, an
action for fraud must be brought within four years after the

-10-

fraudulent act occurred.  As the Alabama Supreme Court stated in
Trammer v. Bernstein, 596 So.2d 572, 575 (Ala. 1991), "a
plaintiff should be entitled to maintain an action based on fraud
or misrepresentation arising out of an act or omission by a
physician as long as that action was filed within two years of
the discovery of the fraud or misrepresentation and within four
years of the [fraudulent] act or omission."  Id.; Ala. Code §§ 6-
2-3, 6-5-482(b).

        In order to determine the validity of plaintiff's fraud
claims, we first turn to the two-year statute of limitations.
Bryant v. Wyeth, et al., No. 02-632-BH-M, slip op. at 7 (S.D.
Ala. Sept. 24, 2002).  A claim for fraud or fraudulent
concealment accrues for purposes of the two-year limitation
period on the date the fraud was discovered or should have been
discovered in the exercise of reasonable diligence.  Auto-Owners
Ins. Co. v. Abston, 822 So.2d 1187, 1194 (Ala. 2001).  Plaintiff
states that like the plaintiff in Bryant, she did not discover
her injury until she had an ecocardiogram that revealed heart
damage more than four years after she ceased taking the diet
drug.  Applying Alabama law, the United States District Court for
the Southern District of Alabama concluded in Bryant that
discovering the injury was contemporaneous with discovering the
fraud, and thus the relevant date of accrual for the fraud
action.  Bryant, No. 02-632-BH-M, slip op. at 8 (S.D. Ala. Sept.
24, 2002).  Because the plaintiff filed suit within two years of
discovery, the court found she had "an arguably viable cause of

-11-

action under Alabama law," and therefore remanded the case to
state court.  Id. at 10.

Here, plaintiff urges this court to follow the
precedent of Bryant.  If, as she argues, discovery of the injury
via the echocardiogram is the relevant date to start the clock
ticking, then the case should be remanded because plaintiff's
August, 2002 filing is well within the two-year period set out in
Ala. Code § 6-2-3.  Wyeth, on the other hand, contends that the
massive publicity surrounding the withdrawal of Pondimin from the
market should have triggered notice to plaintiff of the alleged
fraud more than two years before she filed her claim in August,
2002.  Therefore, Wyeth argues that plaintiff has no colorable
claim in fraud against Dr. Adams.  We note that Bryant did not
discuss the issue of whether the plaintiff there knew or should
have known about the injury prior to her echocardiogram.

The withdrawal of Pondimin and its chemical cousin
Redux from the market on September 15, 1997 was subject to an
extraordinary amount of publicity by Wyeth, the federal
government and national and local media.  Immediately after
removing the drugs from the market, Wyeth issued a press release
advising patients who had used the diet drugs to consult their
physicians.  It included the same message in full page
advertisements that it purchased in leading national and regional
newspapers.  These advertisements led with a banner in large
print, stating "An Important Message To Patients Who Have Used
Pondimin or Redux."   Furthermore, Wyeth sent a "Dear Health Care

-12-

Provider Letter" to approximately 450,000 doctors and pharmacists
informing them of the withdrawal of the drugs from the market and
of the potential association between use of the drugs and
instances of valvular heart disease.

The federal government also acted swiftly to apprise
former diet drug users about the dangers potentially linked to
use of the diet drugs.  The FDA issued a press release in
September, 1997 announcing the withdrawal of the products and
cautioning consumers that approximately 30 percent of diet drug
patients who were evaluated had abnormal echocardiograms, albeit
no symptoms.  Shortly thereafter, on November 14, 1997, the DHHS
published its health recommendations directed to those
individuals who formerly had used Pondimin or Redux.  These
recommendations, which were again published by the American
College of Cardiology less than one year later, advised former
diet drug users to see their physicians.

The efforts undertaken by Wyeth and the federal
government to inform diet drug consumers about the possible
dangers linked to fen-phen were enhanced significantly by
national and local media, which extensively broadcast and
published stories about fen-phen and its withdrawal from the
market.  Reports about the removal of the drugs became national
headlines on nightly news programs and the networks' morning
shows.  All of these reports emphasized the possible connection
between fen-phen and heart valve problems.  The print media was
no less generous in its treatment of the story.  Front page and

-13-

other stories appeared in the USA Today in September and October,
1997.  The Washington Post carried a front page story as well,
the headline of which read, "2 Diet Drugs are Pulled Off Market;
Health Concerns Grow After FDA Links Pills to Rare Heart
Problem."  Both plaintiff and Dr. Adams are residents of
Montgomery, Alabama.  Locally in Alabama, the Montgomery
Advertiser provided high-profile coverage, publishing no fewer
than six stories between July 9, 1997 and September 23, 1997
documenting the potential links between the diet drugs and
certain health risks.

      Widespread media attention related to fen-phen and
valvular heart disease continued after the DHHS released its
health recommendations in November, 1997.  The three major
broadcast networks, as well as CNN and CNN Headline News carried
stories contemporaneously with the announcement of the treatment
advice.  The print media, including the Montgomery Advertiser
published similar stories as well.

      Even if plaintiff somehow was not on notice of any
fraud by Dr. Adams by late 1997, she certainly should have known
about it by Spring, 2000, when the comprehensive notice campaign
regarding the proposed nationwide class action settlement
agreement with Wyeth ended.  See Pretrial Order ("PTO") No. 997
(Nov. 23, 1999).[6]  This notice program "employed sophisticated
media techniques and was designed to reach all class members" to

_____

6.  The Settlement Agreement was approved on August 28, 2000
after an extensive fairness hearing.  Memorandum and PTO No. 1415
at 62-66.

-14-

make them "aware of the potential risks posed by Pondimin and

Redux." Memorandum and PTO No. 1415 (Aug. 28, 2000) at 79-80.

The exhaustive and far-reaching nature of this notice campaign

was described in detail by this court in PTO 1415:

> A television commercial was developed....
> [which] broadcast 106 times over a period of
> five weeks on network television. The
> television commercial message was also
> broadcast 781 times, for six consecutive
> weeks on various cable networks.
>
> A summary notice was prepared for use in the
> print media. The summary notice appeared
> repeatedly in several magazines between
> January and March 2000. The summary notice
> appeared as a one-third page black and white
> ad in four national newspapers, 77 local
> newspapers, 3 newspapers distributed
> throughout the U.S. Territories and four
> newspapers targeted to the Hispanic market.
> These newspapers were selected because they
> were national publications, or because they
> represented the principal newspapers in the
> top 15 markets in the United States, or
> because they were published in geographic
> areas having the highest usage of Pondimin
> and Redux and/or because they were targeted
> to African-American or Spanish speaking
> populations. In addition, the summary form of
> notice was published in a variety of
> publications targeted to healthcare providers
> and pharmacists. Banner ads were also
> developed for use on the Internet, directing
> potential class members to the official
> settlement web site where class members could
> receive information concerning the settlement
> and obtain a notice package. These banner
> advertisements were placed within several
> media categories on a variety of Internet
> publishers.
>
> In addition to the above, notice was
> transmitted by mail to all pharmacists in the
> United States and to doctors who were likely
> to have prescribed Pondimin or Redux or
> treated patients for complications resulting
> from the use of those drugs. Notices to these
> healthcare providers contained a "notice

-15-

package," a letter of explanation and a
counter card reflecting the summary form of
notice described above, which pharmacists and
physicians could display to alert patients
about the existence of the settlement and the
opportunity to obtain a "notice package" by
contacting the 1-800 number or official web
site..... Such mailings were transmitted to
784,128 physicians and to 108,288
pharmacists.

Id. at 80-82. (citations and footnotes omitted).[7]

    Assisted by the widespread publicity surrounding the

diet drugs, the media program concerning the proposed settlement

was "highly successful" at reaching targeted women. Id. at 83.

Indeed, media analyses demonstrated that:

    97% of women between the ages of 25 and 54
    viewed one or more forms of televised or
    printed notice an average of 10 times. A
    reach and frequency analysis indicated that
    almost 80% of women between the ages of 25
    and 54 were exposed to the message contained
    in the televised or printed forms of notice a
    minimum of five times.... In addition, a
    reach and frequency analysis indicated that
    the settlement message reached 97% of women

---

7.   Judge Bechtle also explained that the summary notice

    appeared ten times between January and February 2000 in
    the form of a full page black and white advertisement
    in Parade, People and Time magazines. A full page black
    and white version of the summary notice was inserted
    into eight monthly magazines during the month of
    February including Better Home & Gardens, Ladies Home
    Journal, Family Circle, McCalls, Women's Day, Redbook,
    Good Housekeeping and Ebony. Additional insertions of
    the summary notice appeared as a full page black and
    white advertisements in the March editions of Better
    Home & Gardens and Good Housekeeping. In addition, a
    two page black and white version of the summary notice
    was placed in Reader's Digest during the months of
    February and March 2000.

    Memorandum and PTO No. 1415 at 81 n.12 (citations omitted).

> 35 years and older an average of 11.4 times
> and that it reached 81% of women 35 years and
> older a minimum of five times. With respect
> to African-American women between the ages of
> 25 and 54, the reach and frequency analysis
> shows that the settlement message reached 97%
> of those women an average of 10.2 times and
> that 79% of African-American women between
> the ages of 25 and 54 viewed the message a
> minimum of five times.

Id. at 83 n.16 (citations omitted).  At the time of the notice campaign, Ms. Ferrell was in her early forties.

In light of the massive publicity concerning the health risks associated with the use of Pondimin, we find that plaintiff was on inquiry notice and should have discovered Dr. Adam's alleged fraud at the very latest by early Spring, 2000. Auto-Owners Ins. Co. v. Abston, 822 So.2d 1187, 1194 (Ala. 2001). Based on the two-year discovery period permitted under § 6-2-3, plaintiff would have needed to have filed her complaint sometime in the Spring of 2002.  Ala. Code § 6-2-3.  She did not do so. We find that there is no reasonable basis to sue Dr. Adams at this late date for fraud and fraudulent concealment. Consequently, we need not decide whether any act or omission giving rise to the claim  - the alleged concealment - happened more than four years before plaintiff filed suit in August, 2002.

V.

This effort to join Dr. Adams as a defendant is fraudulent.  It is a thinly veiled effort to destroy diversity of citizenship and prevent removal of this action to the United States District Court for the Middle District of Alabama.

-17-

09-10-2003  04:00pm  From-                                          T-394  P 019/020  F-744

Accordingly, we will deny the motion of plaintiff to remand this
action to the Circuit Court of Montgomery County, Alabama.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS                    :      MDL DOCKET NO. 1203
(PHENTERMINE, FENFLURAMINE,          :
DEXFENFLURAMINE) PRODUCTS            :
LIABILITY LITIGATION                 :
                                     :
THIS DOCUMENT RELATES TO:            :
                                     :
LORETTA FERRELL                      :
                                     :
                v.                   :
                                     :
WYETH, et al.                        :      CIVIL ACTION NO. 03-20094

PRETRIAL ORDER NO. 2996

        AND NOW, this **5th** day of September, 2003, for the
reasons set forth in the accompanying Memorandum, it is hereby
ORDERED that the motion of plaintiff Loretta Ferrell to remand
this action to the Circuit Court of Montgomery County, Alabama,
is DENIED.

                        BY THE COURT:

                        _____ J.

## STATE COURT OF FULTON COUNTY, GEORGIA

*Theresa Anderson, et al., v. Indevus f/k/a Interneuron;* Civil Action No. 2004vs066062A
*Sharon Beard, et al., v. Indevus f/k/a Interneuron;* Civil Action No. 2004vs066063A
*Carla Campbell, et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066064A
*Mary J. Ghorley, et al. v. Indevus f/k/a Interneuron;* Civil Action No. 2004vs066059A
*Kimara Godinez, et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066065A
*Diane Griffin, et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066066A
*Beverly Groseclose, et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066067A
*Kathryn Harding, et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066068A
*Bonita Herman, et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066069A
*Vickie Jensen, et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066070A
*Sandra Kates, et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066071A
*Koyano, Terry et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066072A
*Lee, Michelle S. et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066060A
*Lesowske, Shelly et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066073A
*Lords, Mary et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs060074A
*May, Linda et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066075A
*McKendrick, Cecil et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066076A
*Muije, Elizabeth et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066077A
*Porter, Deborah et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066078A
*Richardson, Nancy et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066079A
*Schmaltz, Cecelia et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066080A
*Schneiter, Laurel et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066081A
*Siepert, Lenna et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066082A
*Turnquist, Earlene et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066083A
*Wayne, Debra et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066084A
*White, Charlene et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066061A
*Wilde, Leta et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066085A
*Ziebarth, Marjorie et al., v. Indevus f/k/a Interneuron;* Civil Action No 2004vs066086A

## SUPERIOR COURT OF MUSCOGEE COUNTY, GEORGIA

*Lisa Angel, et al., v. David Downing, et al.;* Civil Action No. SV-04CV1392

*10*

## CONSENT TO REMOVAL

Defendant DAVID DOWNING hereby consents to the removal of this action.

This 13th day of May 2004.

M. Elizabeth O'Neill
Georgia Bar No. 058163
(*authorized with express permission*)

Hawkins & Parnell, LLP          *Attorneys for DAVID DOWNING*
4000 SunTrust Plaza
303 Peachtree St., N.E.
Atlanta, Georgia  30308
404-614-7400
404-614-7500 (Fax)

## CONSENT TO REMOVAL

Defendant INDEVUS PHARMACEUTICALS, INC., f/k/a INTERNEURON

PHARMACEUTICALS, INC. hereby consents to the removal of this action.

This 18th day of May 2004.

M. Elizabeth O'Neill
Georgia Bar No. 058163

Hawkins & Parnell, LLP
4000 SunTrust Plaza
303 Peachtree St., N.E.
Atlanta, Georgia  30308
404-614-7400
404-614-7500 (Fax)

*Attorneys for INDEVUS
PHARMACEUTICALS, INC., f/k/a
INTERNEURON
PHARMACEUTICALS, INC.*